WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Matthew S. Barr
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | |
|---|---|
| **In re** : | |
| : | **Chapter 11** |
| **FAIRWAY GROUP HOLDINGS** : | |
| **CORP.,** *et al.,* : | **Case No. 16-[_____] (___)** |
| : | |
| **Debtors.**[1] : | **(Joint Administration Pending)** |

---------------------------------------------------------------x

**MOTION OF DEBTORS PURSUANT TO 11 U.S.C.**
**§§ 105, 361, 362, 363, AND 364 AND FED. R. BANKR. P. 4001(b)-(c)**
**FOR AUTHORITY TO (A) OBTAIN POSTPETITION FINANCING,**
**(B) USE CASH COLLATERAL, (C) GRANT CERTAIN PROTECTIONS TO**
**PREPETITION SECURED PARTIES, AND (D) SCHEDULE A FINAL HEARING**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Fairway Group Holdings Corp. (2788); Fairway Group Acquisition Company (2860); Fairway Bakery LLC (4129); Fairway Broadway LLC (8591); Fairway Chelsea LLC (0288); Fairway Construction Group, LLC (2741); Fairway Douglaston LLC (2650); Fairway East 86th Street LLC (3822); Fairway eCommerce LLC (3081); Fairway Georgetowne LLC (9609); Fairway Greenwich Street LLC (6422); Fairway Group Central Services LLC (7843); Fairway Group Plainview LLC (8643); Fairway Hudson Yards LLC (9331); Fairway Kips Bay LLC (0791); Fairway Nanuet LLC (9240); Fairway Paramus LLC (3338); Fairway Pelham LLC (3119); Fairway Pelham Wines & Spirits LLC (3141); Fairway Red Hook LLC (8813); Fairway Stamford LLC (0738); Fairway Stamford Wines & Spirits LLC (3021); Fairway Staten Island LLC (1732); Fairway Uptown LLC (8719); Fairway Westbury LLC (6240); and Fairway Woodland Park LLC (9544). The location of the Debtors' corporate headquarters is 2284 12th Avenue, New York, New York 10027.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Fairway Group Holdings Corp. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**," and, together with their non-debtor affiliate,[2] "**Fairway**"), respectfully represent:

### Preliminary Statement[3]

1.     The Debtors commenced these prepackaged chapter 11 cases to execute a comprehensive reorganization designed to de-lever Fairway's balance sheet and position it for long-term sustainability and growth.  The Debtors' new lean capital structure will ensure that Fairway will continue to provide the high-quality shopping experience that Fairway's customers, vendors, and employees expect from its iconic brand.  Prior to the commencement of these cases, the Debtors commenced the solicitation of votes from their Prepetition Lenders (as hereinafter defined), the only class of voting creditors on the Prepackaged Plan (as hereinafter defined).  Significantly, the reorganization transaction embodied in the Prepackaged Plan will provide Fairway with an infusion of new capital through postpetition debtor-in-possession financing ("**DIP Financing**") that will be converted to exit financing upon consummation of the Prepackaged Plan.  Upon their exit from chapter 11, the Debtors estimate that Fairway will have approximately $42 million of cash and cash equivalents on its balance sheet.

2.     The DIP Financing is being provided by certain of the Debtors' Prepetition Lenders who are parties to the restructuring support agreement (the "**RSA**") and have agreed to the priming of their existing prepetition liens.  The Prepetition Lenders are secured by

---

[2] Affiliate Fairway Lake Grove LLC ("**Lake Grove**") is not a Debtor in these cases.

[3] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Interim DIP Order (as hereinafter defined) and/or the DIP Loan Documents (as hereinafter defined).

WEIL:\95676752\10\44444.0005

first priority liens on substantially all of Fairway's assets (the "**Prepetition Liens**").  The DIP Financing before the Court is a cornerstone of the Prepackaged Plan and the numerous transactions entered into by the Debtors in connection therewith.

3.     To obtain the liquidity necessary to administer these chapter 11 cases and continue their grocery operations in the ordinary course of business, the Debtors have procured and seek approval of (i) a $55 million new money non-amortizing senior secured postpetition term loan facility (the "**Term DIP Facility**," the loans under the Term DIP Facility, the "**DIP Loans**," and the lenders under the Term DIP Facility, the "**DIP Term Lenders**") and (ii) a senior secured revolving credit facility available for the issuance of letters of credit in an aggregate principal amount not to exceed $30,611,941  (the "**LC DIP Facility**" and, together with the Term DIP Facility, the "**DIP Facility**")  pursuant to that certain Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement (the "**DIP Loan Agreement**" and the other agreements and documents executed or delivered in connection therewith, the "**DIP Loan Documents**"),[4] by and among Fairway Group Acquisition Company, as borrower ("**Fairway Acquisition**" or "**Borrower**"), each of the other Debtors and their non-debtor affiliate, Lake Grove, as guarantors, Credit Suisse AG, Cayman Islands Branch ("**Credit Suisse**"), as administrative and collateral agent (in such capacities, the "**DIP Agent**"), and the lenders party thereto (the "**DIP Lenders**").

4.     The DIP Facility provides the financing necessary to provide the Debtors sufficient liquidity to seamlessly operate in chapter 11 and maintain key relationships with employees, vendors, suppliers, and customers.  Absent the DIP Financing, the Debtors would lack the working capital needed to fund these cases and continue their operations.

---

[4] A copy of the form of DIP Loan Agreement is annexed to the Interim DIP Order as **Exhibit "1."**

WEIL:\95676752\10\44444.0005

5.     Additionally, as stated, the DIP Facility, among other things, provides the Debtors with access to sufficient working capital to ensure a smooth exit from chapter 11.  Upon the Debtors' emergence from bankruptcy, the Term DIP Facility and the LC DIP Facility will convert on a dollar-for-dollar basis into a first-out senior secured exit term loan (the "**First Out Exit Term Loan**") and a revolving credit facility available for the issuance of letters of credit (the "**Exit LC Facility**"), respectively.  As a fee for the conversion of the DIP Loans to the First Out Exit Term Loan, the DIP Term Lenders will be entitled to receive 10% of the new common stock of reorganized Fairway Group Holdings Corp. ("**Reorganized Holdings**") pursuant to the Prepackaged Plan.

6.     As set forth in further detail below, the Debtors have satisfied the requirements under section 364 of title 11 of the United States Code (the "**Bankruptcy Code**") to obtain approval of the DIP Facility.[5]  Substantially all of the Debtors' assets are encumbered by valid and perfected Prepetition Liens.  As a result, the Debtors could only obtain postpetition financing from a third party on an unsecured or junior priority basis or on a priming basis subject to the consent of the Prepetition Lenders, or approval of the Court over the objection of the Prepetition Lenders.  The Debtors contacted eight (8) parties to ascertain their interest in extending postpetition financing to the Debtors, but none of the parties offered financing to the Debtors on terms more favorable than those provided by the DIP Lenders.  *See* Stogsdill Decl. ¶ 67.

---

[5] Additional facts and circumstances supporting this Motion and detailing the Debtors' DIP Financing marketing and negotiation process are set forth in the Stogsdill Declaration (as hereinafter defined).

WEIL:\95676752\10\44444.0005

## Summary of Terms of the DIP Facility[6]

7.      In accordance with Bankruptcy Rules 4001(b) and (d) and Rule 4001-2(a)

of the Local Rules of Bankruptcy Procedure for the Southern District of New York (the "**Local**

**Rules**"), the below chart summarizes the significant terms of the Interim DIP Order and the

DIP Loan Documents.

| MATERIAL TERMS OF THE DIP FACILITY | |
|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Fairway Acquisition.<br>*See* **DIP Loan Agreement, Preamble.** |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Fairway Group Holdings Corp. and each of Fairway Acquisitions' Debtor and non-debtor subsidiaries.<br>*See* **DIP Loan Agreement, Preamble; Interim DIP Order Recital (IA).** |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Certain of the Prepetition Lenders who have agreed to be DIP Commitment Parties.  Each Prepetition Lender will be offered the opportunity to participate as a DIP Lender on a pro rata basis.<br>*See* **DIP Loan Agreement Recitals.** |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Credit Suisse AG, Cayman Islands Branch.<br>*See* **DIP Loan Agreement, Preamble.** |
| **DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(a)(ii) | (i) $55 million senior secured new money non-amortizing term loan facility and a (ii) $30,611,941 senior secured revolving credit facility available for the issuance of letters of credit. *See* **DIP Loan Agreement, Recitals; Interim DIP Order Recital (i).** |
| **Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B) | Term Facility: Initial draw of $15 million upon entry of the Interim Order.<br><br>LC DIP Facility: DIP LCs may be utilized only during the Availability Period in the aggregate principal amount of the LC Commitment less any outstanding or drawn (and unreimbursed) letters of credit (the "**Prepetition LCs**") under the Prepetition Loan Agreement (as hereinafter defined).<br>*See* **DIP Loan Agreement, § 2.01; Interim DIP Order ¶ 4.** |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(2) | Use of Cash Collateral and proceeds of the DIP Facility are subject to a "**Budget**," consisting of weekly statements of all forecasted receipts and disbursements of the Debtors on a consolidated basis for the 13 weeks commencing on the week of the Petition Date (as hereinafter defined). The Budget is subject to "**Permitted Variances**," which means, for the first 4 weeks after the Closing Date and on a rolling 4-week basis to be tested every 2 weeks thereafter (each such period, a |

---

[6]    This summary is qualified in its entirety by reference to the applicable provisions of the DIP Loan Documents and/or the Interim DIP Order.  To the extent there are any inconsistencies between this summary and the provisions of the DIP Loan Documents, the provisions of the DIP Loan Documents shall control.   Any capitalized terms used but not otherwise defined in the summary shall have the respective meanings ascribed to such terms in the DIP Loan Documents and/or the Interim DIP Order, as applicable.

WEIL:\95676752\10\44444.0005

| | |
|---|---|
| | "**Testing Period**") (i) all favorable variances, and (ii) an unfavorable variance of no more than 15% for each of actual receipts and disbursements, as compared to the budgeted receipts and disbursements, respectively, set forth in the Budget with respect to the applicable Testing Period; provided, that any disbursements in such Testing Period made from proceeds of favorable variances with respect to receipts in such Testing Period shall not be counted as disbursements for purposes of calculating unfavorable variances.<br>***See*** **DIP Loan Agreement §§ 1.01; 5.04(l); Interim DIP Order ¶ 20.** |
| **Use of DIP Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(6)-(a)(7) | Provide working capital and other general corporate needs and to convert any outstanding Prepetition LCs to letters of credit issued under the DIP Facility ("**DIP LCs**").<br>***See*** **DIP Loan Agreement §§ 3.13; 5.08; Interim DIP Order ¶ 11.** |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | Base Rate:  8.00 % + LIBOR, subject to a 1.00% floor.<br>Default Interest Rate:  The Base Rate plus 2.00% per annum.<br>***See*** **DIP Loan Agreement §§ 2.06-2.08.** |
| **Expenses and Fees**<br>Local Rule 4001-2(a)(3) | DIP Facility Administrative Fee: $50,000 payable to the DIP Agent on the Closing Date.<br><br>Commitment Fees: (i) 2.00% on the entire Term DIP Facility commitment, taking the form of original issue discount, to be shared by the applicable DIP Lenders on a pro rata basis and (ii) 1.00% per annum of the unutilized portion of the LC DIP Facility, payable on a quarterly basis.<br><br>Backstop Fee:  2.00% on the entire Term DIP Facility commitment, taking the form of original issue discount, to be shared by the DIP Commitment Parties (as defined in the DIP Loan Agreement) on a pro rata basis.<br><br>Exit Fee: 10% of the equity in Reorganized Holdings on the Effective Date of the Prepackaged Plan, to be shared by the applicable DIP Term Lenders on a pro rata basis, in exchange for the agreement of such DIP Term Lenders to convert their DIP Loans into the First Out Exit Term Loan under the Exit Facility.<br><br>Arrangement Fee:  0.50% of the entire Term DIP Facility commitment, payable in cash to the DIP Agent on the Closing Date.<br><br>Other Fees Related to DIP LCs: (a) 0.25% per annum fronting fee payable to the applicable LC Issuer on the daily issued but undrawn amount of all outstanding DIP LCs issued by such LC Issuer;  (b) 4.00% per annum issuance fee payable to the DIP Lenders with reimbursement obligations under the LC DIP Facility on a quarterly basis on the daily issued but undrawn amount of all outstanding DIP LCs; and (c) the applicable LC Issuer's customary and reasonable fees and charges in connection with the DIP LCs issued by such LC Issuer.<br>***See*** **DIP Loan Agreement § 2.05.** |

6

| | |
|---|---|
| **Maturity Date**<br>Bankruptcy Rule<br>4001(c)(1)(B);<br>Local Rule 4001-2(a)(10) | Subject to the terms of Exit Financing (as described below), the earliest of:<br>(i)    July 29, 2016;<br>(ii)    the consummation of any sale of all or substantially all of the Debtors' assets;<br>(iii)    if the Final DIP Order (as hereinafter defined) has not been entered, the date that is 45 days after the Petition Date;<br>(iv)    the acceleration of the DIP Loans and the termination of the DIP Commitments upon an Event of Default; and<br>(v)    the effective date of a Prepackaged Plan.<br><br>***See*** **DIP Loan Agreement § 1.01.** |
| **Exit Financing**<br>Bankruptcy Rule<br>4001(c)(1)(B)<br>Local Rule 4001-2(a) | The Exit Facility is comprised of:<br>(i)    the First Out Exit Term Loan;<br>(ii)    the Exit LC Facility;<br>(iii)    the Last Out Exit Term Loan; and<br>(iv)    the Subordinated Holdco Loan.<br><br>On the date of consummation of a Prepackaged Plan, the Term DIP Facility and DIP LCs shall be converted into the First Out Exit Term Loan and the Exit LC Facility, respectively, of the reorganized Debtors.<br>***See*** **DIP Loan Agreement § 9.20.** |
| **Prepayments**<br>Local Rule 4001-2(a)(13) | **Voluntary Prepayments:** shall be permitted at any time, without premium or penalty.<br><br>**Mandatory Prepayments:**  Customary mandatory prepayment events for financings of this type, including, prepayments from proceeds of (i) asset sales, (ii) insurance and condemnation proceeds, (iii) equity or debt issuances, and (iv) extraordinary receipts received by the Debtors.<br>***See*** **DIP Loan Agreement §§ 2.12-2.13.** |
| **Collateral and Priority**<br>Bankruptcy Rule<br>4001(c)(1)(B)(ii);<br>Local Rule 4001-2(a)(4) | Subject to the Carve Out and subject only to the existing liens under the Prepetition Loan Agreement, the DIP Obligations are secured by the following (the "**DIP Collateral**"):<br>(i)    a first priority perfected senior priming lien on, and security interest in, the Prepetition Collateral (as hereinafter defined);<br>(ii)    a first priority perfected lien on, and security interest in, all present and after-acquired property of the Debtors, not subject to a lien or security interest as of the Petition Date;<br>(iii)    a junior perfected lien on, and security interest in, all present and after-acquired property of the Debtors, that is subject to a perfected lien or security interest as of the Petition Date or subject to a lien or security interest in existence on the Petition Date that is perfected subsequent thereto; and<br>(iv)    all funds in any account of the Debtors or any other account of the Debtors.<br><br>The DIP Collateral shall include, without limitation, all assets of the Debtors, whether acquired before or after the Petition Date.  To the extent liens and consents to assignments are not available with respect to real property leases of the Debtors, the Debtors shall grant to the DIP Agent, for the benefit of the DIP Lenders, a lien in the proceeds of such leases.  Nothing in the DIP Loan Documents shall limit, subordinate, or constitute a waiver of any rights   and priorities of claimants with statutory trust rights, including under the Perishable Agricultural Commodities Act of 1930, as amended 7 U.S.C. §§ 499a *et. seq*, or the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. § 181 *et. seq.*<br>***See*** **DIP Loan Agreement § 2.23; Interim DIP Order Recitals (iii); ¶¶ 6-9.** |
| **Conditions to Closing** | The following conditions precedent to closing: |

| Bankruptcy Rule 4001(c)(1)(B);Local Rule 4001-2(a)(2) | (i) execution of the DIP Loan Documents; |
| | (ii) entry of Interim DIP Order within 3 calendar days following the Petition Date; |
| | (iii) payment of fees and expenses of the DIP Agent; |
| | (iv) delivery of the Budget; |
| | (v) appointment of Dennis Stogsdill as the Debtors' Chief Restructuring Officer; |
| | (vi) Debtors' execution of the Moelis Engagement Letter (as defined in the DIP Loan Documents); |
| | (vii) Debtors' retention of a real estate advisory firm reasonably acceptable to the DIP Agent and DIP Lenders; and |
| | (viii) entry into an RSA with the Requisite Consenting Lenders. |
| | **See DIP Loan Agreement § 4.02.** |
| **Covenants** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(8) | Usual and customary for financings of this type, including, among other things: |
| | Affirmative Covenants: Include delivery of and compliance with the Budget, maintenance of cash management system, payment of taxes and claims, maintenance of properties and insurance, inspections and compliance with laws. |
| | Negative Covenants: Include limitations on indebtedness, liens, guarantees, negative pledges, restricted payments, subsidiary distributions, investments, fundamental changes, disposition of assets, acquisitions, disposal of subsidiary interests, sale and lease-backs, transactions with affiliates, conduct of business and deposit accounts. |
| | **See DIP Loan Agreement, Art. V-VI.** |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(10) | Usual and customary for financings of this type, including, among other things: |
| | (i) failure to make payments when due; |
| | (ii) defaults under affirmative and negative covenants; |
| | (iii) breaches of representations and warranties; |
| | (iv) failure to satisfy or stay execution of judgments in excess of specified amounts; |
| | (v) impairment of DIP Loan Documents; |
| | (vi) change in ownership or control, except as provided in Prepackaged Plan; |
| | (vii) filing of a plan of reorganization that has not been consented to by the Requisite DIP Lenders; |
| | (viii) entry of an order without the prior consent of the Requisite DIP Lenders amending, supplementing, or otherwise modifying any DIP Order; |
| | (ix) any violation of the terms of the DIP Orders; |
| | (x) dismissal or conversion of the chapter 11 cases; |
| | (xi) appointment of a chapter 11 trustee or examiner; |
| | (xii) any sale of all or substantially all assets of the Debtors, unless (a) proceeds of such sale satisfy the DIP Obligations in full in cash, or (b) such sale is supported by the Requisite DIP Lenders; |
| | (xiii) failure to meet a Milestone, unless extended or waived by the Requisite DIP Lenders; |
| | (xiv) granting of relief from the automatic stay to permit foreclosure or enforcement on assets of the Debtors with a fair market value in excess of $10 million; |
| | (xv) the Debtors' filing of (or supporting another party's filing of) a motion for, or the entry of, an order granting any superpriority claim or lien senior to or *pari passu* with the DIP Lenders' claims under the DIP Facility; |
| | (xvi) the Debtors' challenge (or supporting any challenge) of the validity or enforceability of any of the obligations under the Prepetition Credit Facility (as hereinafter defined); |
| | (xvii) the Debtors' filing of a motion seeking approval of a key employee |

WEIL:\95676752\10\44444.0005

|  | incentive or retention plan, or comparable plan without prior consent of Requisite DIP Lenders, except as provided in the Prepackaged Plan; |
|  | (xviii) expiration or termination of exclusivity; |
|  | (xix) Permitted Variances under the Budget are exceeded for any period of time without consent of or waiver by the Requisite DIP Lenders; |
|  | (xx) the Debtors' CRO ceases to serve in such capacity, unless replacement is reasonably acceptable to the Requisite DIP Lenders; |
|  | (xxi) any uninsured judgments entered with respect to any postpetition liabilities against any of the Debtors in an aggregate amount in excess of $10 million, unless stayed; |
|  | (xxii) the termination of the RSA and revocation of the votes to accept the Prepackaged Plan by Prepetition Lenders that has the effect of causing the percentage of funded debt owned by the Requisite Consenting Lenders to fall below $66\,{}^{2}/_{3}\%$ of the total amount outstanding under the Prepetition Credit Facility; and |
|  | (xxiii) any Debtor asserting any right of subrogation or contribution against any other Debtor before borrowings under the DIP Facility are paid in full commitments terminated. |
|  | ***See* DIP Loan Agreement, Art. VII; Interim DIP Order, ¶ 12.** |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi); Local Rule 4001-2(10) | The following are some of the pertinent milestones (the "**Milestones**"): |
|  | (i) the Debtors' filing with the Bankruptcy Court, on the Petition Date, of a Prepackaged Plan, which shall be reasonably satisfactory to the Requisite DIP Lenders and for which the Debtors shall have solicited and obtained the requisite consent to the Prepackaged Plan by the Requisite Consenting Lenders or requested and obtained authority from the Bankruptcy Court to complete solicitation within 10 days after the Petition Date; |
|  | (ii) the Debtors' filing with the Bankruptcy Court, on the Petition Date, of a disclosure statement relating to the Prepackaged Plan, which shall be reasonably satisfactory to the Requisite DIP Lenders; |
|  | (iii) on or before 5 days after the Petition Date, entry of the Interim DIP Order; |
|  | (iv) on or before 45 days after the Petition Date, entry of the Final DIP Order; |
|  | (v) on or before 60 days after the Petition Date, entry of an order reasonably satisfactory to the Requisite DIP Lenders approving the Disclosure Statement (as hereinafter defined); |
|  | (vi) on or before 60 days after the Petition Date, entry of an order reasonably satisfactory to the Requisite DIP Lenders confirming the Prepackaged Plan; and |
|  | (vii) on or before 75 days after the Petition Date, the effective date of the Prepackaged Plan shall have occurred. |
|  | ***See* DIP Loan Agreement § 1.01; Interim DIP Order, ¶ 12(o).** |
| **Carve Out**<br>Local Rule 4001-2(a)(5) | A carve out (the "**Carve Out**") for the payment of : |
|  | (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; |
|  | (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000; |
|  | (iii) subject to Bankruptcy Court approval, and solely with respect to a Creditors' Committee (if any), strictly subject to the Budget and the line items applicable to such Committee's professionals set forth therein, all |

|  | accrued and unpaid fees, costs and expenses incurred at any time before the delivery by the DIP Agent of a Carve-Out Trigger Notice (as hereinafter defined) plus any monthly or success or transaction fees payable to professionals or professional firms retained by the Debtors and any Committee (each, a "**Professional**" and the fees, costs, and expenses of Professionals, "**Professional Fees**"); and |
|  | (iv)   subject to Bankruptcy Court approval, and after the delivery by the DIP Agent of the Carve-Out Trigger Notice, all unpaid Professional Fees, in an aggregate amount not to exceed $1,000,000.00 (the "**Post-Carve-Out Trigger Notice Cap**") plus any success or transaction fees that may become due and payable to any Professional, which shall not be included in or subject to the Post-Carve-Out Trigger Notice Cap; _provided_, however, that nothing in the DIP Loan Documents shall be construed to impair the ability of any party to object to any Professional Fees sought by any Professional. |
|  | "**Carve-Out Trigger Notice**" means a written notice delivered by the DIP Agent at the direction of the Requisite DIP Lenders to the Debtors and their counsel, the United States Trustee, and lead counsel to any official committee, which notice may be delivered following the occurrence of an Event of Default and stating that the Post-Carve-Out Trigger Notice Cap has been invoked. Immediately upon delivery of a Carve Out Trigger Notice, the Debtors shall be required to transfer into a segregated account (the "**Carve-Out Account**") not subject to the control of the DIP Agent or the Prepetition Agent an amount equal to the Post-Carve-Out Trigger Notice Cap plus an amount equal to the aggregate unpaid Professional Fees described above in clauses (iii) and (iv), in each case, as determined by a good faith estimate of the applicable Professional. The proceeds on deposit in the Carve-Out Account shall be available only to satisfy obligations benefitting from the Carve-Out, and DIP Agent or the Prepetition Agent (a) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve-Out Account and (b) shall only have a security interest in any residual interest in the Carve-Out Account available following satisfaction in full of all obligations benefitting from the Carve-Out. For the avoidance of doubt and notwithstanding anything to the contrary herein or elsewhere, the Carve-Out shall be senior to all liens securing the DIP Obligations, the prepetition adequate protection liens, all claims and any and all other forms of adequate protection, liens or claims securing the DIP Obligations.<br>_See_ **DIP Loan Agreement § 2.23(e); Interim DIP Order, ¶ 38.** |
| **Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(ii)<br>Local Rule 4001-2(a)(ii) | Subject to the Interim DIP Order and Budget, the Prepetition Lenders consent to the use of cash collateral for working capital and general corporate purposes. _See_ _See_ **Interim DIP Order, Stipulations (F)(ii), (G).** |
| **Duration of Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The Debtors' right to use the Cash Collateral shall terminate upon the earlier of (i) an Event of Default and (ii) a DIP Termination Date (as defined in the DIP Loan Agreement). _See_ **DIP Loan Agreement 7.02; Interim DIP Order, ¶ 30.** |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(iv) and (c)(1)(B)(ii) | The Prepetition Secured Parties (as hereinafter defined) shall be granted the following adequate protection for the use of the collateral (the "**Prepetition Collateral**") securing the Prepetition Debt Obligations (as hereinafter defined), in each case, subject and subordinate to the Carve Out and the liens, security interests, and claims granted to the DIP Lenders under the DIP Facility:<br>(i)   current payment of all reasonable and documented out-of-pocket fees, costs, and expenses of the Prepetition Agent, including the same of its outside counsel and financial advisor, without duplication of the DIP Agent's fees, and the Prepetition Lenders; |

WEIL:\95676752\10\44444.0005

| | |
|---|---|
| | (ii) replacement liens to the extent of any postpetition diminution in value of the Prepetition Lenders' interest in the Prepetition Collateral, including replacement liens on all unencumbered assets of the Debtors, which liens will be junior to the liens granted to the DIP Lenders under the DIP Facility; |
| | (iii) superpriority administrative expense claims to the extent of any postpetition diminution in value of the Prepetition Lenders' interest in the Prepetition Collateral, which claims will be junior to the DIP Obligations and be payable from and have recourse to all assets and property of the Debtors; and |
| | (iv) reasonable access to the Debtors' books and records and such financial reports as are provided to the DIP Agent. *See* **Interim DIP Order, Stipulations (G), ¶ 14.** |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi); Local Bankruptcy Rule 4001-2(a)(i)(C) | The DIP Agent and the DIP Lenders will receive a lien on the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code, and, upon entry of the Final DIP Order, a lien on avoidance actions. *See* **Interim DIP Order, ¶ 6.** |
| **Determination Regarding Prepetition Claim** Bankruptcy Rule 4001(c)(1)(B)(iii) | The Proposed Interim DIP Order contains stipulated findings of fact, including those related to the validity and enforceability of the Prepetition Debt Obligations and the Prepetition Liens. *See* **Interim DIP Order, Stipulations (E).**<br><br>The Committee shall have a maximum of 30 calendar days from the date of the Committee's appointment, but in no event later than 45 calendar days from entry of the Interim DIP Order to investigate and challenge the validity of the interests of the Prepetition Secured Parties in the Prepetition Collateral. *See* **DIP Loan Agreement, §6.15; Interim DIP Order, ¶ 40.** |
| **Effect of Debtors' Stipulations on Third Parties** Bankruptcy Rule 4001(c)(1)(B)(iii),(viii) | The stipulations and admissions contained in the Interim DIP Order shall be binding upon each Debtor, party to the DIP Loan Agreement, and any other party-in-interest. *See* **Interim DIP Order, §40.** |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | Upon 5 days' prior notice to the Debtors, and subject to termination of the automatic stay, the automatic stay is vacated to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise, upon the occurrence and during the continuance of an Event of Default under their respective DIP Loan Documents, any and all of their respective rights and remedies provided for in the DIP Loan Documents. *See* **DIP Loan Agreement §7.02; Interim DIP Order, ¶ 22.** |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | All security interests and liens in collateral under the DIP Loan Agreement, shall be valid and perfected upon entry of the Interim DIP Order. *See* **DIP Loan Agreement § 3.19; Interim DIP Order, ¶ 23, 40.** |
| **Section 506(c) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) | With respect to the DIP Collateral and the Prepetition Collateral, subject to entry of the Final DIP Order, except to the extent of the Carve Out. *See* **DIP Loan Agreement § 2.23(f); Interim DIP Order, Stipulations (I), ¶¶ 6, 7(b).** |
| **Release, Waivers or Limitation on any Claim or Cause of Action** Bankruptcy Rule 4001(c)(1)(B)(viii) | Upon entry of the Final DIP Order, Lake Grove, Fairway Acquisition and each of its Debtor subsidiaries fully and forever release and discharge the DIP Agent, DIP Lenders arising out of or relating to the DIP Financing and the DIP Facility and all of the transactions contemplated thereby and all of the documents and agreements executed in connection therewith. |

11

| | |
|---|---|
| | *See* **DIP Loan Agreement § 2.25; Interim DIP Order, ¶¶ 40, 47.** |

## Background

8.      On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

9.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

10.      Prior to the Petition Date, the Debtors commenced the solicitation of votes by the Senior Secured Lenders (as defined in the Prepackaged Plan)—the only class of voting creditors—on the Joint Prepackaged Chapter 11 Plan of Reorganization of Fairway Group Holdings Corp. and Its Affiliated Debtors (the "**Prepackaged Plan**"), through their Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Reorganization of Fairway Group Holdings Corp. and Its Affiliated Debtors pursuant to sections 1125 and 1126(b) of the Bankruptcy Code ("**Disclosure Statement**").  The solicitation period for the Prepackaged Plan will remain open for another ten (10) days until May 12, 2016.

11.      The Prepackaged Plan provides for a reorganization transaction pursuant to which new equity and new debt of the reorganized Debtors will be issued to the Senior Secured Lenders on the terms and conditions set forth in the Prepackaged Plan, with all General Unsecured Claims (as defined in the Prepackaged Plan) to be unimpaired.  The Debtors have

WEIL:\95676752\10\44444.0005

requested a joint hearing for approval of the Prepackaged Plan and Disclosure Statement to be held within thirty-five (35) days of the Petition Date.

12.    On May 2, 2016, the Debtors executed a restructuring support agreement (the "**RSA**") with Senior Secured Lenders, including the members of the Steering Committee (the "**Consenting Creditors**"), pursuant to which such Consenting Creditors agreed to vote in favor of and support confirmation of the Prepackaged Plan.  Prior to the commencement of these cases, Consenting Creditors holding more than 70% in amount of Secured Loan Claims already have submitted their votes to accept the Prepackaged Plan.[7]

13.    Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the Declaration of Dennis Stogsdill Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York, sworn to on the date hereof (the "**Stogsdill Declaration**"),[8] which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

## Jurisdiction

14.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

15.    By this Motion, the Debtors request entry of an interim order, substantially in the form attached hereto as **Exhibit "A"** (the "**Interim DIP Order**"), and final order (the

---

[7] Fairway believes that these holders constitute more than 50% of the number of holders of all Senior Secured Claims.

[8] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Stogsdill Declaration.

13

"**Final DIP Order**," and, together with the Interim DIP Order, the "**DIP Orders**") granting, among other things, the following relief:

(a)    authority for Fairway Acquisition to be the Borrower under the DIP Facility;

(b)    authority for each other Debtor to guarantee Fairway Acquisition's obligations under the DIP Facility;

(c)    authority for the Borrower to execute and enter into the DIP Loan Agreement and to perform all such other and further acts as may be necessary or appropriate in connection with the DIP Loan Documents;

(d)    authority for Borrower to make an initial draw under the DIP Facility in the aggregate amount of up to $15 million upon entry of the Interim DIP Order to avoid immediate and irreparable harm;

(e)    authority for the Debtors to use the proceeds under the DIP Facility in accordance with the Budget, DIP Loan Documents, and the Debtors' existing cash management system, including with respect to intercompany transactions with their non-debtor affiliate, Lake Grove;

(f)    authority for the Debtors to grant security interest, liens, and superpriority claims to the DIP Agent and the DIP Lenders, and related protections to secure all obligations of the Debtors under and with respect to the DIP Facility in the order of priority and as provided in the DIP Orders and the DIP Loan Documents;

(g)    authority for the Debtors to use cash collateral (as such term is defined in the Bankruptcy Code) and all other Prepetition Collateral in accordance with the Budget;

(h)    upon entry of the Final DIP Order, waiver of any right to seek to surcharge against either of the Prepetition Collateral and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any other law or principle of equity;

(i)    authority for the Debtors to provide Adequate Protection (as hereinafter defined) to the Prepetition Secured Parties on the terms set forth in the Interim DIP Order and the DIP Loan Documents;

(j)    modification of the automatic stay under section 362 of the Bankruptcy Code on the terms and conditions set forth herein to

14

the extent necessary to implement and effectuate the terms of the DIP Loan Documents and the Interim DIP Order;

(k)     waiver of any applicable stay with respect to the effectiveness and enforceability of the Interim DIP Order (including under Bankruptcy Rule 6004); and

(l)     scheduling a final hearing (the "**Final Hearing**"), pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, to be held within fourteen (14) days of entry of the Interim DIP Order to consider entry of an order granting the relief requested in this Motion on a final basis.

**Prepetition Indebtedness**

16.     Pursuant to that certain Credit Agreement, dated as of February 14, 2013, as amended on May 3, 2013 (the "**Prepetition Loan Agreement**"), by and among Fairway Acquisition, as borrower, Credit Suisse, as administrative agent and as collateral agent (in such capacities, the "**Prepetition Agent**"), and the lenders party thereto (the "**Prepetition Lenders**" and, together with the Prepetition Agent, the "**Prepetition Secured Parties**"), the Prepetition Lenders extended to Fairway Acquisition  (i) a revolving credit facility in an amount up to $40 million maturing in August 2017, which includes (a) a $40 million letter of credit subfacility (collectively, the "**Prepetition Revolving Credit Facility**"), and (ii) term loans in the initial aggregate principal amount of $275 million maturing in August 2018 (the "**Prepetition Term Facility**" and, together with the Prepetition Revolving Credit Facility, the "**Prepetition Credit Facility**").

17.     As of the Petition Date, the Debtors' outstanding funded obligations under the Prepetition Credit Facility amount to approximately $279 million, which amount consists of approximately (i) $9 million drawn under the Prepetition Revolving Credit Facility and (ii) $270 million outstanding under the Prepetition Term Facility.  The Debtors also have $30,611,941 in issued and outstanding undrawn Prepetition LCs (together with the amounts in clauses (i) and (ii)

15

of this paragraph, the "**Prepetition Debt Obligations**").  The Debtors have granted first priority security interests in and liens on all or substantially all of their assets to secure their Prepetition Debt Obligations.

### Need for DIP Financing

18.    The Debtors' ability to invest in and grow their business is constrained by Fairway's burdensome debt obligations.  Recurring interest and amortization payments coupled with a recent reduction in the maximum total leverage ratio covenant under the Prepetition Loan Agreement have significantly limited Fairway's financial flexibility.  *See* Stogsdill Decl. ¶ 29. Consequently, Fairway has started to fall behind its competitors in multiple market segments. Although Fairway continues to be one of the most preeminent grocery brands in the Tri-state area, the Debtors have been unable to invest in the necessary marketing efforts to translate that brand value into revenue growth. *See id.*

19.    Prior to the commencement of these cases, the Debtors began taking various steps to address their operational and financial challenges.  *See* Stogsdill Decl. ¶ 34.  In so doing, the Debtors engaged in a strategic review process to identify various alternatives for the Debtors' businesses, including exploring an out-of-court capital raise and sale process. Ultimately, this process did not result in any offers that would satisfy the Debtors' secured debt in full or any offers that the Debtors and their advisors believed to be adequate or on better terms than the Prepackaged Plan. *See* Stogsdill Decl. ¶ 35.

20.    Access to the DIP Facility is essential for the Debtors to assure their employees, customers, vendors, and suppliers that Fairway has sufficient working capital to continue its operations in the ordinary course of business during the pendency of these chapter 11 cases.  The Debtors anticipate that one-time chapter 11 filing-related expenses and increased

WEIL:\95676752\10\44444.0005

demands by constituents will increase the strains on their free cash during early phase of their bankruptcies. During the first four (4) weeks after the Petition Date, the Debtors' available cash—without taking account of authorized proceeds under the DIP Facility—is forecasted to sink as low as negative $6 million. *See* Stogsdill Decl. ¶ 64-65. Without access to interim funding under the DIP Facility, the Debtors' ability to continue their operations during the first weeks of these cases would be in serious jeopardy. Interim funding in the amount of $15 million and immediate access to cash collateral will put the Debtors in a position to restore the confidence of their key constituents at the outset and very critical stage of Fairway's restructuring. *See id*. As such, authorizing the Debtors to enter into the DIP Facility on the terms and conditions set forth herein and in the DIP Loan Documents is essential to the Debtors' ability to minimize disruptions and avoid irreparable harm to their businesses.

21.     The commitments of the DIP Lenders will allow the Debtors to sufficiently de-lever their business and emerge from bankruptcy even more equipped to provide the first-rate products, services, and business relationships that their customers, employees, vendors, and suppliers have come to expect from one of the most distinguished grocery chains in the greater New York area.

### Efforts to Obtain Postpetition Financing

22.     As set forth in the Stogsdill Declaration, the Debtors surveyed various sources of postpetition financing, including potential financing from the Prepetition Lenders and unrelated third parties. In exploring those options, the Debtors were cognizant of the challenges presented by the fact that substantially all of the Debtors' assets are encumbered by the Prepetition Liens. *See* Stogsdill Decl. ¶ 66. It became clear to the Debtors that, in order to obtain the necessary liquidity to administer their chapter 11 cases and execute their

17

reorganization, the Debtors either would have to (i) find a postpetition lender willing to extend credit that would be junior to the Prepetition Liens or unsecured, or (ii) obtain postpetition financing secured by liens that would prime the Prepetition Liens.

23.    The Debtors contacted eight (8) parties to solicit offers to provide the Debtors with postpetition financing.  The Debtors' solicitation did not yield any offers.  Accordingly, the Debtors focused their postpetition financing efforts on securing financing from the DIP Lenders, all of whom also are also Prepetition Lenders.  Further, the Debtors concluded that raising postpetition financing on a nonconsensual priming basis would be much more expensive and disruptive to their businesses than what could reasonably be achieved by entering into the DIP Facility with the DIP Lenders.  *See* Stogsdill Decl. ¶ 67.

24.    On May 2, 2016, the Debtors and the DIP Agent entered into a commitment letter (the "**Commitment Letter**"), a copy of which is attached to the Interim DIP Order as **Exhibit "2."**  For several weeks, the Debtors and their advisors engaged in rigorous negotiations with the Prepetition Secured Parties and their advisors to obtain the best financing terms available.  The negotiations were conducted at arm's length and properly may be characterized as "hard bargaining" by all interested parties.  *See* Stogsdill Declaration ¶ 68.  The DIP Facility is the only realistic financing available to the Debtors under the circumstances and is absolutely critical to the Debtors' ability to administer their chapter 11 cases.

### DIP Facility

25.    The DIP Loan Agreement provides that the Debtors may draw $15 million upon entry of the Interim DIP Order and, upon entry of the Final DIP Order, make an additional draw of $40 million.  The DIP Loan Agreement also provides that the letters of credit issued pursuant to the Prepetition Loan Agreement will be converted into DIP LCs.

WEIL:\95676752\10\44444.0005

26.     Further, the DIP Loan Documents provide that, on the date of consummation of the Prepackaged Plan, the DIP Loans and DIP LCs will convert on a dollar-for-dollar basis into the First Out Exit Term Loan and Exit LC Facility, respectively.  The DIP Lenders' commitments are fundamental to the Debtors' reorganization strategy because they provide the Debtors with the ability to implement their restructuring, emerge from these chapter 11 cases on a timely basis, and operate post-emergence with newfound flexibility to thrive both operationally and financially.

27.     To ensure that the proceeds under the DIP Facility are used in the manner most likely to maximize its value, the Debtors and the DIP Lenders have agreed upon a Budget consisting of weekly statements of receipts and disbursements of the Debtors on a consolidated basis for the thirteen (13) weeks commencing with the week hereof.  The Budget includes, among other things, the anticipated weekly uses of the proceeds of the DIP Facility for such period, available cash, cash flow, trade payables and ordinary course expenses, and total fees, expenses, and capital expenditures.  The Budget is subject to Permitted Variances, which means that, for the first four (4) weeks after the Closing Date and on a rolling four-week basis to be tested every two (2) weeks thereafter: (i) all favorable variances, and (ii) an unfavorable variance of no more than 15% for each of actual receipts and disbursements, as compared to the budgeted receipts and disbursements, respectively, set forth in the Budget with respect to the applicable Testing Period. Any disbursements in a Testing Period made from proceeds of favorable variances with respect to receipts in such Testing Period will not be counted as disbursements for purposes of calculating unfavorable variances.  A copy of the Budget is attached to the Interim DIP Order as **Exhibit "3."**  The Debtors believe that the Budget is achievable and will allow the Debtors to operate without the accrual of unpaid administrative expenses.

WEIL:\95676752\10\44444.0005

## Basis for Relief

**A.    The Debtors Should Be Authorized to Obtain Postpetition Financing**

28.    The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  The Debtors, with the assistance of their advisors, carefully examined all potential avenues for securing the financing necessary to fund these chapter 11 cases.  To assist in the decision making and review process, the Debtors' advisors made formal presentations to the Debtors' Board of Directors and regularly consulted with the Debtors' management team and other advisors.  *See* Stogsdill Decl. ¶ 63.

29.    Despite their reasonable best efforts, the Debtors were unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1) or as an administrative expense under section 364(a) or (b) of the Bankruptcy Code.  *See* 11 U.S.C. §§ 364(a)-(b), 503(b)(1).   Having determined that postpetition financing only is available pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated extensively with the DIP Agent and the Prepetition Lenders who are the DIP Lenders to secure the DIP Financing on the terms set forth herein.  *See* Stogsdill Decl. ¶ 68.  The DIP Facility is tailored to the Debtors' needs and will allow the Debtors to effectively execute their restructuring. Absent the relief requested herein, the Debtors' ability to continue to operate their businesses and reorganize will be in serious jeopardy.  For the foregoing reasons and those discussed further below, the Debtors satisfy the necessary conditions under sections 364(c) and (d) for authority to enter into the DIP Facility.

WEIL:\95676752\10\44444.0005

### i.    Entry into the DIP Facility Is a Sound Business Judgment

30.    Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit. *See, e.g.*, *In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment.").

31.    In determining whether the Debtors have exercised sound business judgment in selecting the DIP Facility and entering into the DIP Loan Documents, the Court should consider the economic terms of the DIP Facility in light of current market conditions. *See* Hr'g Tr. at 734 35:24, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009) (recognizing "the terms that are now available for DIP Financing in the current economic environment aren't as desirable" as in the past). Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition

WEIL:\95676752\10\44444.0005

facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern

District of New York held that:

> Although all parties, including the Debtors and the Committee, are
> naturally motivated to obtain financing on the best possible terms,
> a business decision to obtain credit from a particular lender is
> almost never based purely on economic terms.  Relevant features
> of the financing must be evaluated, including non-economic
> elements such as the timing and certainty of closing, the impact on
> creditor constituencies and the likelihood of a successful
> reorganization. This is particularly true in a bankruptcy setting
> where cooperation and established allegiances with creditor groups
> can be a vital part of building support for a restructuring that
> ultimately may lead to a confirmable reorganization plan. That
> which helps foster consensus may be preferable to a notionally
> better transaction that carries the risk of promoting unwanted
> conflict.

Case No. 09–13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).  In light of the

interrelated agreements comprising the Debtors' reorganization strategy, the negotiations that the

Debtors undertook with the Prepetition Lenders, and the need for certainty during and upon exit

from chapter 11, the Debtors' selection of certain Prepetition Lenders to provide the DIP Loans

on a consensual basis was the most logical and favorable choice.  Not only do the DIP Lenders

have a vested interest in recovering the full value of the DIP Loans, but, given their prepetition

investments, they also are highly motivated to ensure that the restructuring is successfully

executed.  This is a more favorable dynamic for the Debtors than obtaining postpetition

financing from lenders without such vested interest.  In addition, given the benefits of the

Prepackaged Plan, the Debtors did not wish to commence these cases with a highly contested and

expensive priming litigation, which almost certainly would have occurred had the Debtors

obtained financing from another lender.  *See* Stogsdill Decl. ¶ 67.

      32.    The Debtors' determination to secure DIP Financing was a business

decision guided by the Debtors' financial and operational needs.  Specifically, the Debtors and

WEIL:\95676752\10\44444.0005

their advisors determined that the Debtors require liquidity to fund and implement their reorganization. *See* Stogsdill Decl. ¶¶ 63, 66-67. Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *Id.* at 513-14 (footnote omitted). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, Case No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

33.     As discussed in the Stogsdill Declaration, the Debtors determined that the DIP Financing was the best available after exploring other options. *See* Stogsdill Decl. ¶¶ 66-68. The Debtors then engaged in extensive negotiations with the DIP Agent and its advisors to secure the most favorable terms possible under the circumstances. *See* Stogsdill Decl. ¶ 68. Such negotiations resulted in not only obtaining the best postpetition financing available to the Debtors, but also in securing a commitment to provide the Debtors with sufficient cash to emerge from bankruptcy in a way that best serves the long-term future of their business. The Debtors submit that entry into the DIP Facility is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets, and is an exercise of the Debtors' sound and reasonable business judgment.

WEIL:\95676752\10\44444.0005

ii.    **The Debtors Should Be Authorized to Obtain Postpetition Financing on a Secured and Superpriority Basis**

34.    The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; [or]
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien;
>
> (3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).

35.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117,

24

120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

36.    As stated, the Debtors contacted eight (8) institutions to seek proposals for postpetition financing.  No offers were submitted primarily due to the perceived difficulty in obtaining the Prepetition Lenders' consent to priming their Prepetition Liens and an unwillingness to provide the Debtors with unsecured or junior lien financing. The Court should, therefore, authorize the Debtors to provide the DIP Agent and the DIP Lenders with superpriority administrative expense status for any obligations arising under their respective DIP Loan Documents as provided for in section 364(c)(1) of the Bankruptcy Code.

**iii.    The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by Priming Liens Senior to Prepetition Liens**

37.    In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on encumbered property, without the consent of the existing lien holders, if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected.   *See* 11 U.S.C. § 364(d)(1). Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

WEIL:\95676752\10\44444.0005

(2) In any hearing under this subsection, the trustee has the burden
of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

38.    Here, the parties who may have their interests in the Debtors' assets

subject to a priming lien are the Prepetition Lenders.  The DIP Lenders hold more than 70% of

the debt under the Prepetition Credit Facility.  When determining whether to authorize a debtor

to obtain credit secured by a lien as authorized by section 364(d) of the Bankruptcy Code, courts

focus on whether the transaction will enhance the value of the Debtors' assets. Courts consider a

number of factors, including, without limitation:

(a)    whether the party subject to a priming lien has consented to such
treatment;

(b)    whether alternative financing is available on any other basis (*i.e.*,
whether any better offers, bids, or timely proposals are before the
court);

(c)    whether the proposed financing is necessary to preserve estate
assets and is necessary, essential and appropriate for continued
operation of the debtors' business;

(d)    whether the terms of the proposed financing are reasonable and
adequate given the circumstances of both the debtors and proposed
lender(s); and

(e)    whether the proposed financing agreement was negotiated in good
faith and at arms' length and entry therein is an exercise of sound
and reasonable business judgment and in the best interest of the
debtor's estate and its creditors.

*See*, *e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109,

113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79, *Lyondell Chem. Co.*, Case No.

09-10023 (Bankr. S.D.N.Y. March 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649 at *10; *see*

*also* 3 Collier on Bankruptcy ¶ 364.04[1] (15th ed. rev. 2008).  The DIP Loan Documents satisfy

all of these factors.

WEIL:\95676752\10\44444.0005

39.    <u>First</u>, the Prepetition Lenders have consented to being primed by the DIP Facility in exchange for the Adequate Protection (as hereinafter defined).  The Debtors therefore submit that such treatment is appropriate.

40.    <u>Second</u>, the Debtors and their advisors explored other financing sources. The DIP Lenders offered the only avenue for financing. The Debtors conducted arms'-length negotiations with the DIP Lenders on the terms of the DIP Facility.  The DIP Loan Documents reflect the most favorable terms on which the DIP Lenders were willing to extend the DIP Financing.  The Debtors have not been able to obtain financing on better terms from the DIP Lenders, or any other lender.

41.    <u>Third</u>, the Debtors require the proceeds of the DIP Facility to effectuate their reorganization strategy.  Gaining access to the liquidity necessary to preserve the going concern value of the Debtors' estates through the pendency of these chapter 11 cases is in the best interest of all stakeholders.

42.    <u>Fourth</u>, upon entry of the Interim DIP Order, the DIP Financing will provide access to $15 million in incremental liquidity, which the Debtors and their advisors have determined is sufficient and necessary to allow the Debtors to maintain their operations and meet the various obligations they owe to key constituents notwithstanding the commencement of these cases.  Accordingly, the terms of the DIP Facility are reasonable and adequate to support the Debtors' operations and restructuring activities during their chapter 11 cases.

43.    <u>Fifth</u>, as described in greater detail above and in the Stogsdill Declaration, the Debtors and the DIP Lenders negotiated the DIP Loan Documents in good faith and at arms'-length. The Debtors' entry into the DIP Loan Documents is an exercise of their sound business judgment.  The DIP Facility is the only viable source of the liquidity the Debtors need to fund

their reorganization, and it also sets the foundation for the Debtors' successful emergence from

chapter 11 and post-emergence growth and profitability. *See* Stogsdill Decl. ¶¶ 61-63.

### iv.    Interests of Prepetition Secured Parties Are Adequately Protected

44.    Parties with an interest in cash collateral or collateral that may be used to

secure postpetition financing are entitled to adequate protection. *See* 11 U.S.C. § 363(e). In

addition, a debtor may obtain postpetition credit "secured by a senior or equal lien on property of

the estate that is subject to a lien only if" the debtor, among other things, provides "adequate

protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B). Adequate

protection may be provided in various forms, including payment of adequate protection fees,

payment of interest, or granting of replacement liens or administrative claims. Thus, what

constitutes adequate protection is decided on a case-by-case basis. *See, e.g.*, *In re Mosello*, 195

B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact

specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360

(Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the

application of adequate protection "is left to the vagaries of each case, but its focus is protection

of the secured creditor from diminution in the value of its collateral during the reorganization

process") (citation omitted). The critical purpose of adequate protection is to guard against the

diminution of a secured creditor's collateral during the period when such collateral is being used

by the debtor in possession. *See 495 Cent. Park*, 136 B.R. at 631 ("The goal of adequate

protection is to safeguard the secured creditor from diminution in the value of its interest during

the chapter 11 reorganization."); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y.

1986); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

45.     The Debtors will provide the following adequate protection to the Prepetition Secured Parties:

(a)     <u>Adequate Protection Liens</u>.  Subject to the Carve Out and the security interests, liens, and superpriority claims granted to the DIP Lenders under the DIP Facility, and solely to the extent of any diminution in value of the Prepetition Secured Parties' interest in the Prepetition Collateral, the Prepetition Secured Parties will be granted replacement liens on and security interests in all assets of the Debtors (excluding avoidance actions) in the order of priority set forth in paragraph 14(a)(i) of the Interim DIP Order (collectively, the "**Prepetition Adequate Protection Liens**").

(b)     <u>Adequate Protection Prepetition Superpriority Claims</u>.  Subject to the Carve Out and the security interests, liens, and superpriority claims granted to the DIP Lenders under the DIP Facility, and solely to the extent of any diminution in value of the Prepetition Secured Parties' interest in the Prepetition Collateral, the Prepetition Secured Parties will be granted superpriority administrative expense claims, having priority over any and all administrative expense claims, in the order of priority set forth in paragraph 14(a)(ii) of the Interim DIP Order (collectively, the "**Prepetition Superpriority Claims**"). The Prepetition Superpriority Claims shall be payable from and have recourse to prepetition and postpetition property of the Debtors and all proceeds thereof, subject to entry of the Final DIP Order, including, proceeds of avoidance actions or property recovered under such avoidance actions whether by judgment, settlement or otherwise.

(c)     <u>Adequate Protection Payments</u>. Subject to the Carve Out and the security interests, liens, and superpriority claims granted to the DIP Lenders under the DIP Facility, the Debtors will make adequate protection payments to the Prepetition Secured Parties for all reasonable and documented out-of-pocket fees, costs, and expenses incurred by the Prepetition Agent, limited to the reasonable and documented fees, costs, disbursements and expenses of its outside counsel, King & Spalding LLP, and financial advisor, Moelis & Company LLC (collectively, the "**Adequate Protection Payments**" and, together with the Prepetition Adequate Protection Liens and Prepetition Superpriority Claims, the "**Adequate Protection**").

46.     The Prepetition Secured Parties' interests in the Prepetition Collateral are being primed by the DIP Facility with their consent, and, ultimately, to their financial benefit.

WEIL:\95676752\10\44444.0005

The Adequate Protection appropriately safeguards the Prepetition Secured Parties from the diminution in the value of their interests in the Prepetition Collateral, and, as such, is fair and reasonable and satisfies the requirements of section 364 of the Bankruptcy Code.

**B.    The Debtors Should Be Authorized to Use Cash Collateral**

47.    For the reasons set forth herein, the Debtors require use of cash collateral for working capital and to implement the transactions contemplated by the Prepackaged Plan. Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral. Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
> (A) each entity that has an interest in such cash collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

48.    The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the cash collateral.  Importantly, the Prepetition Secured Parties have consented to the use of the cash collateral, subject to the Budget and the Carve Out. Additionally, and as described above, the Debtors are providing the Prepetition Secured Parties with Prepetition Adequate Protection Liens and Prepetition Superpriority Claims for and equal in amount to any aggregate diminution in the value of each Prepetition Secured Parties' respective interests in the Prepetition Collateral.  Accordingly, the Court should grant the Debtors the authority to use their cash collateral under section 363(c)(2) of the Bankruptcy Code.

WEIL:\95676752\10\44444.0005

**C.      The Debtors Should Be Authorized to Pay Fees Required
by the DIP Lenders and Honor Obligations Under the Commitment Letter**

49.      As described above, pursuant to the Commitment Letter, and subject to

Court approval, the Debtors have agreed to pay certain fees to the DIP Lenders in exchange for

their funding the DIP Facility.  The Debtors carefully considered and negotiated these fees.[9]  The

DIP Facility is fair and reasonably priced and consistent with postpetition financings of this

nature.  Much of the cost of the DIP Facility is offset by the flexibility it affords the Debtors to

continue their operations in the ordinary course of business during the pendency of these chapter

11 cases.  The Debtors submit that the terms of the DIP Facility, including the fees imposed

thereunder, constitute the best terms on which the Debtors could obtain the postpetition financing

necessary to successfully execute their reorganization strategy.  Paying these fees in order to

obtain the DIP Financing is in the best interests of all stakeholders.  *See* Stogsdill Decl. ¶¶ 63,

68.

**D.      The Carve Out Is Appropriate**

50.      The proposed DIP Facility subjects the DIP Lenders' security interests and

administrative expense claims to the Carve Out.  The Carve Out is similar to other terms created

for professional fees that have been found to be reasonable and necessary to ensure that a

debtor's estate and any statutory committee can retain assistance from counsel.  *See Ames Dep't

Stores*, 115 B.R. at 40.

51.      Without the Carve Out, the Debtors' estates or other parties-in-interest

may be deprived of possible rights and powers because the services for which Professionals may

---

[9] Due to the sensitive commercial nature of the Fee Letter (as defined in the DIP Loan Agreement) and the confidentiality provisions contained therein, the Debtors have not attached a copy of the Fee Letter to this Motion. Upon request, the Debtors will make copies of the Fee Letter available to the Court and the U.S. Trustee on a confidential basis.

WEIL:\95676752\10\44444.0005

be paid in these cases is restricted. *Id.* at 38 (observing that courts insist on carve outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve Out protects against administrative insolvency during the course of these cases by ensuring that assets remain for the payment of U.S. Trustee fees and Professional Fees, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

**E.      The DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e)**

52.      Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

53.      As explained in detail herein and in the Stogsdill Declaration, the DIP Loan Documents are the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms pursuant to which the Debtors could obtain necessary postpetition financing.  All negotiations of the DIP Facility and with all potential lenders were conducted in good faith and at arms' length.  The terms and conditions of the DIP Loan Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being

WEIL:\95676752\10\44444.0005

provided to any party to the DIP Loan Documents other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section. *See* Stogsdill Decl. ¶ 68.

**F.    Modification of the Automatic Stay Is Warranted**

54.    The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to:  (i) grant the security interests, liens, and superpriority claims described above with respect to the DIP Lenders and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the DIP Lenders to exercise, upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Loan Documents), after the expiration of the applicable grace period, if any, or the occurrence of the DIP Maturity Date, as applicable, certain remedies under the DIP Loan Documents at any time five (5) business days after giving notice to the Debtors; and (iii) implement the terms of the proposed DIP Orders.

55.    Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances. *See, e.g., In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) [Docket No. 88]; *In re Chassix Holdings, Inc.*, Case No. 15-10578 (MW) (Bankr. S.D.N.Y. Mar. 13, 2015) [Docket No. 67]; *In re The Reader's Digest Assoc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) [Docket No. 26]; *In re Lear Corp.*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. July 7, 2009) [Docket No. 59].

WEIL:\95676752\10\44444.0005

**G.      The Debtors Require Immediate Access to Cash Collateral and DIP Financing**

56.      The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(b)(2), (c)(2).    In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions.  *See Ames Dep't Stores*, 115 B.R. at 36.

57.      The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to borrow up to $15 million under the DIP Facility, is not granted promptly after the Petition Date. The Debtors have insufficient cash to fund operations without immediate access to the DIP Financing or Cash Collateral.  Further, the Debtors anticipate that the commencement of these chapter 11 cases will significantly and immediately increase the demands on their free cash as a result of, among other things, the costs of administering the cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations.  Accordingly, the Debtors have an immediate need for access to liquidity to continue the operation of their businesses, maintain their key business relationships, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers, and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain the Debtors' enterprise value for the benefit of all parties in interest.

58.      The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances.  *See, e.g., In re The Great Atl. & Pac. Tea Co., Inc.* Case No.

15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) [Docket No. 88] (order approving postpetition financing on an interim basis); *In re Chassix Holdings, Inc.*, Case No. 15-10578 (MW) (Bankr. S.D.N.Y. Mar. 13, 2015) [Docket No. 67] (same); *In re Eastman Kodak Co.*, Case No. 12-10202 (MEW) (Bankr. S.D.N.Y. Jan. 20, 2012) [Docket No. 54] (same); *In re The Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) [Docket No. 43] (same); *In re The Reader's Digest Assoc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) [Docket No. 26] (same); *In re Tronox Inc.*, Case No. 09-10156 (MEW) (Bankr. S.D.N.Y. Jan. 13, 2009) [Docket No. 46] (same); *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) [Docket No. 79] (same); *In re Frontier Airlines Holdings, Inc.*, Case No. 08-11298 (RDD) (Bankr. S.D.N.Y. Aug. 5, 2008) [Docket No. 433] (same).   Accordingly, for the reasons set forth above, prompt entry of the Interim DIP Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

### H.    Request for Final Hearing

59.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date that is no later than fourteen (14) days after entry of the Interim DIP Order as a final hearing for consideration of entry of the Final DIP Order.

60.    The Debtors request that they be authorized to serve a copy of the signed Interim DIP Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the notice parties listed below. The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## Reservation of Rights

61.     Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## Bankruptcy Rule 6003(b) Is Satisfied

62.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may approve a motion to "incur an obligation regarding property of the estate" prior to twenty-one (21) days after the Petition Date. FED. R. BANKR. P. 6003(b).   The Debtors require immediate access to the interim funding allowed under the DIP Facility.    Based on the foregoing, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## Waiver of Bankruptcy Rules 6004(a) and (h)

63.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

64.     Notice of this Motion has been provided to (i) the Office of the U.S. Trustee for Region 2; (ii) the holders of the forty (40) largest unsecured claims against the Debtors (on a consolidated basis); (iii) King & Spalding LLP, 1185 Avenue of the Americas,

36

New York, New York 10036 (Attn:  Michael Rupe, Esq. and Christopher G. Boies, Esq.) and

1180 Peachtree Street, Atlanta, Georgia 30309 (Attn:  W. Austin Jowers, Esq.), the attorneys for

Credit Suisse AG, Cayman Islands Branch, as (a) Prepetition Agent and (b) DIP Agent; (iv) the

Securities and Exchange Commission; (v) the Internal Revenue Service; and (vi) the United

States Attorney's Office for the Southern District of New York.  The Debtors submit that, in

view of the facts and circumstances, such notice is sufficient and no other or further notice need

be provided.

65.    No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: May 2, 2016
        New York, New York

/s/ Matthew S. Barr
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Matthew S. Barr
Sunny Singh

*Proposed Attorneys for Debtors
and Debtors in Possession*

**Exhibit A**

**Interim DIP Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

In re                                          :
                                               :        **Chapter 11**
**FAIRWAY GROUP HOLDINGS**                     :
**CORP.**, *et al.*,                           :        **Case No. 16-[_____] (___)**
                                               :
              **Debtors.**[1]                  :        **(Joint Administration Pending)**
-------------------------------------------------------------------x

## INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507: (A) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING AND USE CASH COLLATERAL; (B) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (C) GRANTING ADEQUATE PROTECTION; (D) MODIFYING AUTOMATIC STAY; (E) SCHEDULING A FINAL HEARING; AND (F) GRANTING RELATED RELIEF

This matter having come before this Court (as defined below) upon the motion, dated May 2, 2016 (the "Motion")[2], filed by Fairway Group Holdings Corp. ("Holdings"), Fairway Group Acquisition Company (the "Borrower"), Fairway Bakery LLC, Fairway Broadway LLC, Fairway Chelsea LLC, Fairway Construction Group LLC, Fairway Douglaston LLC, Fairway East 86th Street LLC, Fairway Ecommerce LLC, Fairway Hudson Yards LLC, Fairway Georgetowne LLC, Fairway Greenwich Street LLC, Fairway Group Central Services LLC, Fairway Group Plainview LLC, Fairway Kips Bay LLC, Fairway Nanuet LLC, Fairway Paramus LLC, Fairway Pelham LLC, Fairway Pelham Wines & Spirits LLC, Fairway Red Hook LLC,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Fairway Group Holdings Corp. (2788); Fairway Group Acquisition Company (2860); Fairway Bakery LLC (4129); Fairway Broadway LLC (8591); Fairway Chelsea LLC (0288); Fairway Construction Group, LLC (2741); Fairway Douglaston LLC (2650); Fairway East 86th Street LLC (3822); Fairway eCommerce LLC (3081); Fairway Georgetowne LLC (9609); Fairway Greenwich Street LLC (6422); Fairway Group Central Services LLC (7843); Fairway Group Plainview LLC (8643); Fairway Hudson Yards LLC (9331); Fairway Kips Bay LLC (0791); Fairway Nanuet LLC (9240); Fairway Paramus LLC (3338); Fairway Pelham LLC (3119); Fairway Pelham Wines & Spirits LLC (3141); Fairway Red Hook LLC (8813); Fairway Stamford LLC (0738); Fairway Stamford Wines & Spirits LLC (3021); Fairway Staten Island LLC (1732); Fairway Uptown LLC (8719); Fairway Westbury LLC (6240); and Fairway Woodland Park LLC (9544).

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

Fairway Stamford LLC, Fairway Stamford Wines & Spirits LLC, Fairway Staten Island LLC, Fairway Uptown LLC, Fairway Westbury LLC, and Fairway Woodland Park LLC (the "Subsidiaries"), each as a debtor and debtor in possession (collectively, the "Debtors") in the above-captioned Chapter 11 cases (collectively with any Successor Cases (as defined herein), the "Cases"), pursuant to Sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e) and 507 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and S.D.N.Y. Bankr. L.R. 4001-2 (the "Local Rules"), seeking entry of an interim order (this "Interim Order"), *inter alia*:

(i)    authorizing the Debtors to obtain senior secured post-petition financing on a superpriority basis pursuant to the terms and conditions of that certain Senior Secured Priming and Superpriority Debtor-In-Possession Credit Agreement attached hereto as Exhibit A (the "DIP Loan Agreement"; together with the agreements, documents, instruments and certificates executed by the Debtors or otherwise delivered in connection therewith, the "DIP Loan Documents"), by and among the Debtors, Credit Suisse AG, Cayman Islands Branch ("Credit Suisse"), as post-petition administrative agent and collateral agent (in such capacities, the "DIP Agent"), and the lenders party thereto from time to time (collectively, the "DIP Lenders"), providing for, *inter alia*, (x) a superpriority, new money, term loan credit facility providing for the borrowing of loans in accordance with the Approved Budget (as defined below) in an aggregate principal amount not to exceed $55,000,000 (the "Term DIP Facility"), and (y) a superpriority letter of credit facility available for issuance of letters of credit ("DIP LCs") in an aggregate principal amount not to exceed $30,611,941 (the "LC DIP Facility"; together with the Term DIP Facility, collectively, the "DIP Facility");

(ii)    authorizing the Debtors to (a) use the proceeds of the DIP Facility and Cash Collateral on the terms and conditions set forth herein and (b) execute and deliver the DIP Loan Agreement and the other DIP Loan Documents and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

(iii)    pursuant to Section 364(c)(2) of the Bankruptcy Code, granting the DIP Agent, for the benefit of itself and the DIP Lenders, valid, enforceable, non-avoidable, automatically and fully perfected first priority liens on and security interests in all DIP Collateral (as defined below) that is not otherwise subject to a valid, perfected and unavoidable security interest or lien as of the Petition Date (as defined below) to secure any and all obligations owing under and with respect to the DIP Facility and the DIP Loan Documents (collectively, and including, without limitation, all "Obligations" as defined in the DIP Loan Agreement, the "DIP Obligations"), subject only to the Carve-Out (as defined below);

2

(iv)    in accordance with the terms of, this Interim Order, the DIP Loan Agreement and the other DIP Loan Documents (x) authorizing reimbursement obligations with respect to Prepetition LCs (as defined below) to be included as DIP Obligations hereunder, and (y) treating all Prepetition LCs as having been issued under the LC DIP Facility;

(v)    pursuant to Section 364(c)(3) of the Bankruptcy Code, granting the DIP Agent, for the benefit of itself and the DIP Lenders, for the purpose of securing the DIP Obligations, valid, enforceable, non-avoidable, automatically and fully perfected junior liens on and security interests in all present and after-acquired Collateral, wherever located, subject only to Permitted Prior Liens and the Prepetition Liens (each as defined below) and the Carve-Out;

(vi)    pursuant to Section 364(d)(1) of the Bankruptcy Code, granting the DIP Agent, for the benefit of itself and the DIP Lenders, for the purpose of securing the DIP Obligations, valid, enforceable, non-avoidable, automatically and fully perfected first priority senior priming liens on and security interests in all Collateral, wherever located, subject only to Permitted Prior Liens and the Carve-Out;

(vii)    pursuant to Section 364(c)(1) of the Bankruptcy Code, granting all of the claims of the DIP Agent and the DIP Lenders on account of the DIP Obligations allowed superpriority administrative expense claim status in each of the Cases with priority over any and all administrative expenses of the kind specified in or arising under any section of the Bankruptcy Code (including, without limitation, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 or 1114 of the Bankruptcy Code), subject only to the Carve-Out;

(viii)    providing adequate protection to the Prepetition Agent (as defined below) and the other Prepetition Secured Parties (as defined below) for any Diminution in Value (as defined below) of their interests in the Prepetition Collateral;

(ix)    authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Loan Documents as such amounts become due and payable, including, without limitation, commitment fees, arrangement fees, administrative agent fees, letter of credit fees and the fees and disbursements of the respective attorneys, advisors, accountants and other consultants engaged by the DIP Agent and the DIP Lenders, all to the extent provided in, and in accordance with the terms of, this Interim Order, the DIP Loan Agreement and the other DIP Loan Documents;

(x)    modifying the automatic stay imposed by Section 362 of the Bankruptcy Code on the terms and conditions set forth herein to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order; and

(xi)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing;

WEIL:\95676752\10\44444.0005

and this Court having considered the Motion, the Declaration of Dennis Stogsdill Pursuant to

Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York, the exhibits

attached thereto, the DIP Loan Documents, and the record established at the interim hearing held

on May [___], 2016 to consider the interim relief requested in the Motion (the "Interim

Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy

Rules 4001(b), (c) and (d), and 9014 and all applicable Local Rules; and the Interim Hearing

having been held and concluded; and all objections, if any, to the interim relief requested in the

Motion having been withdrawn, resolved or overruled by this Court; and it appearing to this

Court that granting the interim relief requested in the Motion is necessary to avoid immediate

and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is

fair and reasonable and in the best interests of the Debtors, their estates, and their creditors, and

is essential for the continued operation of the Debtors' businesses; and it further appearing that

the Debtors are unable to obtain unsecured credit for money borrowed allowable as an

administrative expense under Section 503(b)(1) of the Bankruptcy Code; and adequate protection

being provided on account of the interests of certain holders of liens on the property of the

Debtors' estates on which liens are to be granted; and after due deliberation and consideration,

and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THIS

COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS

OF LAW:[3]

    A.    *Petition Date*.  On the date of the Motion (the "Petition Date"), each of the

Debtors filed a separate, voluntary petition under Chapter 11 of the Bankruptcy Code in the

---

[3]    Where appropriate in this Interim Order, findings of fact shall be construed as conclusions of law and
conclusions of law shall be construed as findings of fact pursuant to Bankruptcy Rule 7052.

WEIL:\95676752\10\44444.0005

United States Bankruptcy Court for the Southern District of New York (this "Court")
commencing these Cases.

B.    _Debtors-in-Possession_.    The Debtors continue to manage and operate their
businesses and properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the
Bankruptcy Code.  No trustee or examiner has been appointed in any of the Cases.

C.    _Jurisdiction and Venue_.    This Court has jurisdiction, pursuant to 28 U.S.C. §§
157(b) and 1334, over these proceedings, and over the persons and property affected hereby.
Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).
Venue for the Cases and proceedings on the DIP Motion is proper in this district pursuant to 28
U.S.C. §§ 1408 and 1409.

D.    _Committee Formation_.    As of the date hereof, the United States Trustee
(the "U.S. Trustee") has not yet appointed an official committee of unsecured creditors in these
Cases (the "Committee").

E.    _Debtors' Stipulations_.    Subject to paragraph 40 hereof, the Debtors admit,
stipulate, acknowledge, and agree that:

(i)    Prior to the Petition Date, the Borrower, Credit Suisse, as administrative
agent and collateral agent (the "Prepetition Agent"), and the lenders from time to time party
thereto (collectively, the "Prepetition Lenders"; together with the Prepetition Agent, collectively,
the "Prepetition Secured Parties") entered into that certain Credit Agreement, dated as of
February 14, 2013 (as amended, restated, supplemented or otherwise modified from time to time,
the "Prepetition Loan Agreement").

(ii)    Each of Holdings, the Subsidiaries and non-Debtor affiliate, Fairway Lake
Grove LLC is a guarantor (each, a "Guarantor" and collectively, the "Guarantors") of the
Obligations (as defined below) pursuant to the terms of that certain Guarantee and Collateral
Agreement, dated as of February 14, 2013 (as amended, restated, supplemented or otherwise
modified from time to time, the "Prepetition Guarantee and Collateral Agreement").

(iii)    Each of the Prepetition Loan Agreement, the Prepetition Guarantee and
Collateral Agreement, and the other Loan Documents (as defined in the Prepetition Loan
Agreement) (collectively, the "Prepetition Loan Documents") are valid and enforceable in

5

accordance with their terms against each of the Debtors (other than in respect of the automatic stay of enforcement arising from Section 362 of the Bankruptcy Code);, are not subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever, and are not subject to avoidance, subordination, recovery, disallowance, recharacterization or other challenge pursuant to applicable state or federal law (including, without limitation, the Bankruptcy Code).

(iv)    Pursuant to the Prepetition Loan Documents, the Prepetition Secured Parties agreed to provide the Borrower with (x) term loans in an aggregate principal amount of $275,000,000, and (y) a revolving credit facility in an aggregate amount not to exceed $40,000,000.  As of the Petition Date, the outstanding principal amount owed by the Debtors with respect to the term loans made under the Prepetition Loan Agreement was not less than $269,761,507.81, the aggregate principal amount owed by the debtors with respect to revolving loans under the Prepetition Loan Agreement was $9,226,011.61, and letters of credit in an aggregate amount not to exceed $30,611,941 had been issued and remained outstanding and undrawn under the Prepetition Loan Agreement (such letters of credit, the "Prepetition LCs") (collectively, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition Loan Documents, including, without limitation, accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements), indemnification obligations, any other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the Borrower's or any other Loan Party's (as defined in the Prepetition Loan Agreement) obligations pursuant to the Prepetition Loan Documents, the "Prepetition Obligations").

(v)    The Prepetition Obligations are legal, binding and enforceable obligations of the Debtors and are not subject to any offset, defense, claim, counterclaim or any other diminution of any type, kind or nature whatsoever.  No portion of the Prepetition Obligations, or any funds previously paid to the Prepetition Secured Parties is subject to avoidance, subordination, recovery, disallowance, recharacterization or other challenge pursuant to the Bankruptcy Code (including, but not limited to, Section 502(d) of the Bankruptcy Code) or applicable non-bankruptcy law.

(vi)    To secure the Prepetition Obligations, the Debtors granted to the Prepetition Agent, for the benefit of the Prepetition Secured Parties, security interests in and liens on (collectively, the "Prepetition Liens") substantially all assets and properties of the Debtors, including, without limitation, all capital stock, intellectual property, equipment, owned and leased real property, fixtures, investment property, commercial tort claims, chattel paper, documents, instruments, letter of credit rights, general intangibles, supporting obligations and other contract rights, accounts and payment intangibles, inventory, deposit accounts, cash and cash equivalents, customer contracts, tax refunds, books and records relating to the foregoing and all proceeds (including insurance proceeds) and products of the foregoing books and records relating to the foregoing and all proceeds (including insurance proceeds) and products of the foregoing, in each case, subject to the carve-outs and exclusions set forth in the Prepetition Guarantee and Collateral Agreement (collectively, the "Prepetition Collateral").

(vii)    The Prepetition Agent filed: (a) UCC-1 Financing Statements regarding the Prepetition Collateral against the Debtors in the applicable state and/or county filing offices; (b) leasehold mortgages with respect to the Prepetition Collateral consisting of leased real property in the applicable filing office; and (c) notices of security interest regarding the Prepetition Collateral consisting of intellectual property in the applicable filing offices.[4]

(viii)    Subject to the Carve-Out and the provisions of paragraph 38 hereof: (a) the liens and security interests granted to the Prepetition Agent in the Prepetition Collateral (collectively, the "Prepetition Liens") are senior in priority to all other liens on or security interests in the Prepetition Collateral, subject only to certain liens otherwise permitted by the Prepetition Loan Agreement (to the extent any such permitted liens were existing, valid, enforceable, properly perfected, non-avoidable, not subject to subordination, recharacterization or other challenge and senior in priority to the Prepetition Liens as of the Petition Date, the "Permitted Prior Liens"); (b) the Prepetition Liens held by the Prepetition Agent are valid, binding, enforceable, non-avoidable and perfected; (c) the Prepetition Obligations constitute legal, valid, binding and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of the Prepetition Loan Documents (other than in respect of the stay of enforcement arising from Section 362 of the Bankruptcy Code); (d) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or the Prepetition Obligations exist, and no portion of the Prepetition Liens or the Prepetition Obligations is subject to any challenge or defense, including, without limitation, avoidance, disgorgement, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no offsets, defenses, claims, objections, challenges, causes of action and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code, against the Prepetition Secured Parties and/or any of their respective affiliates, parents, subsidiaries, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees; and (f) the Debtors have waived, discharged and released any right they may have to challenge any of the Prepetition Obligations, the priority of the Prepetition Obligations and the security for (and the priority of the liens securing) the Prepetition Obligations, and to assert any offsets, defenses, claims, objections, subordination, challenges, causes of action and/or choses of action against the Prepetition Secured Parties and/or any of their respective affiliates, parents, subsidiaries, controlling persons, agents, attorneys, advisors, professionals, officers, directors or employees relating thereto.

(ix)    The Debtors represent that all of the Debtors' cash as of the entry of this Interim Order, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitute the Prepetition Collateral of the Prepetition Secured Parties.

(x)    The Debtors acknowledge and stipulate that the Debtors are in default of their debts and obligations under the Prepetition Loan Documents.

---

[4]    Copies of each of these UCC-1 Financing Statements, leasehold mortgages and notices of security interest will be provided to this Court, if necessary, upon request.

WEIL:\95676752\10\44444.0005

F.    *Findings Regarding the Post-Petition Financing*.

(i)    *Good Cause*.    Good cause has been shown for the entry of this Interim Order.

(ii)    *Priming of Prepetition Liens*.    The priming of the liens granted to the Prepetition Agent, as contemplated by this Interim Order and the DIP Facility and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of their estates and creditors; however, the Prepetition Agent is entitled to receive adequate protection as set forth in this Interim Order pursuant to Sections 361, 363 and 364 of the Bankruptcy Code, for and to the extent of any diminution in the value of its interests in the Prepetition Collateral resulting from, among other things, the Debtors' use, sale or lease of such collateral, market value decline of such collateral, the imposition of the automatic stay, the subordination to the Carve-Out and the priming (to the extent provided for herein) of the Prepetition Liens by the DIP Liens (as defined below) (collectively, solely to the extent of any such diminution in value of its interests in the Prepetition Collateral, the "Diminution in Value").    The Prepetition Agent, on behalf of the Prepetition Lenders, consents to the priming of their existing liens and the adequate protection thereof as provided by this Interim Order.

(iii)    *Need for Post-Petition Financing*.    The Debtors' obtaining credit on an interim basis pursuant to the DIP Facility as provided for herein is necessary to avoid immediate and irreparable harm to the Debtors, their estates, their creditors and other parties-in-interest, and to enable the Debtors to continue operations and to administer and preserve the value of their estates.    The ability of the Debtors to finance their operations, to maintain business relationships with their vendors, suppliers and customers, to pay their employees and otherwise to finance

8

their operations through the Chapter 11 process requires the availability of working capital from the DIP Facility.  Without the ability to access the Interim Financing (as defined below) and the DIP Facility, the Debtors, their estates and their creditors would suffer immediate and irreparable harm.  The Debtors do not have sufficient available sources of working capital or financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility.

(iv)    *No Credit Available on More Favorable Terms.*  Given their current financial condition, financing arrangements and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Lenders on terms more favorable than provided for in the DIP Facility.  The Debtors have been unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors also have been unable to obtain sufficient credit (a) having priority over that of administrative expenses of the kind specified in Sections 503(b), 507(a) and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a post-petition basis is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders, (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims, and (3) the other protections set forth in this Interim Order.

(v)    *Use of Proceeds of the DIP Facility.*  As a condition to entering into the DIP Loan Agreement, the extension of credit under the DIP Facility and the authorization to use the proceeds of the DIP Facility, the DIP Agent and the DIP Lenders require, and the Debtors

WEIL:\95676752\10\44444.0005

have agreed, that the proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of the DIP Loan Documents and in accordance with an Approved Budget (subject to Permitted Variances), (x) in the case of the Term DIP Facility, solely for (a) for the payment of prepetition amounts acceptable to the DIP Lenders as authorized by the Bankruptcy Court pursuant to orders approving the "first day" motions filed by the Debtors; (b) in accordance with the terms of the DIP Facility and the Orders (1) for the payment of working capital and other general corporate needs of the Borrower and the Guarantors in the ordinary course of business, (2) for the payment of Chapter 11 expenses, including allowed professional fees, costs and expenses for advisors, consultants, counsel and other professionals retained by the Borrower, and (3) the payment of costs, fees and expenses incurred in connection with the DIP Facility or by the Prepetition Agent in connection with the Cases, in each case, to the extent such costs, fees and expenses are reimbursable pursuant to the terms of the DIP Loan Documents or Prepetition Loan Documents, respectively; and (y) in the case of the LC DIP Facility, solely for (a) the replacement of Prepetition LCs, (b) for reimbursement obligations under the Prepetition LCs, as necessary, and (c) for issuance of DIP LCs.

G.      *Adequate Protection*.  The Prepetition Secured Parties are entitled to receive adequate protection to the extent of any Diminution in Value of their interests in the Prepetition Collateral.  Pursuant to Sections 361, 363 and 507(b) of the Bankruptcy Code and subject to the terms of this Interim Order, as adequate protection, the Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties, consents to and will receive the adequate protection liens and claims, and the professional and other expense reimbursements, as more fully set forth in paragraph 14 herein.

WEIL:\95676752\10\44444.0005

H.    _New Loan_.  The DIP Facility (including the Interim Financing) constitutes new loans and financial accommodations from the DIP Lenders to the Debtors, separate and distinct from the loans and financial accommodations provided prior to the Petition Date under the Prepetition Loan Documents, and the proceeds of the DIP Facility may only be borrowed and such proceeds may only be used in compliance with an Approved Budget (subject to Permitted Variances), the DIP Loan Agreement and this Interim Order.

I.    _Sections 506(c) and 552(b)_.  In exchange for (i) the DIP Agent's and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out, and (ii) the Prepetition Secured Parties' agreement to subordinate their Prepetition Liens to the DIP Liens and the Carve-Out, upon entry of a final order substantially in the form of the Interim Order (with only such modifications thereto as necessary to convert the Interim Order to a final order and such other modifications satisfactory to the DIP Agent and the Requisite Lenders (the "Final Order" and together with the Interim Order, the "Orders")),  providing for such relief, each of the Prepetition Secured Parties, the DIP Agent and the DIP Lenders shall receive: (a) a waiver of any "equities of the case" claims under Section 552(b) of the Bankruptcy Code; and (b) a waiver of the provisions of Section 506(c) of the Bankruptcy Code.

J.    _Good Faith of the DIP Agent and the DIP Lenders; Debtors' Business Judgment_.

(i)    _Willingness to Provide Financing_.  The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to: (a) the entry by this Court of this Interim Order and the Final Order; (b) approval by this Court of the terms and conditions of the DIP Facility and the DIP Loan Documents; and (c) entry of findings by this Court that such financing is essential to the Debtors' estates, that the DIP Agent and the DIP Lenders are extending post-petition credit to the Debtors pursuant to the DIP Loan Documents and this

Interim Order in good faith, and that the DIP Agent's and the DIP Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Loan Documents will have the protections provided in Section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order or any other order for amounts loaned or advanced pursuant to this Interim Order.

(ii)     *Business Judgment and Good Faith Pursuant to Section 364(e)*.    The extension of credit under the DIP Facility, governed by the terms and conditions of the DIP Loan Documents, the fees paid and to be paid thereunder, and this Interim Order as it relates to the Interim Financing: (a) are fair and reasonable; (b) are the best available to the Debtors under the circumstances; (c) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties; and (d) are supported by reasonably equivalent value and fair consideration.  The DIP Facility was negotiated in good faith and at arms' length among the Debtors, the DIP Agent and the DIP Lenders.  The credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made, used and/or extended in good faith, and for valid business purposes and uses, within the meaning of Section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders are therefore entitled to the protection and benefits of Section 364(e) of the Bankruptcy Code and this Interim Order.

K.     *Notice*.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) the Internal Revenue Service; (iii) the parties included on the Debtors' consolidated list of their forty (40) largest unsecured creditors; (iv) counsel to the DIP Agent for itself and for the DIP Lenders; (v) counsel

WEIL:\95676752\10\44444.0005

to the Prepetition Agent for itself and for the other Prepetition Secured Parties; (vi) all other known parties with liens of record on assets of the Debtors as of the Petition Date; (vii) all financial institutions at which the Debtors maintain deposit accounts; (viii) the landlords for all non-residential real properties occupied by the Debtors as of the Petition Date; and (ix) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 and applicable Local Rules or requesting to receive notice prior to the date hereof.  The Debtors have made reasonable efforts to afford appropriate notice under the circumstances, and such notice of the Motion and the Interim Hearing is good and sufficient to permit the interim relief set forth in this Interim Order.

L.    *Immediate Entry*.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Rules.  Absent entry of this Interim Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed.  This Court concludes that sufficient cause exists therefor and that entry of this Interim Order is in the best interest of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses.

Based upon the foregoing findings and conclusions, the Motion and the record made before this Court with respect to the Motion at the Interim Hearing, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.    Interim Financing Approved.  The Motion is granted to the extent provided herein, and the Interim Financing (as defined in paragraph 4 below) is authorized and approved, subject to the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

13

2.      <u>Objections Overruled</u>.  All objections to the interim relief sought in the Motion to the extent not previously withdrawn, overruled or resolved are hereby overruled on the merits and denied with prejudice.

**<u>DIP Facility Authorization</u>**

3.      <u>Authorization of the DIP Facility</u>.  The DIP Facility and the Interim Financing are hereby approved by this Interim Order.  The Debtors are immediately authorized and empowered to execute and deliver the DIP Loan Documents, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents, and to deliver any and all instruments and documents that may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens.  The Debtors are hereby authorized, empowered and directed to pay, in accordance with this Interim Order, the principal, interest, fees, expenses, legal fees and other amounts described in the DIP Loan Documents, as such become due and payable and without the need to obtain further approval of this Court, including, without limitation, commitment fees, arrangement fees, administrative agent fees, letter of credit fees and the fees and disbursements that are chargeable and reimbursable under the DIP Loan Agreement.  Each officer of the Debtors is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive of such officer's authority to act in the name of and on behalf of the Debtors.  Upon execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.

4.      <u>Authorization to Borrow</u>.  Prior to the entry of the Final Order, and to prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby authorized to

WEIL:\95676752\10\44444.0005

borrow an aggregate principal amount of $15,000,000 (the "Interim Financing"), subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order.

5.      DIP Obligations.  Upon its entry, this Interim Order shall constitute and evidence the validity and binding effect of the DIP Obligations, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Cases, or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").  Upon entry of this Interim Order, the DIP Obligations will include all post-petition loans and any other post-petition indebtedness or obligations, contingent or absolute, that may now or from time-to-time be owing by any of the Debtors to the DIP Lenders under this Interim Order and the DIP Loan Documents, including, without limitation, all principal, accrued interest, costs, fees, expenses and other amounts due under the DIP Facility as set forth herein.  The DIP Obligations will also include any and all reimbursement obligations in respect of Prepetition LCs, which Prepetition LCs shall, upon entry of this Interim Order, be deemed to be issued under the LC DIP Facility, and, as of the Petition Date, all reimbursement obligations and related Revolving Credit Commitments (as defined in the Prepetition Loan Agreement) under the Prepetition Loan Documents with respect to such Prepetition LCs shall be deemed to have terminated.  The DIP Obligations shall be due and payable as provided for herein and in the DIP Loan Documents.

6.      DIP Liens.  To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to Sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected

WEIL:\95676752\10\44444.0005

post-petition priming, first-priority security interests in and liens (collectively, the "DIP Liens")

on all of the following assets, subject to the Carve-Out and Permitted Prior Liens, in each case,

whether now owned by or owing to, or hereafter acquired by or arising in favor of the Debtors

(including under any trade names, styles, or derivations thereof), and whether owned or

consigned by or to, or leased from or to, the Debtors, and regardless of where located, including,

without limitation:  (a) all Prepetition Collateral; (b) cash and cash equivalents; (c) all funds in

any account of the Debtors; (d) all accounts and other receivables; (e) contract rights;

(f) instruments, documents and chattel paper; (g) securities (whether or not marketable);

(h) equipment, inventory and fixtures; (i) real property interests; (j) interests in leaseholds,

(k) franchise rights; (l) patents, tradenames, trademarks, copyrights and all other intellectual

property; (m) general intangibles; (n) capital stock; (o) investment property; (p) supporting

obligations; (q) letter of credit rights; (r) except for avoidance actions under Chapter 5 of the

Bankruptcy Code (other than Section 549 thereof), all commercial tort claims and all other

claims and causes of action; (s) the proceeds of all claims or causes of action (including the

proceeds of avoidance actions under Chapter 5 of the Bankruptcy Code) except to the extent

expressly set forth herein; (t) upon entry of a Final Order providing for such relief, all avoidance

actions and proceeds of avoidance actions under Chapter 5 of the Bankruptcy Code; (u) upon

entry of a Final Order providing for such relief, the Debtors' rights under Section 506(c) of the

Bankruptcy Code; and (v) to the extent not covered by the foregoing, all other assets or property

of the Debtors, whether tangible, intangible, real, personal or mixed, and all proceeds and

products of each of the foregoing and all accessions to, substitutions and replacements for, and

rents, profits and products of, each of the foregoing, any and all proceeds of any insurance,

indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of

16

the foregoing (all of which being hereinafter collectively referred to as the "DIP Collateral"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the DIP Obligations. Notwithstanding the foregoing, the DIP Collateral shall not include (and the DIP Liens shall not extend to) assets held by the Debtors in trust; provided, however, that the DIP Liens shall extend to (a) any rights, claims or causes of action that the Debtors may have with respect to such assets, and (b) any proceeds of such assets that become property of the Debtors. Nothing herein shall limit, subordinate, or constitute a waiver of any rights and priorities of claimants with statutory trust rights, including those afforded under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a et. seq ("PACA") or the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. § 181 et. seq. ("PASA"). The Prepetition Liens shall continue, shall (to the extent that any of the Prepetition Obligations are refinanced) inure to the benefit of the DIP Agent and the DIP Lenders, shall secure the DIP Obligations, and shall be included in the definition of "DIP Liens."

7.    DIP Lien Priority.

(a)    The DIP Agent, for the benefit of itself and the DIP Lenders, and for the purpose of securing the DIP Obligations, shall have the following DIP Liens, in each case, subject and subordinate to the Carve-Out:

(i)    Pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to a valid, perfected and unavoidable security interest or lien as of the Petition Date;

17

(ii)        Pursuant to Section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable, automatically and fully perfected junior liens on and security interests in all DIP Collateral, wherever located, subject only to Permitted Prior Liens and the Prepetition Liens;

(iii)       Pursuant to Section 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable, automatically and fully perfected first priority senior priming liens on and security interests in all DIP Collateral securing the Prepetition Obligations, subject only to Permitted Prior Liens.

(b)        Except as expressly set forth herein, absent further order of the Court, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases, and shall be valid and enforceable against any trustee appointed in the Cases, upon the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code, and/or upon the dismissal of any of the Cases or any Successor Cases, subject only to the Carve-Out.  The DIP Liens shall not be subject to (i) Sections 510, 549 or 550 of the Bankruptcy Code, or (ii) upon entry of a Final Order providing for such relief, Sections 506(c) or 551 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

8.      Protection of DIP Lenders' Rights.  So long as there are any DIP Obligations outstanding, the Prepetition Agent and the other Prepetition Secured Parties shall: (a) have no right to, and take no action to, foreclose upon or recover in connection with the liens granted thereto pursuant to the Prepetition Loan Documents, this Interim Order or otherwise or seek or exercise any enforcement rights or remedies against any DIP Collateral or in connection with the

WEIL:\95676752\10\44444.0005

debt and obligations underlying the Prepetition Loan Documents or the Prepetition Adequate Protection Liens (as defined below), including, without limitation, in respect of the occurrence or continuance of any Event of Default (as defined in the Prepetition Loan Agreement); (b) be deemed to have consented to any release of DIP Collateral authorized under the DIP Loan Documents; (c) not file any further financing statements, trademark filings, copyright filings, mortgages, memoranda of lease, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (c), the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to the DIP Loan Documents and/or this Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the date of filing; and (d) deliver or cause to be delivered, at the Debtors' cost and expense (for which the Prepetition Secured Parties shall be reimbursed for reasonable costs and expenses upon submission to the Debtors of invoices or billing statements), any termination statements, releases and/or assignments (to the extent provided for herein) in favor of the DIP Agent and the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of the Prepetition Adequate Protection Liens on any portion of the DIP Collateral subject to any sale or disposition approved or arranged for by the DIP Agent.

9.    <u>Superpriority DIP Claim</u>.  Subject to the Carve-Out, upon entry of this Interim Order, the DIP Agent and the DIP Lenders are hereby granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim (the "<u>Superpriority DIP Claim</u>"), in each of the Cases, for all of the DIP Obligations: (a) with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Cases, at any time existing or arising, of any kind or nature whatsoever, including, without

limitation, (i) administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code, (ii) any claims allowed pursuant to the Prepetition Obligations, and (iii) the Prepetition Superpriority Claims; and (b) which shall at all times be senior to all administrative expense claims in any Successor Case, including the claims of any successor trustee or other estate representative to the extent permitted by law.

10.    <u>Extension of Credit</u>.    The DIP Agent and the DIP Lenders shall have no obligation to make any loan or advance under the DIP Loan Documents, unless all of the conditions precedent to the making of such extension of credit under this Interim Order and the DIP Loan Documents have been satisfied in full or waived in accordance with the DIP Loan Documents.

11.    <u>Use of DIP Facility Proceeds</u>.

(a)    The proceeds of the DIP Facility will be used only for the following purposes, except as otherwise agreed by the DIP Agent and the Required DIP Lenders (as defined below): the proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of the DIP Loan Documents and in accordance with an Approved Budget (subject to Permitted Variances), (x) in the case of the Term DIP Facility, solely for (a) for the payment of prepetition amounts as authorized by the Bankruptcy Court pursuant to orders approving the "first day" motions filed by the Debtors; (b) in accordance with the terms of the DIP Facility and the Orders (1) for the payment of working capital and other general corporate needs of the Borrower and the Guarantors, including Fairway Lake Grove

LLC, in the ordinary course of business, (2) for the payment of Chapter 11 expenses, including allowed professional fees, costs and expenses for advisors, consultants, counsel and other professionals retained by the Borrower, and (3) the payment of costs, fees and expenses incurred in connection with the DIP Facility or by the Prepetition Agent in connection with the Cases, in each case, to the extent such costs, fees and expenses are reimbursable pursuant to the terms of the DIP Loan Documents or Prepetition Loan Documents, respectively; and (y) in the case of the LC DIP Facility, solely for (a) the replacement of Prepetition LCs, (b) for reimbursement obligations under the Prepetition LCs, as necessary, and (c) for issuance of DIP LCs.

      (b)      Without in any way limiting the foregoing, no DIP Collateral, proceeds of the DIP Loans, any portion of the Carve-Out or any other amounts may be used directly or indirectly, without the prior written consent of the DIP Agent and the DIP Lenders, by any of the Debtors, the Committee, if any, any other committee, or any trustee or other estate representative appointed in the Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (i) to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the DIP Liens or the Superpriority DIP Claim (except to the extent expressly set forth herein), the Prepetition Adequate Protection Liens or Prepetition Superpriority Claims, or the Prepetition Liens; or (ii) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, any of the DIP Agent, the DIP Lenders, the Prepetition Agent or the other Prepetition Secured Parties, any of their controlling persons, affiliates or successors or assigns, and each of the respective

21

officers, directors, employees, agents, attorneys, or advisors of each of the foregoing (collectively, the "Released Parties"), with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any claims or causes of action arising under Chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the Prepetition Superpriority Claims, the DIP Liens, the DIP Loan Documents, the Prepetition Loan Documents or the Prepetition Obligations, (D) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the DIP Obligations or the Prepetition Obligations, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (1) the DIP Agent or the DIP Lenders hereunder or under any of the DIP Loan Documents, or (2) the Prepetition Agent or the other Prepetition Secured Parties under any of the Prepetition Loan Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the DIP Agent's, the DIP Lenders' or the other Prepetition Secured Parties' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents, Prepetition Loan Documents and the Interim and/or Final Orders), or (F) objecting to, contesting, or interfering with, in any way, the DIP Agent's, the DIP Lenders' and the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral once an Event of Default (as defined in the DIP Loan Agreement) has occurred; provided, however, that no more than $25,000 in the aggregate of the DIP Collateral, the Carve-Out and proceeds from the borrowings under the DIP Facility may be

WEIL:\95676752\10\44444.0005

used by any Committee to investigate claims against the DIP Lenders and/or liens granted to the Prepetition Agent under the Prepetition Loan Agreement.

12.    <u>Termination Events</u>.    The occurrence of any of the following events (the "<u>Termination Events</u>") shall constitute an Event of Default under the DIP Loan Agreement and a termination event under this Interim Order:

(a)    for a period in excess of five (5) business days, reversal, vacatur or stay of the effectiveness of this Interim Order or the Final Order without the express prior written consent of the DIP Agent (acting at the direction of DIP Lenders holding more than fifty percent (50%) of the outstanding loans and commitments under the DIP Facility (collectively "<u>Required DIP Lenders</u>"));

(b)    without the written consent of the DIP Agent acting at the direction of the Required DIP Lenders, (i) dismissal of any of the Cases of a Debtor with material assets or conversion of any of the Cases of such a Debtor to chapter 7 cases, or appointment of a chapter 11 trustee or examiner or other responsible officer with enlarged powers relating to the operation of the business of the Borrower or any Guarantor in any of the Cases, which dismissal, conversion or appointment shall not have been reversed, stayed or vacated within three (3) calendar days, (ii) termination of exclusivity of a Debtor with material assets, or (iii) the Debtors shall seek or request the entry of any order to effect any of the events described in subclause (i) of this clause (b);

(c)    the occurrence of any Event of Default (as defined in the DIP Loan Agreement), or the occurrence of any Default following the passage of any applicable notice or cure period set forth in the DIP Loan Agreement;

(d)    the entry by this Court of an order granting relief from the automatic stay imposed by Section 362 of the Bankruptcy Code sought by any party that permits the foreclosure or enforcement on assets of the Borrower or any Guarantor in a combined aggregate amount in excess of $10,000,000 unless stayed, vacated or satisfied for a period of twenty (20) calendar days after entry thereof, without the written consent of the DIP Agent (acting at the direction of the Required DIP Lenders);

(e)    [Reserved]

(f)    except as set forth herein, five (5) business days after the failure by the Debtors to observe or perform any of the material terms or provisions contained in the Orders;

(g)    the entry of an order of this Court granting any lien on or security interest in any of the DIP Collateral that is pari passu with or senior to the DIP Liens held by the DIP Agent on or as security interests in the DIP Collateral, the Prepetition Adequate Protection Liens, the Prepetition Superpriority Claims or the Prepetition Liens, or the Debtors shall seek or request the entry of any such order;

(h)    the Debtors' creating or permitting to exist any other superpriority claim which is pari passu with or senior to the claims of the DIP Agent and the DIP Lenders, the Prepetition Adequate Protection Liens, the Prepetition Superpriority Claims or the Prepetition Liens, except for the Carve-Out;

(i)    the Debtors filing a pleading, or in any way support another party's pleading, seeking to modify or otherwise alter any of the terms and conditions set forth in the Orders without the prior written consent of the DIP Agent (acting at the direction of the Required DIP Lenders);

(j)    the entry of an order of this Court amending, supplementing or otherwise altering any of the terms and conditions set forth in the Orders without the prior written consent of the DIP Agent (acting at the direction of the Required DIP Lenders);

(k)    any of the Debtors uses the DIP Facility for any item other than those set forth in the Approved Budget (subject to Permitted Variances) or the Carve-Out, except as agreed in writing in advance by the DIP Agent (acting at the direction of the Required DIP Lenders);

(l)    any of the Debtors (or any party with the support of any of the Debtors) shall file a plan of reorganization in any of the Cases if the filing of such plan is made without the prior written consent of the DIP Agent (acting at the direction of the Required DIP Lenders);

(m)    any uninsured judgments are entered with respect to any post-petition liabilities against any of the Debtors or any of their respective properties in a combined aggregate amount in excess of $10,000,000 unless stayed, vacated or satisfied for a period of twenty (20) calendar days after entry thereof;

(n)    the Debtors' Chief Restructuring Officer ceases to serve in such capacity or is replaced, unless such replacement is reasonably acceptable to the Required DIP Lenders in their reasonable discretion;

(o)    the failure of the Debtors to meet any of the following milestones, unless extended or waived by the DIP Agent at the direction of the Required DIP Lenders:

(i)    to obtain entry of the Final Order in form and substance satisfactory to the DIP Agent and the Required DIP Lenders in their sole discretion on or before the forty-fifth (45th) day after the Petition Date;

(ii)    to obtain this Court's (x) confirmation of the plan of reorganization contemplated by that certain Restructuring Support Agreement, dated as of May 2, 2016 (the "RSA"), by and among the Debtors and the Prepetition Secured Parties party thereto (the "Prepackaged Plan"), and (y) approval of a disclosure statement relating to the Prepackaged Plan pursuant to one or more orders that are in form and substance satisfactory to the DIP Agent and the Required DIP Lenders in their sole discretion, in each case, no later than the date that is sixty (60) calendar days following the Petition Date;

(iii)    the occurrence of the "Effective Date" of the Prepackaged Plan no later than the date that is seventy-five (75) calendar days following the Petition Date;

(p)    any Debtor asserts a right of subrogation or contribution against any other Debtor prior to the date upon which all DIP Obligations have been paid in full and all DIP Loan Commitments have been terminated;

(q)    the Debtors seek to sell any of their assets outside the ordinary course of business, unless (i) the proceeds of such sale are used to indefeasibly pay the DIP Obligations in full in cash, and (ii) such sale is supported by the DIP Agent (acting at the direction of Required DIP Lenders);

(r)    the Debtors filing of a plan of reorganization in the Cases that does not propose to indefeasibly repay the DIP Obligations in full in cash, unless otherwise consented to by the DIP Agent (acting at the direction of Required DIP Lenders);

(s)    any of the Debtors (or any party with the support of any of the Debtors) shall challenge the validity or enforceability of any of the DIP Loan Documents or the Prepetition Loan Documents;

(t)    any Debtor shall make any payment or grant adequate protection unless expressly provided in the Orders or consented to by the DIP Agent at the direction of the Required DIP Lenders; or

(u)    the termination of the RSA and revocation of the votes to accept the Prepackaged Plan by Prepetition Secured Parties that has the effect of causing the percentage of funded debt owed by the Prepetition Secured Parties party thereto to fall below 66 2/3 % of the total amount outstanding under the Prepetition Loan Documents, it being understood that the "Requisite Consenting Lenders" (as defined in the RSA) shall have the right to revoke their votes to accept the Prepackaged Plan as provided in the RSA.

### **Authorization to Use Proceeds of DIP Facility and Adequate Protection**

13.    Authorization to Use Proceeds of DIP Facility.  Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, and in accordance with an Approved Budget (subject to Permitted Variances), the Debtors are authorized to use the proceeds of the DIP Facility in accordance with this Interim Order.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, except as permitted in this Interim Order and the DIP Loan Documents, and in accordance with an Approved Budget (subject to Permitted Variances).

14.    Adequate Protection.

25

(a)    <u>Prepetition Secured Party Adequate Protection Liens and Claims</u>. Pursuant to Sections 361, 363(e), 364(d) and 507(b) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Secured Parties for any potential diminution in value of collateral, the Debtors hereby grant to the Prepetition Agent, on behalf of itself and the other Prepetition Secured Parties, the following:

(i)    continuing, valid, binding, enforceable and perfected postpetition "replacement" liens on the Prepetition Collateral to the extent of any post-petition Diminution in Value of the Prepetition Secured Parties' interest in the Prepetition Collateral (the "<u>Prepetition Adequate Protection Liens</u>"), which liens will be junior to the DIP Liens, the Term Permitted Prior Liens, the Prepetition Liens, and the Carve-Out; and

(ii)    an allowed superpriority administrative expense claim in each of the Cases to the extent of any post-petition Diminution in Value of the Prepetition Secured Parties' interest in the Prepetition Collateral (the "<u>Prepetition Superpriority Claims</u>"), which claims will be junior only to the DIP Obligations, the Superpriority DIP Claim, the Carve-Out and, with respect to the DIP Collateral, any validly perfected secured claim, and be payable from and have recourse to all assets and property of the Debtors.

Notwithstanding the foregoing, the Prepetition Adequate Protection Liens shall not extend to assets held by the Debtors in trust; <u>provided</u>, <u>however</u>, that the Prepetition Lender Adequate Protection Liens shall extend to (a) any rights, claims or causes of action that the Debtors may have with respect to such assets, and (b) any proceeds of such assets that become property of the

26

Debtors.    Nothing herein shall limit, subordinate, or constitute a waiver of any rights and priorities of claimants with statutory trust rights, including those afforded under PACA or PASA.

(b)    <u>Adequate Protection Payments</u>.    As further adequate protection for the Prepetition Secured Parties, the Debtors are authorized to provide adequate protection in the form of current payment of all reasonable and documented (in summary form) out-of-pocket fees, costs and expenses of the Prepetition Agent (including (and limited, in the case of counsel, to) all reasonable fees, costs, disbursements and expenses of their outside counsel, King & Spalding LLP ("<u>K&S</u>"); and Moelis & Company LLC ("<u>Moelis</u>"), as financial advisor to K&S in its capacity as counsel to the Prepetition Agent (pursuant to that certain letter of engagement dated as of April 25, 2016, by and between K&S, Moelis, the Prepetition Agent and the Borrower (the "<u>Moelis Engagement Letter</u>"), in each case, without duplication of the DIP Agent's fees as provided in paragraph 32 of this Interim Order).    Subject to the Carve-Out and paragraphs 32(ii) and 40, the payments set forth in this paragraph are not and shall not be subject to any offset, defense, claim, counterclaim or diminution, or recovery, of any type, kind or nature whatsoever.

(c)    <u>Access to Books and Records</u>.    As further adequate protection for each of the Prepetition Secured Parties, the Debtors shall provide the Prepetition Agent with reasonable access to the Debtors' books and records and such financial reports as are provided to the DIP Agent pursuant to Section 5.07 of the DIP Loan Agreement.

15.    <u>Adequate Protection Reservation</u>.    The receipt by the Prepetition Secured Parties of the adequate protection provided pursuant to paragraph 14 of this Interim Order shall not be deemed an admission that the interests of the Prepetition Secured Parties are indeed adequately protected.    Further, this Interim Order shall not prejudice or limit the rights of the Prepetition

WEIL:\95676752\10\44444.0005

Secured Parties to seek additional adequate protection or the Debtors' or any party in interest's rights to dispute such additional adequate protection.

16.    <u>Reporting</u>. The Debtors shall provide to the DIP Agent for the benefit of the DIP Lenders: (i) monthly consolidated operating reports of the Debtors and their subsidiaries within thirty (30) days of month-end, certified by the Debtors' chief financial officer; (ii) quarterly consolidated financial statements of the Debtors within sixty (60) days of fiscal quarter-end, certified by the Borrower's chief financial officer; (iii) annual audited consolidated financial statements of the Debtors within one-hundred twenty (120) days of fiscal year-end, certified with respect to such consolidated statements by independent certified public accountants reasonably acceptable to the DIP Lenders, which shall not be qualified in any material respect as to scope but may contain a qualification with respect to the Cases; (iv) following delivery of the Initial Approved Budget (as defined below), and for each four week period thereafter during the Cases, an updated 13-week cash flow forecast, in each case, in form and reasonably substance satisfactory to the DIP Agent at the direction of the Required DIP Lenders (each such forecast approved by the DIP Agent at the direction of the Required DIP Lenders, an "<u>Approved Budget</u>") for the subsequent 13 week period consistent with the form of the Initial Approved Budget; and (v) beginning on the fourth Friday following the date on which all conditions precedent to the effectiveness of the DIP Facility have been satisfied or waived as provided therein (such date, the "<u>Closing Date</u>"), and on every second Friday thereafter, a variance report (the "<u>Variance Report</u>") setting forth actual cash receipts and disbursements of the Debtors for the prior two week period and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such period as compared to the then-applicable Approved Budget, and each such Variance Report shall include explanations for all material variances and shall be

28

certified by the chief financial officer or chief restructuring officer of the Borrower.  The Debtors will promptly provide notice to the DIP Agent, for prompt distribution to the DIP Lenders, of any Material Adverse Effect (as defined in the DIP Loan Agreement).

17.     Additional Reports and Information.  Further, the Debtors will provide to the DIP Agent, for the benefit of the DIP Lenders, such other reports and information as may be reasonably requested by the DIP Agent that are appropriate and necessary in relation to the DIP Obligations.  In addition, the Debtors' accountants, financial advisors and consultants are hereby authorized to cooperate, consult with, and provide to the DIP Agent, for the benefit of the DIP Lenders, all such information as may be reasonably requested with respect to the businesses, results of operations, and financial condition of the Debtors.

18.     Section 507(b) Reservation.  Subject to the Carve-Out, nothing herein shall impair or modify the application of Section 507(b) of the Bankruptcy Code in the event that the adequate protection provided hereunder is insufficient to compensate for any Diminution in Value during any of the Cases.

**Provisions Common to DIP Facility**

19.     Amendment of the DIP Loan Documents or this Interim Order.  Except for actions expressly permitted to be taken by the DIP Agent or the Required DIP Lenders, no amendment, modification, termination or waiver of any provision of the DIP Loan Documents or this Interim Order or any other related documents, or any consent to any departure by any of the Debtors therefrom, shall in any event be effective unless the same shall be in writing (it being understood that any necessary signatures may be on a document consenting to such amendment, modification, termination, or waiver) and (a) in the case of an amendment to cure any ambiguity, non-material omission, defect or inconsistency, signed by the DIP Agent and the Debtors, and (b) in the case of any other amendment, modification, termination or waiver, signed by the

29

Debtors, the DIP Agent and the Required DIP Lenders.  In the event of any such amendment, modification, termination or waiver, the DIP Agent shall provide notice thereof to the Prepetition Agent, the Committee, if any, and the U.S. Trustee no less than three (3) days prior to the effective date thereof (or such shorter period as to which such parties may agree).

     20.    <u>Budget</u>.

     (a)    The Debtors have prepared and delivered an initial 13-week budget to the DIP Agent (the "<u>Initial Approved Budget</u>"), which reflects the Debtors' anticipated cumulative cash receipts and disbursements on a weekly basis and all necessary and required cumulative expenses that the Debtors, in consultation with any financial advisors engaged by the DIP Agent, expect to incur during each week of the Initial Approved Budget.  The Debtors' (i) actual aggregate disbursements shall not exceed the aggregate amount of disbursements in the Initial Approved Budget or any subsequently Approved Budget, as applicable, for the applicable period by more than the Permitted Variance (as defined below), and (ii) actual aggregate cash receipts (excluding proceeds of the DIP Facility that may be deemed a receipt) during the applicable period shall not be less than the aggregate amount of such cash receipts in the Initial Approved Budget or any subsequently Approved Budget, as applicable, for such period by more than the Permitted Variance.

     (b)    "<u>Permitted Variance</u>" will mean, for the first four weeks (commencing on May 2, 2016) after the Closing Date and on a rolling 2-week basis to be tested every two weeks thereafter (each such period, the "<u>Testing Periods</u>"): (i) all favorable variances, (ii) an unfavorable variance of no more than 15% for each of actual receipts and disbursements as compared to the budgeted receipts and disbursements, respectively, set forth in the Approved Budget with respect to the applicable Testing Period.  The Permitted Variance with respect to

WEIL:\95676752\10\44444.0005

each Testing Period shall be determined and reported to the DIP Agent and the DIP Lenders not later than Friday immediately following each such Testing Period. Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the approval of the DIP Agent at the direction of the Requisite DIP Lenders. Subject to paragraph 20(a), variances, if any, from the Initial Approved Budget or any subsequently Approved Budget, and any proposed changes to the Initial Approved Budget or any Approved Budget, shall be subject to the approval of the DIP Agent at the direction of the Required DIP Lenders.

(c)      The Initial Approved Budget shall be modified or supplemented from time to time consistent with the provisions of paragraph 16 hereof (i.e., a revised 13-week cash flow forecast that must be approved by the DIP Agent at the direction of the Required DIP Lenders), in each case without further notice, motion or application to, order of, or hearing before, this Court. For all purposes hereunder, (i) the Initial Approved Budget shall constitute an "Approved Budget," and (ii) any Approved Budget shall replace any prior Approved Budgets (including the Initial Approved Budget) for all Testing Periods ending after the approval of such Approved Budget.

21.      Budget Compliance. Except as otherwise provided herein or approved by the DIP Agent, the Debtors will not, and will not permit any subsidiary directly or indirectly to, use any cash or the proceeds of the DIP Facility in a manner or for a purpose other than those consistent with an Approved Budget and this Interim Order.

22.      Modification of Automatic Stay. The automatic stay imposed by Section 362(a) of the Bankruptcy Code is hereby modified as necessary to permit: (a) the Debtors to grant the DIP Liens and the Prepetition Superpriority Claims, and to perform such acts as the DIP Agent may request to assure the perfection and priority of the DIP Liens; (b) the Debtors to take all

31

appropriate action to grant the Prepetition Adequate Protection Liens and the Prepetition Superpriority Claims set forth in paragraph 14 hereof, and to take all appropriate action to ensure that the Prepetition Adequate Protection Liens granted thereunder are perfected and maintain the priority set forth herein; (c) the Debtors to incur all liabilities and obligations to the Prepetition Secured Parties, the DIP Agent and the DIP Lenders as contemplated under this Interim Order; (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents and this Interim Order; (e) the Debtors to execute any amendments to the DIP Loan Documents agreed to in writing with the DIP Agent and the DIP Lenders; and (f) the implementation of the terms of this Interim Order.

23.    <u>Perfection of DIP Liens and Post-Petition Liens</u>.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection and priority of all liens granted herein, including, without limitation, the DIP Liens and the Prepetition Adequate Protection Liens, without the necessity of execution, filing or recording any financing statement, mortgage, notice or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable law) such liens, or to entitle the Prepetition Secured Parties, the DIP Agent or the DIP Lenders to the priorities granted herein.  Notwithstanding the foregoing, each of the DIP Agent and the Prepetition Agent is authorized to execute, file or record and the DIP Agent may require the execution, filing or recording, as each, in its sole discretion deems necessary, such financing statements, mortgages, notices of lien, and other similar documents to perfect in accordance with applicable law or to otherwise evidence the DIP Liens and/or Prepetition Adequate Protection Liens, as applicable, and all such financing statements, mortgages, notices,

and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Prepetition Adequate Protection Liens.  The Debtors are authorized to execute and deliver promptly upon demand to the DIP Agent or the Prepetition Agent all such financing statements, mortgages, notices, and other documents as the DIP Agent or the Prepetition Agent, as applicable, may reasonably request.   The DIP Agent and the Prepetition Agent, in their respective discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

24.    <u>After-Acquired Property</u>.  Except as otherwise provided in this Interim Order, pursuant to Section 552(a) of the Bankruptcy Code, all property acquired by the Debtors after the Petition Date, including, without limitation, all DIP Collateral pledged or otherwise granted to the DIP Agent and/or the DIP Lenders pursuant to this Interim Order, is not and shall not be subject to any lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a Permitted Prior Lien.

25.    [Reserved].

26.    <u>Maintenance of DIP Collateral</u>.  Until the indefeasible payment in full in cash of all DIP Obligations and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall: (a) insure the DIP Collateral as required under this Interim Order and the DIP Loan Documents, as applicable; and (b) maintain the cash management system in

effect as of the Petition Date, as modified by this Interim Order and any order that may be entered by this Court in accordance with this Interim Order.

27.    <u>Insurance Policies</u>.    The Debtors shall continue to maintain all property, operational and other insurance as required and as specified in the DIP Loan Documents.    Upon entry of this Interim Order, each of the DIP Agent and the DIP Lenders shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

28.    <u>Disposition of or New Liens on DIP Collateral</u>.    Other than in the ordinary course of business, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral without the prior written consent of the DIP Agent acting at the direction of the Required DIP Lenders (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, except as otherwise provided for herein) unless such sale, transfer, lease, encumbrance or other disposition (i) results in payment in full of the DIP Obligations and the Prepetition Obligations in cash, or (ii) is expressly permitted by the DIP Loan Documents.    Absent further order of this Court, the Debtors shall not create or permit to exist any post-petition liens or encumbrances on any of their assets or property except any post-petition liens allowed pursuant to the DIP Loan Documents and as otherwise agreed to by DIP Agent (acting at the direction of the Required DIP Lenders) in writing.

29.    <u>DIP Termination Date</u>.    On the Maturity Date (as defined in the DIP Loan Agreement), all DIP Obligations shall be immediately due and payable, and all commitments to extend credit under the DIP Facility will terminate.

30.    <u>Rights and Remedies Upon Termination Event</u>.    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and without order of or application or motion to this

Court, immediately upon the occurrence and during the continuance of a Termination Event: (a) the DIP Agent may (and, at the direction of the Required DIP Lenders, shall), by written notice to the Debtors, their counsel, the U.S. Trustee and any counsel for the Committee, if any, terminate the DIP Facility, declare the DIP Obligations to be immediately due and payable and, subject to the immediately following clause (b), exercise all rights and remedies under the DIP Loan Documents and this Interim Order; and (b) the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise all rights and remedies provided for in the DIP Loan Documents, including to take any or all of the following actions, without further order of or application to this Court (as applicable): (i) immediately terminate the Debtors' limited use of any cash collateral; (ii) cease making any extensions of credit under the DIP Facility to the Debtors; (iii) declare all DIP Obligations to be immediately due and payable; (iv) freeze monies or balances in the Debtors' accounts (and, with respect to the DIP Obligations, sweep all funds contained in any deposit account of the Debtors that is subject to the terms of a deposit account control agreement in favor of the Prepetition Agent and/or the DIP Agent, as applicable); (v) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the DIP Lenders against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Lenders, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations; and (vi) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents or applicable law to effect the repayment of the DIP Obligations; provided, however, that prior to the exercise of any right in clauses (i) or (vi) the DIP Agent shall be required to provide five (5) business days written notice (the

"Remedies Notice Period") to the Debtors and the Committee of the DIP Agent's intent to exercise such rights and remedies; provided, further, that none of the Debtors, the Committee or any other party-in-interest shall have the right to contest the enforcement of the remedies set forth in this Interim Order and the DIP Loan Documents on any basis other than an assertion that a Termination Event has not occurred or has been cured within the cure periods expressly set forth herein or in the applicable DIP Loan Documents.   During the Remedies Notice Period, the Debtors and the Committee shall be entitled to seek an emergency hearing with the Court in connection therewith.   With respect to the aforementioned clauses (i) and (vi), unless the Court determines during the Remedies Notice Period that a Termination Event has not occurred, or to the extent of an applicable cure period was cured within the applicable cure period as provided under the DIP Loan Documents: (i) the automatic stay shall automatically be terminated at the end of the Remedies Notice Period without further notice or order and the DIP Agent shall be permitted to exercise all rights and remedies set forth herein; (ii) the Debtors shall cooperate fully with the DIP Agent and the DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise; and (iii) the Debtors shall waive any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Agent and the DIP Lenders set forth in the Interim and/or Final Orders and in the DIP Loan Documents.   Any remedies taken affecting any leases or premises subject to any leases shall be in accordance with applicable federal and state law, the Bankruptcy Code, the governing leases, consent of the applicable landlord (if required), or as otherwise ordered by the Court.

31.      Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order.  Based on the record, the DIP Agent and the DIP Lenders have acted

in good faith in connection with the DIP Facility, the Interim Financing, and with this Interim

Order, and their reliance on this Interim Order is in good faith.  Based on the findings set forth in

this Interim Order and the record made during the Interim Hearing, and in accordance with

Section 364(e) of the Bankruptcy Code for any amounts loaned or advanced under this Interim

Order, in the event any or all of the provisions of this Interim Order are hereafter modified,

amended or vacated by a subsequent order of this Court or any other court, the DIP Agent and

the DIP Lenders are entitled to the protections provided in Section 364(e) of the Bankruptcy

Code.    Any  such  modification,  amendment  or  vacatur  shall  not  affect  the  validity  and

enforceability of any advances previously made or made hereunder, or lien, claim or priority

authorized or created hereby.  Any liens or claims granted to the DIP Agent and the DIP Lenders

arising prior to the effective date of any such modification, amendment, or vacatur of this Interim

Order shall be governed in all respects by the original provisions of this Interim Order, including

entitlement to all rights, remedies, privileges, and benefits granted herein.

32.    <u>DIP and Other Expenses</u>.  The Debtors are authorized to pay promptly,

regardless of whether any transactions contemplated by the Prepackaged Plan are ever actually

consummated, all (i) reasonable and documented (in summary form) out-of-pocket fees, costs,

disbursements and expenses of (A) the DIP Agent (including (and limited, in the case of counsel,

to) all reasonable fees, costs, disbursements and expenses of the DIP Agent's outside counsel,

K&S), and (B) Moelis, as financial advisor to K&S in its capacity as counsel to the DIP Agent

(pursuant to the Moelis Engagement Letter), in each cash without duplication of the Adequate

Protection payments provided to the Prepetition Secured Parties in paragraph 14(b)), in the case

of each of the foregoing clauses (A) and (B), in connection with the negotiations, preparation,

execution and delivery of the DIP Loan Documents and the funding of all extensions of credit

under the DIP Facility, including, without limitation, all due diligence, transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the DIP Agent and its counsel and professional advisors in connection with the DIP Facility, the DIP Loan Documents or the transaction contemplated thereby, the administration of the DIP Facility and any amendment or waiver of any provision of the DIP Loan Documents, and (ii) without duplication, reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of each of the DIP Agent (including (and limited, in the case of counsel, to) all reasonable fees, costs, disbursements and expenses of the DIP Agent's outside counsel, K&S) and professional advisors in connection with the enforcement of any rights and remedies under the DIP Loan Documents.

33.    <u>Indemnification</u>.  Subject to the investigation rights set forth in paragraph 40 hereof, the Debtors shall jointly and severally indemnify and hold harmless the DIP Agent, each DIP Lender, any of their affiliates and each of the respective officers, directors, employees, controlling persons, agents, advisors, attorneys and representatives of each in their respective capacities as such (each, an "<u>Indemnified Party</u>"), from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or relating to the DIP Facility, the DIP Loan Documents or the transactions contemplated thereby, or any use made or proposed to be made with the proceeds of the DIP Facility, whether or not such investigation, litigation or proceeding is brought by any Debtor or any of its subsidiaries, any shareholders or creditors of the foregoing,

an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or under the DIP Loan Documents are consummated, except, with respect to any Indemnified Party, to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from the bad faith, gross negligence or willful misconduct of such Indemnified Party or any of such Indemnified Party's affiliates or their respective principals, directors, officers, employees, representatives, agents, attorneys or third party advisors. No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except, with respect to any Indemnified Party, to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from the bad faith, gross negligence or willful misconduct of such Indemnified Party or any of such Indemnified Party's affiliates or their respective principals, directors, officers, employees, representatives, agents, attorneys or third party advisors. In no event, however, shall any person be liable on any theory of liability for any special, indirect, consequential or punitive damages. The foregoing indemnity includes indemnification for the DIP Agent's and the DIP Lenders' exercise of discretionary rights granted under this Interim Order or the DIP Loan Documents. In all such litigation or the preparation therefor, subject to paragraph 32, the DIP Agent and the DIP Lenders shall be entitled to select their own counsel and, in addition to the foregoing indemnity, the Debtors agree to promptly pay the reasonable fees and expenses of such counsel.

34.    <u>Proofs of Claim</u>. The DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not be required to file proofs of claim in any of the Cases for any claim allowed

herein.  Any proof of claim filed by the DIP Agent, the DIP Lenders or the Prepetition Secured

Parties shall be deemed to be in addition to (and not in lieu of) any other proof of claim that may

be filed by any such persons.

35.    <u>Rights of Access and Information</u>.  Without limiting the rights of access and

information afforded the Prepetition Secured Parties, the DIP Agent and the DIP Lenders under

this Interim Order, the DIP Loan Documents and/or the Prepetition Loan Documents, the

Debtors shall afford representatives, agents and/or employees of the DIP Agent and DIP Lenders

reasonable access to the Debtors' premises and their books and records and shall reasonably

cooperate, consult with, and provide to such persons all such information as may be reasonably

requested.  In addition, the Debtors shall authorize their independent certified public accountants,

financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to

the DIP Agent (and, so long as a Termination Event has occurred and is continuing, each of the

DIP Lenders) all such information as may be reasonably requested with respect to the business,

results of operations, and financial condition of any of the Debtors subject to any non-disclosure,

non-reliance or other letter agreement reasonably required.

36.    [Reserved].

37.    [Reserved].

38.    <u>Carve-Out</u>.

(i)    For the purposes of this Interim Order, the "<u>Carve-Out</u>" shall mean

an amount equal to the sum of the following: (i) all fees required to be paid to the Clerk

of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to

31 U.S.C. § 3717; (ii) all reasonable fees and expenses incurred by a trustee under section

726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000; (iii) to the

extent allowed by this Court at any time, and, solely with respect to any Committee, strictly subject to the Approved Budget and the line items applicable to such Committee's professionals set forth therein, all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtors and any Committee at any time before or on the date and time of the delivery by the DIP Agent at the direction of the Required DIP Lenders of a Carve Out Trigger Notice (as defined below), plus any monthly or success or transaction fees payable to the Debtors' professionals or professionals firms retained by the Debtors and any Committee, (each, a "Professional" and the fees, costs and expenses of Professionals, the "Professional Fees")[5] in each case, to the extent such Professional Fees are allowed by this Court (or, in the case of A&M, are permitted to be paid pursuant to the procedures set forth in the A&M Retention Order) at any time, whether before or after delivery of a Carve Out Trigger Notice; and (iv) after the date and time of the delivery by the DIP Agent at the direction of the Required DIP Lenders of the Carve Out Trigger Notice, to the extent allowed by this Court (or, in the case of A&M, are permitted to be paid pursuant to the procedures set forth in the A&M Retention Order) at any time, all unpaid fees, disbursements, costs and expenses incurred by Professionals in an aggregate amount not to exceed $1,000,000 (the amount set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"), plus any success or transaction fees that may become due and payable to any Professional, which shall not be included in or subject to the Post-Carve

---

[5] As used herein, the term "Professional" shall be deemed to include Alvarez & Marsal North America, LLC ("A&M") notwithstanding that A&M is not being retained by the Debtors under section 327 of the Bankruptcy Code but, rather, is being retained under sections 105(a) and 363(b) of the Bankruptcy Code. The treatment of A&M as a Professional under this Interim Order shall not subject A&M to the provisions of sections 327, 328, 330, or 331 of the Bankruptcy Code but, rather, A&M shall be subject only to the provisions of the order approving its retention (the "A&M Retention Order").

WEIL:\95676752\10\44444.0005

Out Trigger Notice Cap; provided, however, nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement or compensation sought by any such professionals or any other person or entity. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by the DIP Agent at the direction of the Required DIP Lenders to the Debtors and their counsel, the U.S. Trustee, and lead counsel to any official committee, which notice may be delivered following the occurrence of an Event of Default and stating that the Post-Carve Out Trigger Notice Cap has been invoked.  Immediately upon delivery of a Carve-Out Trigger Notice, the Debtors shall be required to transfer into a segregated account (the "Carve-Out Account") not subject to the control of the DIP Agent or the Prepetition Agent an amount equal to the Post-Carve-Out Trigger Notice Cap plus an amount equal to the aggregate unpaid fees, costs and expenses described above in clauses (iii) and (iv) of this paragraph, in each case, as determined by a good faith estimate of the applicable Professional.  The proceeds on deposit in the Carve-Out Account shall be available only to satisfy obligations benefitting from the Carve-Out, and the DIP Agent or the Prepetition Agent (i) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve-Out Account and (ii) shall only have a security interest in any residual interest in the Carve-Out Account available following satisfaction in full of all obligations benefitting from the Carve-Out.   For the avoidance of doubt and notwithstanding anything to the contrary herein or elsewhere, the Carve Out shall be senior to all liens securing the DIP Obligations, the Prepetition Adequate Protection Liens, all claims and any and all other forms of adequate protection, liens or claims securing the DIP Obligations.

42

(ii)         Subject to paragraph 40 herein, notwithstanding anything to the contrary herein, neither the Carve-Out nor any other DIP Collateral may be used for the payment of any fees or disbursements incurred in connection with: (a) attempting to modify or otherwise alter any of the terms and conditions set forth in this Interim Order, without the prior written consent of the DIP Agent; (b) asserting, alleging, bringing, supporting any claim or cause of action, or the initiation or prosecution of any claim or action against the Prepetition Secured Parties, the DIP Agent or the DIP Lenders, including any causes of action under Chapter 5 of the Bankruptcy Code or state law of any type or nature whatsoever, against any of the Prepetition Secured Parties, the DIP Agent or any of the DIP Lenders, including, without limitation, challenging the amount, extent, priority, validity, perfection or enforcement of the Prepetition Obligations, the DIP Obligations, or any of the Prepetition Secured Parties', the DIP Agent's or any of the DIP Lenders' security interests and liens or to recover any funds previously paid to the Prepetition Secured Parties, the DIP Agent or any of the DIP Lenders except to the extent related to the enforcement of the priority afforded to the Carve-Out; or (c) bringing or asserting any claims or causes of actions against the Prepetition Secured Parties, the DIP Agent or any of the DIP Lenders under the Prepetition Loan Documents or the DIP Facility (as the case may be), or their respective advisors or agents, including formal discovery proceedings in anticipation thereof, and/or challenging any lien, security or interest of Prepetition Secured Parties under the Prepetition Loan Documents in the Prepetition Collateral or of the DIP Agent and the DIP Lenders under this Interim Order in the DIP Collateral.

WEIL:\95676752\10\44444.0005

39.    <u>Payment of Compensation</u>.  So long as an unwaived Termination Event has not

occurred, and to the extent permitted under this Interim Order (including the dollar caps provided

in paragraphs 11(b) and 38 hereof), the Debtors are authorized to pay fees and expenses allowed

and payable, as applicable, by any interim, procedural, or final order of this Court (that has not

been vacated or stayed, unless the stay has been vacated) under Sections 330 and 331 of the

Bankruptcy Code, as the same may be due and payable.

40.    <u>Investigation Rights</u>.  The Committee and any other parties in interest (other than

the Debtors) are permitted to undertake a Challenge (as defined below).  Any party (other than

the Debtors, which have waived any Challenge rights), including the Committee, shall have a

maximum of thirty (30) calendar days after the appointment of the Committee, if any, but in no

event later than forty-five (45) calendar days from entry of the Interim Order (the "<u>Ch. 11

Challenge Period</u>") to investigate and commence an adversary proceeding or contested matter, as

required by the applicable Bankruptcy Rules, and challenge (each, a "<u>Challenge</u>") the findings,

the Debtors' stipulations, or any other stipulations contained in this Interim Order or any Final

Order, including, without limitation, any challenge to the validity, priority or enforceability of

the Prepetition Liens, or to assert any claim or cause of action against the Prepetition Agent or

the Prepetition Lenders arising under or in connection with the Prepetition Loan Documents or

the Prepetition Obligations, as the case may be, whether in the nature of a setoff, counterclaim or

defense of Prepetition Obligations, or otherwise.  If the Cases are converted to cases under

chapter 7 of the Bankruptcy Code prior to the latest date by which the Ch. 11 Challenge Period

would end pursuant to the immediately preceding sentence, then any chapter 7 trustee appointed

in such converted cases shall have a maximum of thirty (30) calendar days (the "<u>Ch. 7 Challenge

Period</u>" and, together with the Ch. 11 Challenge Period, the "<u>Challenge Period</u>") after the date

44

that the Cases are converted to bring any such Challenge.  The Challenge Period may only be extended: (a) with the prior written consent of counsel to the DIP Agent (at the direction of the Required DIP Lenders), as memorialized in an order of this Court, or (b) pursuant to an order of this Court upon a showing of good cause for such extension.  Except to the extent asserted in an adversary proceeding or contested matter filed during the Challenge Period, upon the expiration of such applicable Challenge Period (to the extent not otherwise waived or barred), (i) any and all Challenges or potential challenges shall be deemed to be forever waived and barred; (ii) all of the agreements, waivers, releases, affirmations, acknowledgements and stipulations contained in this Interim Order and any Final Order shall be irrevocably and forever binding on the Debtors, the Committee and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, including any chapter 7 trustee, without further action by any party or this Court; (iii) the Prepetition Obligations shall be deemed to be finally allowed and the Prepetition Liens shall be deemed to constitute valid, binding and enforceable encumbrances, and not subject to avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iv) the Debtors shall be deemed to have released, waived and discharged the Released Parties from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Obligations.  Notwithstanding anything to the contrary herein: (x) if any Challenge is timely commenced, the stipulations contained in the Final Order shall nonetheless remain binding on all other parties-in-interest and preclusive except to the extent that such stipulations are expressly and successfully challenged in such Challenge; and (y) the Released Parties reserve all of their rights to contest on any grounds any Challenge.  Nothing in this Interim Order vests or confers on any person, including, without limitation, the Committee or any other statutory committee that may be appointed in any of these Cases, standing or authority

45

to pursue any cause of action, claim, defense, or other right belonging to the Debtors or their estates.

41.    <u>No Third Party Rights</u>.    Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

42.    <u>Section 506(c) Claims</u>.    Upon entry of a Final Order providing for such relief, except for the Carve-Out, no costs or expenses of administration that have been or may be incurred in any of the Cases at any time shall be charged against the DIP Agent, any of the DIP Lenders, the Prepetition Secured Parties or any of their respective claims or liens (including any claims or liens granted pursuant to this Interim Order) or the DIP Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

43.    <u>Section 552(b)</u>.    Upon entry of a Final Order providing for such relief, the Prepetition Secured Parties shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) shall not apply to the Prepetition Agent (on its own behalf and on behalf of the applicable other Prepetition Secured Parties) with respect to proceeds, products, offspring, or profits of any of the Prepetition Collateral.

44.    <u>No Marshaling/Application of Proceeds</u>.    Upon entry of a Final Order providing for such relief, in no event shall the DIP Agent, the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied in accordance with this Interim Order.

45.    [Reserved].

46.      <u>Right to Credit Bid</u>.  Each of the Prepetition Agent (acting at the direction of the

"Required Lenders" as such term is defined in the Prepetition Loan Documents) and the DIP

Agent (acting at the direction of the Required DIP Lenders) shall have the right to "credit bid"

the full amount of their respective claims in connection with any sale of all or any portion of the

Debtors' assets, including, without limitation, sales occurring pursuant to Section 363 of the

Bankruptcy Code or included as part of any restructuring plan subject to confirmation under

Section 1129(b)(2)(A)(iii) of the Bankruptcy Code.  In connection with the foregoing, each of

the Prepetition Agent and the DIP Agent shall have the right to assign their right to purchase all

or any portion of the Debtors' assets in connection with any such "credit bid" to a newly-formed

acquisition vehicle.

47.      <u>Release</u>.  Upon entry of a Final Order providing for such relief and subject to

paragraph 40, the Debtors agree to forever waive and release any and all claims and causes of

action against the Prepetition Secured Parties, the DIP Agent and the DIP Lenders whether at law

or in equity, arising under or relating to the DIP Facility, Section 105 and Chapter 5 of the

Bankruptcy Code and under any other similar provisions of applicable state or federal law.

48.      <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of

this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or

implicitly: (a) the DIP Agent's or the DIP Lenders' rights to seek any other or supplemental

relief in respect of the Debtors; (b) the rights of the DIP Agent and the DIP Lenders under the

DIP Loan Documents, the Bankruptcy Code or under applicable law, including, without

limitation, the right (i) upon the occurrence and during the continuation of a Termination Event,

to (A) request modification of the automatic stay of Section 362 of the Bankruptcy Code,

(B) request dismissal of any of the Cases, conversion of any or all of the Cases to a case under

Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (C) propose, subject to the provisions of Section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans of reorganization, or (ii) to object to the application or motion by any professionals retained by the Debtors or any Committee for the payment of fees and expenses, including, without limitation, in connection with the Carve-Out; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the Prepetition Secured Parties, the DIP Agent or the DIP Lenders.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors' or any party-in-interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order.

49.    Joint and Several Liability.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of this Interim Order.

50.    No Waiver by Failure to Seek Relief.  The DIP Agent's or any DIP Lender's delay or failure to exercise rights and remedies under the DIP Loan Documents, applicable law, or this Interim Order shall not constitute a waiver of any of the DIP Agent's or such DIP Lenders' respective rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed by the DIP Agent or such DIP Lenders, as applicable.

51.    Binding Effect of this Interim Order.  Pursuant to Bankruptcy Rules 6004(h) and 7062, immediately upon entry by this Court, this Interim Order shall inure to the benefit of the Debtors, the Prepetition Secured Parties, the DIP Agent and the DIP Lenders, and it shall become valid and binding upon the Debtors, the Prepetition Secured Parties, the DIP Agent and the DIP

48

Lenders, their respective successors and assigns, any and all other creditors of the Debtors, any committee appointed in any of the Cases or any Successor Cases, including, without limitation, the Committee, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed as legal representative of any of the Debtors in any of the Cases or any Successor Cases, or upon dismissal of any of the Cases or any Successor Cases. Further, upon entry of this Interim Order: (a) the Debtors' admissions contained herein shall be binding on the Debtors; and (b) the DIP Obligations of the Debtors under the DIP Loan Documents shall constitute allowed claims for all purposes in any of the Cases or any Successor Cases for any amounts loaned or advanced pursuant to this Interim Order.

52.      Interim Order Controls.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents, any other document or any other order of this Court (other than the Final Order) and of this Interim Order, the provisions of this Interim Order shall govern and control.

53.      Survival.  Unless otherwise agreed to by the DIP Agent, the provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order that may be entered: (a) confirming any plan of reorganization in any of the Cases; (b) converting any or all of the Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any or all of the Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or any Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the Prepetition Secured Parties, the DIP Agent or the DIP Lenders pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in any of the Cases or any Successor Cases, or following dismissal

49

of any of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order.  The terms and provisions concerning the indemnification of the Prepetition Secured Parties, the DIP Agent and the DIP Lenders shall continue in any of the Cases or any Successor Cases following dismissal of any of the Cases or any Successor Cases, termination of the provisions of this Interim Order, and/or the indefeasible repayment of the Prepetition Obligations and/or the DIP Obligations.

54.      <u>Entry of this Interim Order/Waiver of Applicable Stay</u>.  The Clerk of this Court is hereby directed to forthwith enter this Interim Order on the docket of this Court maintained in regard to the Cases.  This Interim Order shall be effective upon its entry and not subject to any stay (all of which are hereby waived), notwithstanding anything to the contrary contained Bankruptcy Rule 4001(a)(3).

55.      <u>Notice of Entry of this Interim Order</u>.  The Debtors' counsel shall serve a copy of this Interim Order or a suitable notice respecting same on all of the following parties:  (a) the U.S. Trustee; (b) the Internal Revenue Service; (c) the parties included on the Debtors' consolidated list of their forty (40) largest unsecured creditors; (d) counsel to the DIP Agent for itself and for the DIP Lenders; (e) counsel to the Prepetition Agent for itself and for the other Prepetition Secured Parties; (f) all other known parties with liens of record on assets of the Debtors as of the Petition Date; (g) all financial institutions at which the Debtors maintain deposit accounts; (h) the landlords for all non-residential real properties occupied by the Debtors as of the Petition Date; and (i) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 and applicable Local Rules or requesting to receive notice prior to the date hereof.

WEIL:\95676752\10\44444.0005

56.    _Final Hearing_.  The Final Hearing shall take place on [_____], 2016 at

[_____] **[a.m./p.m.]**, and parties shall have until [_____], 2016 at [_____] **[a.m./p.m.]** to

file an objection with the Court, and serve such objection upon (i) the proposed attorneys for the

Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York  10153 (Attn:

Ray C. Schrock, P.C., Matthew S. Barr, Esq., and Sunny Singh, Esq.); (ii) the Office of the

United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New

York, NY  10014 (Attn: Greg Zipes, Esq. and Andy Velez-Rivera, Esq.); and (iii) King &

Spalding LLP, 1185 Avenue of the Americas, New York, New York 10036 (Attn:  Michael

Rupe, Esq. and Christopher G. Boies, Esq.) and 1180 Peachtree Street, Atlanta, Georgia 30309

(Attn:  W. Austin Jowers, Esq.), the attorneys for Credit Suisse AG, Cayman Islands Branch, as

(a) Prepetition Agent and (b) DIP Agent.  In the event this Court modifies any of the provisions

of this Interim Order or other documents following the Final Hearing, such modifications shall

not affect the rights and priorities of the DIP Agent and the DIP Lenders pursuant to this Interim

Order with respect to the DIP Collateral and any portion of the DIP Facility that arises, or is

incurred or is advanced prior to such modifications (or otherwise arising prior to such

modifications), and this Interim Order shall remain in full force and effect except as specifically

modified pursuant to the Final Hearing.

57.    _Effect of this Interim Order_.  Notwithstanding Bankruptcy Rules 4001(a)(3),

6004(h), 6006(d), 7062 and 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal

Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon

its entry and there shall be no stay of execution or effectiveness of this Interim Order.  The

requirements set forth in Bankruptcy Rule 6003(b) have been satisfied.  The requirements of

Bankruptcy Rule 6004(a) are waived.

58.    <u>Retention of Jurisdiction</u>.  This Court shall retain jurisdiction to hear, determine

and, if applicable, enforce the terms of, any and all matters arising from or related to the DIP

Facility and/or this Interim Order.


Dated: _____, 2016
      New York, New York

                                    _____
                                    UNITED STATES BANKRUPTCY JUDGE

52

**Exhibit 1**

**Form DIP Loan Agreement**

SENIOR SECURED PRIMING AND SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of

May [__], 2016,

among

FAIRWAY GROUP ACQUISITION COMPANY,
a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code,
as Borrower,

FAIRWAY GROUP HOLDINGS CORP.,
a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code,

THE LENDERS PARTY HERETO

and

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH
as Administrative Agent and Collateral Agent

## Table of Contents

Page

### ARTICLE I

#### Definitions

SECTION 1.01. Defined Terms ........................................................................................2
SECTION 1.02. Terms Generally....................................................................................27
SECTION 1.03. [Reserved]..............................................................................................28
SECTION 1.04. Classification of Loans and Borrowings .........................................28

### ARTICLE II

#### The Credits

SECTION 2.01. Commitments...........................................................................................28
SECTION 2.02. Loans .......................................................................................................28
SECTION 2.03. Borrowing Procedure .............................................................................30
SECTION 2.04. Evidence of Debt; Repayment of Loans..............................................31
SECTION 2.05. Fees...........................................................................................................32
SECTION 2.06. Interest on Loans ....................................................................................33
SECTION 2.07. Default Interest........................................................................................33
SECTION 2.08. Alternate Rate of Interest.......................................................................33
SECTION 2.09. Termination and Reduction of Commitments .....................................33
SECTION 2.10. Conversion and Continuation of Borrowings .....................................34
SECTION 2.11. Repayment of Term Borrowings............................................................35
SECTION 2.12. Voluntary Prepayment.............................................................................35
SECTION 2.13. Mandatory Prepayments .........................................................................36
SECTION 2.14. Reserve Requirements; Change in Circumstances..............................37
SECTION 2.15. Change in Legality ..................................................................................38
SECTION 2.16. Breakage ..................................................................................................39
SECTION 2.17. Pro Rata Treatment .................................................................................40
SECTION 2.18. Sharing of Setoffs...................................................................................40
SECTION 2.19. Payments..................................................................................................41
SECTION 2.20. Taxes ........................................................................................................41
SECTION 2.21. Assignment of Commitments Under Certain Circumstances;
                Duty to Mitigate ......................................................................................44
SECTION 2.22. Letters of Credit ......................................................................................46
SECTION 2.23. Super Priority Nature of Obligations and Lenders' DIP Liens.........50
SECTION 2.24. No Discharge; Survival of Claims ........................................................52
SECTION 2.25. Release......................................................................................................52
SECTION 2.26. Waiver of any Priming Rights ...............................................................53

Table of Contents
(continued)

ARTICLE III

Representations and Warranties

SECTION 3.01. Organization; Powers ........................................................................53
SECTION 3.02. Authorization ..................................................................................54
SECTION 3.03. Enforceability..................................................................................54
SECTION 3.04. Governmental Approvals..................................................................54
SECTION 3.05. Financial Statements; Budget ..........................................................54
SECTION 3.06. No Material Adverse Change ...........................................................55
SECTION 3.07. Title to Properties; Possession Under Leases ...................................55
SECTION 3.08. Equity Interests ...............................................................................56
SECTION 3.09. Litigation; Compliance with Laws....................................................56
SECTION 3.10. Agreements .....................................................................................57
SECTION 3.11. Federal Reserve Regulations ...........................................................57
SECTION 3.12. Investment Company Act .................................................................57
SECTION 3.13. Use of Proceeds...............................................................................57
SECTION 3.14. Tax Returns .....................................................................................57
SECTION 3.15. No Material Misstatements...............................................................57
SECTION 3.16. Employee Benefit Plans ...................................................................58
SECTION 3.17. Environmental Matters.....................................................................58
SECTION 3.18. Insurance .........................................................................................58
SECTION 3.19. Security Interest ..............................................................................59
SECTION 3.20. Location of Real Property and Leased Premises ...............................59
SECTION 3.21. Labor Matters..................................................................................59
SECTION 3.22. Chapter 11 Cases.............................................................................59
SECTION 3.23. [Reserved.]......................................................................................59
SECTION 3.24. Sanctioned Persons; Trading with the Enemy ..................................59
SECTION 3.25. Orders .............................................................................................60
SECTION 3.26. Business and Property of the Loan Parties ........................................60

ARTICLE IV

Conditions of Lending

SECTION 4.01. All Credit Events..............................................................................60
SECTION 4.02. First Credit Event ............................................................................61

ARTICLE V

Affirmative Covenants

SECTION 5.01. Existence; Compliance with Laws; Businesses and Properties .........................65
SECTION 5.02. Insurance .........................................................................................65

ii

Table of Contents
(continued)

SECTION 5.03. Obligations, Taxes and Cash Management ....................................................66
SECTION 5.04. Financial Statements, Reports, etc ...........................................................67
SECTION 5.05. Litigation and Other Notices....................................................................69
SECTION 5.06. Information Regarding Collateral ..............................................................69
SECTION 5.07. Maintaining Records; Access to Properties and Inspections............................69
SECTION 5.08. Use of Proceeds.....................................................................................69
SECTION 5.09. Employee Benefits .................................................................................71
SECTION 5.10. Compliance with Environmental Laws .......................................................71
SECTION 5.11. Reserved. ............................................................................................71
SECTION 5.12. Further Assurances ................................................................................71
SECTION 5.13. [Reserved.].........................................................................................72
SECTION 5.14. Investor Calls ......................................................................................72
SECTION 5.15. Post-Closing Obligations ........................................................................72
SECTION 5.16. Ratings................................................................................................72
SECTION 5.17. Reserved. ............................................................................................72
SECTION 5.18. Bankruptcy Covenants ...........................................................................72
SECTION 5.19. Chapter 11 Cases...................................................................................72

ARTICLE VI

Negative Covenants

SECTION 6.01. Indebtedness.........................................................................................74
SECTION 6.02. Liens ..................................................................................................74
SECTION 6.03. Sale and Lease-Back Transactions.............................................................75
SECTION 6.04. Investments, Loans and Advances .............................................................76
SECTION 6.05. Mergers, Consolidations, Sales of Assets and Acquisitions;
    Accounting...........................................................................................76
SECTION 6.06. Restricted Payments; Restrictive Agreements ...............................................77
SECTION 6.07. Transactions with Affiliates .....................................................................78
SECTION 6.08. Business of Holdings, Borrower and Subsidiaries..........................................78
SECTION 6.09. Subordinated Indebtedness and Other Agreements .........................................78
SECTION 6.10. Chapter 11 Claims.................................................................................79
SECTION 6.11. Revision of Orders; Applications to Bankruptcy Court;
    Superpriority Claims ...............................................................................79
SECTION 6.12. Compliance with Budget. ........................................................................79
SECTION 6.13. Fiscal Year ..........................................................................................80
SECTION 6.14. Reserved .............................................................................................80
SECTION 6.15. Investigation Rights................................................................................80
SECTION 6.16. Access to Controlled Account ..................................................................81

iii

Table of Contents
(continued)

ARTICLE VII

Events of Default

SECTION 7.01. Events of Default .................................................................................81
SECTION 7.02. Remedies upon an Event of Default.............................................................85

ARTICLE VIII

The Administrative Agent and the Collateral Agent; Etc.

ARTICLE IX

Miscellaneous

SECTION 9.01. Notices; Electronic Communications..............................................................89
SECTION 9.02. Survival of Agreement ...........................................................................91
SECTION 9.03. Binding Effect...................................................................................92
SECTION 9.04. Successors and Assigns ..........................................................................92
SECTION 9.05. Expenses; Indemnity .............................................................................97
SECTION 9.06. Right of Setoff..................................................................................99
SECTION 9.07. Applicable Law ..................................................................................99
SECTION 9.08. Waivers; Amendment .............................................................................100
SECTION 9.09. Interest Rate Limitation .......................................................................101
SECTION 9.10. Entire Agreement ...............................................................................101
SECTION 9.11. WAIVER OF JURY TRIAL ...........................................................................102
SECTION 9.12. Severability ...................................................................................102
SECTION 9.13. Counterparts ...................................................................................102
SECTION 9.14. Headings .......................................................................................102
SECTION 9.15. Jurisdiction; Consent to Service of Process....................................................102
SECTION 9.16. Confidentiality ................................................................................103
SECTION 9.17. Lender Action ..................................................................................104
SECTION 9.18. USA PATRIOT Act Notice .........................................................................104
SECTION 9.19. Acknowledgement and Consent to Bail-In of EEA Financial
                  Institutions ..............................................................................104
SECTION 9.20. Exit Financing .................................................................................105

WEIL:\95701648\1\44444.0005

Table of Contents
(continued)

## SCHEDULES

Schedule 1.01(a)  -  Existing Letters of Credit
Schedule 1.01(b)  -  Subsidiary Guarantors
Schedule 1.01(c)  -  Mortgaged Property
Schedule 1.01(d)  -  Initial Budget
Schedule 2.01       -  Lenders and Commitments
Schedule 3.07       -  Title to Properties; Possession Under Leases
Schedule 3.08       -  Subsidiaries
Schedule 3.09(a)  -  Litigation
Schedule 3.09(d)  -  Certificates of Occupancy; Permits
Schedule 3.16       -  Employee Benefit Plans
Schedule 3.17       -  Environmental Matters
Schedule 3.18       -  Insurance
Schedule 5.12       -  Further Assurances
Schedule 5.15       -  Post-Closing Obligations
Schedule 6.01       -  Existing Indebtedness
Schedule 6.02       -  Existing Liens

## EXHIBITS

Exhibit A    -    Form of Administrative Questionnaire
Exhibit B    -    Form of Assignment and Acceptance
Exhibit C    -    Form of Borrowing Request
Exhibit D    -    Form of Guarantee and Collateral Agreement
Exhibit F    -    Form of Affiliate Subordination Agreement
Exhibit H    -    Form of Compliance Certificate
Exhibit J    -    Form of Exemption Certificate

WEIL:\95701648\1\44444.0005

SENIOR SECURED PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of May [_], 2016 (this "Agreement"), among FAIRWAY GROUP ACQUISITION COMPANY, a Delaware corporation (the "Borrower") a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, FAIRWAY GROUP HOLDINGS CORP., a Delaware corporation ("Holdings") a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, the Lenders (such term and each other capitalized term used but not defined in this introductory statement having the meaning given it in Article I), and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, including any successor thereto, the "Administrative Agent") and as collateral agent (in such capacity, including any successor thereto, the "Collateral Agent") for the Lenders.

WHEREAS, on May [2], 2016 (the "Petition Date"), the Borrower and the Guarantors (other than Fairway Lake Grove LLC ("Lake Grove"), collectively, the "Debtors") commenced Chapter 11 Case Nos. [_____ through _____,] as administratively consolidated as Chapter 11 Case No. _____ (each a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization under Chapter 11, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  Each of the Borrower and the Guarantors (other than Lake Grove) continue to operate its businesses and manage its properties as a debtor and debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

WHEREAS, prior to the Petition Date, certain lenders provided financing to Borrower pursuant to that certain Credit Agreement, dated as of February 14, 2013, among the Borrower, the other credit parties signatory thereto, Credit Suisse AG, Cayman Islands Branch, as agent and lender, and the lenders from time to time signatory thereto (as amended, modified or supplemented through the Petition Date, the "Prepetition Credit Agreement");

WHEREAS, Borrower has requested that Lenders provide (i) a senior secured, superpriority debtor-in-possession term loan facility to Borrower in the maximum principal amount of $55,000,000 in the aggregate (the "DIP Term Facility") and (ii) a senior secured, superpriority debtor-in-possession revolving credit facility to Borrower in the maximum principal amount of $30,611,941 in the aggregate (the "DIP L/C Facility"; and together with the DIP Term Facility, collectively, the "DIP Facility"), in each case, to be used for the purposes set forth in Section 5.08;

WHEREAS, Borrower desires that all Obligations under the Loan Documents will be joint and several and all of the Guarantors will guaranty all of the Obligations under the Loan Documents;

WHEREAS, in order to secure the Obligations of the Borrower and the Guarantors under the Loan Documents, the Borrower and the Guarantors will grant to the Collateral Agent, for the benefit of Collateral Agent and all other Secured Parties, a security interest in and DIP Lien (or, with respect to Lake Grove, a Lien) upon substantially all of the now existing and hereafter acquired personal and real property of

the Borrower and the Guarantors, including, without limitation, all present and future Equity Interests of all Subsidiaries of the Borrower and the Guarantors;

WHEREAS, the relative priority of the Liens and security interests granted to secure the Obligations (other than the Liens and security interests granted by Lake Grove) in relation to the Liens and security interests securing the Prepetition Obligations and certain other obligations will be set forth in the Interim Order and the Final Order (in each case, as hereinafter defined);

WHEREAS, the Borrowers and Guarantors (other than Lake Grove) will provide to the lenders and other secured parties under the Prepetition Credit Agreement and the Prepetition Loan Documents, adequate protection; and

WHEREAS, the Lenders are willing to extend such credit to the Borrower, and the Issuing Bank is willing to issue Letters of Credit for the account of the Borrower, in each case on the terms and subject to the conditions set forth herein.  Accordingly, the parties hereto agree as follows:

ARTICLE I

*Definitions*

SECTION 1.01.  **Defined Terms**.  As used in this Agreement, the following terms shall have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acquired Entity" shall have the meaning assigned to such term in Section 6.04(g).

"Adjusted LIBO Rate" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum equal to the greater of (a) 1.00% per annum and (b) the product of (i) the LIBO Rate in effect for such Interest Period and (ii) Statutory Reserves.

"Administrative Agent" shall have the meaning assigned to such term in the introductory statement to this Credit Agreement.

"Administrative and Upfront Fees" shall have the meaning assigned to such term in Section 2.05(b).

"Administrative Questionnaire" shall mean an Administrative Questionnaire in the form of Exhibit A, or such other form as may be supplied from time to time by the Administrative Agent.

"Affiliate" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided, however, that for purposes of the definition of "Eligible Assignee" and Section 6.07, the term "Affiliate" shall also include any Person that directly or indirectly owns 5% or more of any class of Equity Interests of the Person specified or that is an officer or director of the Person specified.

"Affiliate Subordination Agreement" shall mean an Affiliate Subordination Agreement in the form of Exhibit F pursuant to which intercompany obligations and advances owed by any Loan Party are subordinated to the Obligations.

"Agents" shall have the meaning assigned to such term in Article VIII.

"Aggregate L/C Credit Exposure" shall mean the aggregate amount of the Lenders' L/C Credit Exposures.

"Agreement" shall have the meaning assigned to such term in the introductory statement to this Credit Agreement.

"Agreement Value" shall mean, for each Hedging Agreement, on any date of determination, the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or a Subsidiary would be required to pay if such Hedging Agreement were terminated on such date.

"Alternate Base Rate" shall mean, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1%, (c) the Adjusted LIBOR for a three month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1.00%, and (d) 2.00%; provided that, for the avoidance of doubt, the Adjusted LIBOR for any day shall be based on the rate determined on such day at approximately 11 a.m. (London time) by reference to the London interbank offered rate per annum as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate). Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBOR shall be effective on the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBOR, as the case may be.

"Applicable Margin" shall mean, for any day, (a) with respect to any Eurodollar Loan, 8.00% per annum and (b) with respect to any ABR Loan, 7.00% per annum.

"Asset Sale" shall mean any sale, transfer or other disposition (including by way of merger, casualty, condemnation or otherwise (including a Recovery Event)) by the Borrower or any Subsidiary to any Person other than the Borrower or any Subsidiary Guarantor of (a) any Equity Interests of Borrower or any of the Subsidiaries (other than directors' qualifying shares) or (b) any other assets of the Borrower or any of the Subsidiaries (other than inventory, damaged, obsolete or worn out assets, scrap and Permitted Investments, in each case disposed of in the ordinary course of business).

"<u>Assignment and Acceptance</u>" shall mean an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Administrative Agent, in the form of Exhibit B or such other form as shall be approved by the Administrative Agent.

"<u>Automatic Stay</u>" shall mean the automatic stay imposed under Section 362 of the Bankruptcy Code.

"<u>Bail-In Action</u>" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"<u>Bail-In Legislation</u>" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"<u>Bankruptcy Code</u>" shall have the meaning assigned to such term in the recitals to this Agreement.

"<u>Bankruptcy Court</u>" shall have the meaning assigned to such term in the recitals to this Agreement.

"<u>Board</u>" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"<u>Borrower</u>" shall have the meaning assigned to such term in the introductory statement to this Credit Agreement.

"<u>Borrower Materials</u>" shall have the meaning assigned to such term in Section 9.01.

"<u>Borrowing</u>" shall mean Loans of the same Class and Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"<u>Borrowing Request</u>" shall mean a request by the Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit C, or such other form as shall be approved by the Administrative Agent.

"<u>Breakage Event</u>" shall have the meaning assigned to such term in Section 2.16.

"<u>Budget</u>" shall have the meaning assigned to such term in Section 5.04(l).

"<u>Business Day</u>" shall mean any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close; <u>provided</u>, <u>however</u>, that when used in connection with a Eurodollar Loan, the term "<u>Business Day</u>"

shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"<u>Capital Lease Obligations</u>" of any Person shall mean the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"<u>Carve-Out</u>" shall have the meaning assigned to such term in Section 2.23(d).

"<u>Carve-Out Account</u>" shall have the meaning assigned to such term in Section 2.23(d).

"<u>Carve-Out Trigger Notice</u>" shall have the meaning assigned to such term in Section 2.23(d).

"<u>Carve-Out Trigger Notice Cap</u>" shall have the meaning assigned to such term in Section 2.23(d).

"<u>Challenges</u>" shall have the meaning assigned to such term in Section 6.15.

A "<u>Change in Control</u>" shall be deemed to have occurred if (a) any "person" or "group" (within the meaning of Rule 13d-5 of the Securities Exchange Act of 1934 as in effect on the date hereof), other than Sponsor, shall own, directly or indirectly, beneficially or of record, shares representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding capital stock of Holdings, (b) a majority of the seats (other than vacant seats) on the board of directors of Holdings shall at any time be occupied by persons who were neither (i) nominated by the board of directors of Holdings nor (ii) appointed by directors so nominated or (c) Holdings shall cease to directly own, beneficially and of record, 100% of the issued and outstanding Equity Interests of the Borrower.

"<u>Change in Law</u>" shall mean (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or the Issuing Bank (or, for purposes of Section 2.14, by any lending office of such Lender or by such Lender's or the Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; <u>provided</u> that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in

each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Chapter 11 Case(s)" has the meaning assigned to such term in the recitals to this Agreement.

"Charges" shall have the meaning assigned to such term in Section 9.09.

"Class", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are L/C Loans or Term Loans and, when used in reference to any Commitment, refers to whether such Commitment is a L/C Credit Commitment or Term Loan Commitment.

"Closing Date" shall have the meaning assigned to such term in Section 4.02.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall mean all the "Collateral" as defined in any Security Document and shall also include the Mortgaged Properties.

"Collateral Agent" shall have the meaning assigned to such term in the introductory statement to this Credit Agreement.

"Commitment" shall mean, with respect to any Lender, such Lender's L/C Credit Commitment and Term Loan Commitment.

"Commitment Fee" shall have the meaning assigned to such term in Section 2.05(a).

"Committee" shall have the meaning assigned to such term in Section 5.08(c)

"Communications" shall have the meaning assigned to such term in Section 9.01.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" shall have meanings correlative thereto.

"Controlled Account" shall mean any deposit account or money market account subject to a control agreement in favor of the Collateral Agent for the benefit of the Secured Party in substantially in the form of that certain Amended and Restated Deposit Account Control Agreement, dated as of March 29, 2016, among the Loan Parties and Credit Suisse AG, Cayman Islands Branch in its capacity as administrative agent and collateral agent under the Prepetition Credit Agreement and Bank of America, N.A.

"Credit Event" shall have the meaning assigned to such term in Section 4.01.

"Credit Suisse" shall mean Credit Suisse AG, Cayman Islands Branch.

"CRO" shall have the meaning assigned to such term in Section 2.23(d).

"Debtors" shall have the meaning assigned to such term in the recitals to this Agreement.

"Default" shall mean any event or condition which upon notice, lapse of time or both would constitute an Event of Default.

"Defaulting Lender" shall mean any Lender, as determined by the Administrative Agent, that has (a) failed to fund any portion of its Loans or participations in Letters of Credit within three Business Days of the date required to be funded by it hereunder, (b) notified the Borrower, the Administrative Agent, the Issuing Bank or any Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements in which it commits to extend credit, (c) failed, within three Business Days after request by the Administrative Agent, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans or participations in then outstanding Letters of Credit, (d) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three Business Days of the date when due, unless the subject of a good faith dispute, or (e) (i) become or is insolvent or has a parent company that has become or is insolvent, (ii) become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or (iii) become the subject of a Bail-In Action.

"DIP Liens" shall mean continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition:

(a) first-priority senior priming Liens on and security interests in, subject to the Carve-Out and Permitted Priority Liens pursuant to Section 364(d)(1) of the Bankruptcy Code, all present and after-acquired Collateral (as defined in the Prepetition Credit Agreement) securing the Prepetition Obligations, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Debtors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless of wherever located, that may be subject to a validly perfected security interest in existence on the Petition Date securing the Prepetition Obligations under the Prepetition Loan Documents (the "Prepetition Credit Agreement Liens"), which Prepetition Credit Agreement Liens shall be primed by and made subject and subordinate to the perfected first-priority senior priming liens and

7

security interests to be granted to the Collateral Agent for the benefit of the Secured Parties, which senior priming liens and security interests in favor of the Collateral Agent for the benefit of the Secured Parties shall also be senior to the Prepetition Lender Adequate Protection Liens (as defined in the Orders), and

(b) subject to the Carve-Out, pursuant to section 364(c)(2) of the Bankruptcy Code, first-priority senior priming Liens on, and security interests in, all present and after-acquired Collateral, wherever located, not subject to a Lien or security interest on the Petition Date.

"DIP Facility" has the meaning assigned to such term in the recitals to this Agreement.

"DIP Superpriority Claim" shall have the meaning assigned to such term in Section 2.23(b).

"DIP Term Facility" has the meaning assigned to such term in the recitals to this Agreement.

"DIP Termination Date" shall mean the earliest of (i) July 29, 2016, (ii) the consummation of any sale of all or substantially all of the assets of the Loan Parties pursuant to section 363 of the Bankruptcy Code, (iii) if the Final Order has not been entered, the date that is forty-five (45) calendar days after the Petition Date, (iv) the acceleration of the Loans and the termination of the Commitments pursuant to Section 7.02 upon the occurrence of an Event of Default and (v) the Effective Date of a Prepackaged Plan.

"Disclosure Statement" shall have the meaning assigned to such term in the definition of "Milestone".

"Disqualified Stock" shall mean any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of (i) an optional redemption by the issuer thereof or (ii) the occurrence of a Liquidation Event (as such term is defined in the Amended and Restated Certificate of Incorporation of Holdings as in effect on the date hereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case at any time on or prior to the first anniversary of the Term Loan Maturity Date, or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interest referred to in clause (a) above, in each case at any time prior to the first anniversary of the Term Loan Maturity Date.

"Dollars" or "$" shall mean lawful money of the United States of America.

WEIL:\95701648\1\44444.0005

"Domestic Subsidiaries" shall mean all Subsidiaries incorporated or organized under the laws of the United States of America, any State thereof or the District of Columbia.

"EEA Financial Institution" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" shall have the meaning assigned to such term in the definition of "Milestone".

"Eligible Assignee" shall mean (a) in the case of Term Loans, (i) a Lender, (ii) an Affiliate of a Lender, (iii) a Related Fund of a Lender, (iv) [reserved] and (v) any other Person (other than a natural person or competitors of the Borrower previously identified by the Borrower to the Administrative Agent) approved by the Administrative Agent, and (b) in the case of any assignment of a L/C Credit Commitment, (i) a L/C Credit Lender, (ii) an Affiliate of a L/C Credit Lender, (iii) a Related Fund of a L/C Credit Lender, and (iv) any other Person (other than a Related Person, a natural person or competitors of the Borrower previously identified by the Borrower to the Administrative Agent) approved by the Administrative Agent, the Issuing Bank and, unless an Event of Default has occurred and is continuing, the Borrower (each such approval not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "Eligible Assignee" shall not include Holdings, the Borrower or any of their Affiliates (other than the Sponsor and its other Affiliates).

"Environmental Laws" shall mean all Federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and agreements in each case, relating to the environment, the preservation or reclamation of natural resources, endangered or threatened species, protection of the climate, human health and safety or the presence or Release of, exposure to, or the generation, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

WEIL:\95701648\1\44444.0005

"Environmental Liability" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages, costs of medical monitoring, remediation costs and reasonable fees and expenses of attorneys and consultants), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, distribution, recycling, transportation, storage, treatment or disposal (or the arrangement for such activities) of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permits" shall mean any permit, license or other approval required under any Environmental Law.

"Equity Interests" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any Person, and any option, warrant or other right entitling the holder thereof to purchase or otherwise acquire any such equity interest.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414 of the Code.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived by regulation), (b) the failure of any Plan to satisfy the minimum funding standard applicable to such Plan within the meaning of Section 412 of the Code or Section 302 of ERISA), whether or not waived, (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) the incurrence by the Borrower or any of its ERISA Affiliates of any Withdrawal Liability or any liability under Title IV of ERISA with respect to the termination of any Plan, (e) the receipt by the Borrower or any of its ERISA Affiliates from the PBGC or the administrator of any Plan or Multiemployer Plan of any notice relating to the intention to terminate any Plan or Multiemployer Plan or to appoint a trustee to administer any Plan, (f) the adoption of any amendment to a Plan that would require the provision of security pursuant to Section 436(f) of the Code or Section 206 of ERISA, (g) the receipt by the Borrower or any of its ERISA Affiliates of any notice of, the receipt by any Multiemployer Plan from the Borrower or any of its ERISA Affiliates of any notice of, or any notice that could reasonably be expected to result in, the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or "in reorganization", "endangered" or "critical" status within the meaning of Title IV of ERISA, (h) the occurrence of a "prohibited transaction" with respect to which the

10

Borrower or any of the Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Code) or with respect to which the Borrower or any such Subsidiary could otherwise incur a material liability, or (i) any other event or condition with respect to a Plan or Multiemployer Plan that would result in a material liability of the Borrower or any Subsidiary.

"EU Bail-In Legislation Schedule" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Events of Default" shall have the meaning assigned to such term in Section 7.01.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender, the Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) its net income or other taxes imposed in lieu of net income taxes, by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or which imposes such taxes as a result of a present or former connection between such recipient and such jurisdiction (other than a connection arising solely from such recipient having executed, delivered or performed its obligations, or received a payment or enforced its rights, hereunder) or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction described in clause (a) above, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.21(a)), any withholding tax (i) to which amounts payable to such Foreign Lender are subject at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.20(a), (ii) attributable to such Foreign Lender's or Agent's failure to comply with Section 2.20(e) or (iii) that results from actions taken by such Foreign Lender (other than the designation of a new lending office) after such Foreign Lender became a party to this Agreement and would not have arisen in the absence of such actions, (d) any United States federal withholding tax imposed under FATCA and (e) any United States federal, state or local backup withholding tax.

"Exemption Certificate" shall have the meaning assigned to such term in Section 2.20(e).

"Existing Letter of Credit" shall mean each letter of credit previously issued for the account of the Borrower under the Prepetition Loan Documents that (a) is outstanding on the Closing Date and (b) is listed on Schedule 1.01(a).

WEIL:\95701648\1\44444.0005

"Existing Note" shall have the meaning assigned to such term in Section 2.04(e).

"Extraordinary Receipt" shall mean any cash received by or paid to or for the account of any Person that is not in any category of receipts contemplated by the Budget and is not in the ordinary course of business (other than any such cash received or paid from Recovery Events), including tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments; *provided*, *however,* that an Extraordinary Receipt shall not include payments to the extent that payments are received by any Person in respect of any third party claim against such Person and applied to pay (or to reimburse such Person for its prior payment of) such claim and the costs and expenses of such Person with respect thereto.

"FATCA" shall mean sections 1471 through 1474 of the Code as of the Closing Date (or any amended or successor statutes that are substantively comparable and not materially more onerous to comply with), the current and any future United States Treasury Regulations promulgated thereunder, any current and any future official published guidance with respect thereto, any agreements entered into pursuant to section 1471(b)(1) of the Code and any intergovernmental agreements entered into pursuant to the foregoing.

"Federal Funds Effective Rate" shall mean, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Fee Letter" shall mean the fee letter dated May [_], 2016, among Holdings, the Borrower, the Administrative Agent and the other parties thereto.

"Fees" shall mean the Commitment Fees, the Administrative and Upfront Fees, the L/C Participation Fees and the Issuing Bank Fees.

"Final Order" shall mean the final order entered by the Bankruptcy Court in the Chapter 11 Cases authorizing and approving, among other things, the DIP Facility and the Transactions, substantially in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and other modifications as are satisfactory in form and substance to the Administrative Agent and the Required Lenders in their sole discretion).

"Financial Officer" of any Person shall mean the chief financial officer, principal accounting officer, treasurer or controller of such Person.

"first-priority" shall mean, with respect to any Lien purported to be created in any Collateral pursuant to the Orders or any Security Document, that such Lien is the most senior Lien to which such Collateral is subject (subject to the Carve-Out and Permitted Priority Liens applicable to such Collateral which have priority by operation of law

WEIL:\95701648\1\44444.0005

(including the priority granted under the UCC to any purchase money security interests that are Permitted Priority Liens) or by contract (including pursuant to the Orders) permitted hereunder over the respective Liens on such Collateral created pursuant to the Orders or relevant Security Document).

"Fiscal Quarter" shall mean each fiscal quarter of Holdings, which for any fiscal year of Holdings is (i) the thirteen week period ending on the last day of the thirteenth week following the end of the previous fiscal year, (ii) the thirteen week period ending on the last day of the twenty-sixth week following the end of the previous fiscal year, (iii) the thirteen week period ending on the last day of the thirty-ninth week following the end of the previous fiscal year, and (iv) the period beginning on the first day after the Fiscal Quarter specified in clause (iii) and ending on the last day of such fiscal year.

"Foreign Lender" shall mean any Lender that is not a "United States person" within the meaning of § 7701(a)(30) of the Code.

"Foreign Subsidiary" shall mean any Subsidiary that is not a Domestic Subsidiary and any Foreign Subsidiary Holding Company.

"Foreign Subsidiary Holding Company" shall mean any Subsidiary that (a) (i) has no material assets other than Equity Interests in a Subsidiary that is not a Domestic Subsidiary or (ii) has no material assets other than equity interests in a Subsidiary that is a Foreign Subsidiary Holding Company pursuant to clause (i) and (b) has no material liabilities.

"GAAP" shall mean United States generally accepted accounting principles applied on a basis consistent with the financial statements delivered pursuant to Section 4.02(k).

"Governmental Authority" shall mean any Federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory body.

"Granting Lender" shall have the meaning assigned to such term in Section 9.04(i).

"Guarantee" of or by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation or (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; provided, however, that the term "Guarantee" shall not include (i) endorsements for collection or deposit in the

WEIL:\95701648\1\44444.0005

ordinary course of business or (ii) guarantees by a Loan Party of any obligation of any other Loan Party.

"Guarantee and Collateral Agreement" shall mean the Guarantee and Collateral Agreement, substantially in the form of Exhibit D, among Holdings, the Borrower, Subsidiaries party thereto and the Collateral Agent for the benefit of the Secured Parties.

"Guarantors" shall mean Holdings and the Subsidiary Guarantors.

"Hazardous Materials" shall mean (a) any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

"Hedging Agreement" shall mean any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

"Holdings" shall have the meaning assigned to such term in the introductory statement to this Credit Agreement.

"Indebtedness" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind (other than deposits or advances made in the ordinary course of business), (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (e) all obligations of such Person issued or assumed as the deferred purchase price of property or services, (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all Guarantees by such Person of Indebtedness of others (excluding any Loan Party), (h) all Capital Lease Obligations of such Person, (i) net obligations of such Person under any Hedging Agreements, valued at the Agreement Value thereof, (j) all obligations of such Person as an account party in respect of letters of credit, (k) all obligations of such Person in respect of bankers' acceptances, and (l) any Equity Interest of such Person that is Disqualified Stock.  The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner unless such Indebtedness is expressly non-recourse to the general partner.  Notwithstanding the foregoing, the Indebtedness of any Person shall not include trade accounts payable and accrued obligations incurred in the ordinary course of business.

"Indemnified Taxes" shall mean Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

14

"Indemnitee" shall have the meaning assigned to such term in Section 9.05(b).

"Information" shall have the meaning assigned to such term in Section 9.16.

"Initial Budget" shall mean a 13-week operating budget setting forth all forecasted receipts and disbursements on a weekly basis for such 13-week period beginning as of the week of the Petition Date, broken down by week, including the anticipated weekly uses of the proceeds of the DIP Facility for such period, which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses, total expenses and capital expenditures, fees and expenses relating to the DIP Facility, fees and expenses related to the Chapter 11 Cases, and working capital and other general corporate needs, which forecast shall be in form and substance satisfactory to the Administrative Agent at the direction of the Required Lenders. Such Budget shall be in the form set forth in Schedule 1.01(d) hereto. Until supplemented pursuant to Section 5.04(l), the Initial Budget shall constitute a "Budget".

"Interest Payment Date" shall mean (a) with respect to any ABR Loan, the last Business Day of each Fiscal Quarter, and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Borrowing.

"Interest Period" shall mean, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is 1, 2, 3 or 6 months (or 12 months if available from all relevant Lenders) thereafter, as the Borrower may elect; provided, however, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period, (c) no Interest Period for any Loan shall extend beyond the maturity date of such Loan and (d) notwithstanding anything to the contrary herein, any Interest Period that ends in a calendar month in which a Repayment Date occurs shall end on such Repayment Date. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Order" shall mean the interim order entered by the Bankruptcy Court in the Chapter 11 Cases (as the same may be amended, supplemented, or modified form time to time after entry thereof in a manner satisfactory to the Required Lenders in their sole discretion) authorizing and approving, among other things, the DIP Facility and the

Transactions, which interim order is in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole discretion.

"Issuing Bank" shall mean, as the context may require, (a) Credit Suisse, acting through any of its Affiliates or branches, in its capacity as the issuer of Letters of Credit hereunder, (b) with respect to each Existing Letter of Credit, the Person that issued such Existing Letter of Credit, and (c) any other Lender that may become an Issuing Bank pursuant to Section 2.22(i) or 2.22(k), in each case with respect to Letters of Credit issued by such Lender. The Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates or branches of the Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate or branch, in each case, with respect to Letters of Credit issued by such Affiliate or branch.

"Issuing Bank Fees" shall have the meaning assigned to such term in Section 2.05(c).

"Investigation Period" shall have the meaning assigned to such term in Section 6.15.

"K&S" shall have the meaning assigned to such term in Section 4.02(e).

"Lake Grove" shall have the meaning assigned to such term in the recitals to this Agreement.

"L/C Credit Borrowing" shall mean a Borrowing comprised of L/C Loans.

"L/C Credit Commitment" shall mean, with respect to each Lender, the commitment of such Lender to acquire participations in Letters of Credit and to make L/C Loans as provided for herein as set forth on Schedule 2.01, or in the Assignment and Acceptance pursuant to which such Lender assumed its L/C Credit Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.09 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04.

"L/C Credit Exposure" shall mean, with respect to any Lender at any time, the aggregate principal amount at such time of all outstanding L/C Loans of such Lender, *plus* the aggregate amount at such time of such Lender's L/C Exposure.

"L/C Credit Lender" shall mean a Lender with a L/C Credit Commitment or an outstanding L/C Loan.

"L/C Credit Maturity Date" shall mean the DIP Termination Date.

"L/C Disbursement" shall mean a payment or disbursement made by the Issuing Bank pursuant to a Letter of Credit.

"L/C Exposure" shall mean at any time the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time and (b) the aggregate amount of

all L/C Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time. The L/C Exposure of any L/C Credit Lender at any time shall equal its Pro Rata Percentage of the aggregate L/C Exposure at such time.

"L/C Issuing Commitment" shall mean the commitment of the Issuing Bank to issue Letters of Credit pursuant to Section 2.22.

"L/C Loans" shall mean the loans made by the Lenders to the Borrower pursuant to clause (iii) of Section 2.01(a).

"L/C Participation Fee" shall have the meaning assigned to such term in Section 2.05(c).

"Lenders" shall mean (a) the Persons listed on Schedule 2.01 (other than any such Person that has ceased to be a party hereto pursuant to an Assignment and Acceptance) and (b) any Person that has become a party hereto pursuant to an Assignment and Acceptance.

"Letter of Credit" shall mean any letter of credit issued pursuant to Section 2.22 and any Existing Letter of Credit, in each case as such letter of credit may be amended, modified, extended, renewed or replaced from time to time.

"LIBO Rate" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the commencement of such Interest Period by reference to the London interbank offered rate per annum as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for a period equal to such Interest Period; provided that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "LIBO Rate" shall be the interest rate per annum determined by the Administrative Agent to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of such Interest Period.

"Lien" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, encumbrance, charge or security interest in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" shall mean this Agreement, the Letters of Credit, the Security Documents, and the promissory notes, if any, executed and delivered pursuant to Section 2.04(e) and any other document executed in connection with the foregoing.

"Loan Parties" shall mean Holdings, the Borrower and the Subsidiary Guarantors.

17

"Loans" shall mean the L/C Loans and the Term Loans.

"Manager" shall mean Sterling Investment Partners Advisers, LLC and its successors and assigns.

"Margin Stock" shall have the meaning assigned to such term in Regulation U.

"Material Adverse Effect" shall mean, other than, in each case, the commencement and continuation of the Chapter 11 Cases, as customarily would occur as a result of the Chapter 11 Cases, the events leading up thereto, the effect of the bankruptcy, conditions in the industry in which the Borrower operates in as existing on the Closing Date and/or consummation of transactions contemplated by the Loan Parties' "first day" pleadings reviewed by the Administrative Agent and the Required Lenders, a material adverse change in (i) the business, operations, properties or condition (financial or otherwise) of the Loan Parties and their Subsidiaries, collectively, (ii) the legality, validity or enforceability of any Loan Documents or the Orders, (iii) the ability of the Borrower or the Guarantors, taken as a whole, to perform their payment obligations under the Loan Documents, (iv) the perfection or priority of the Liens granted pursuant to the Loan Documents or the Orders, or (v) the rights and remedies of the Administrative Agent and the Lenders under the Loan Documents taken as a whole.

"Material Indebtedness" shall mean Indebtedness (other than the Loans and Letters of Credit) of any one or more of Holdings, the Borrower or any Subsidiary in an aggregate principal amount exceeding $4,000,000.

"Maximum Rate" shall have the meaning assigned to such term in Section 9.09.

"Milestone" shall mean any of the following:

(i) the Loan Parties' filing with the Bankruptcy Court, on the Petition Date, of the Prepackaged Plan which shall be in form and substance reasonably satisfactory to the Required Lenders and for which the Loan Parties shall have solicited and obtained the requisite consent to the Prepackaged Plan by the Requisite Consenting Lenders or requested and obtained authority from the Bankruptcy Court to complete solicitation within ten (10) days from the Petition Date;

(ii) the Loan Parties' filing with the Bankruptcy Court, on the Petition Date, of a disclosure statement relating to the Prepackaged Plan, and all related schedules, supplements, exhibits and orders (as applicable), in form and substance reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders (the "Disclosure Statement");

(iii) the Bankruptcy Court's entry of an order, in form and substance satisfactory to the Administrative Agent at the direction of the Required Lenders, approving the DIP Facility on an interim basis, on or before five (5) calendar days following the Petition Date;

18

(iv) the Bankruptcy Court's entry of an order, in form and substance satisfactory to the Administrative Agent at the direction of the Required Lenders, approving the DIP Facility on a final basis, on or before forty-five (45) calendar days following the Petition Date;

(v) the Bankruptcy Court's entry of an order, in form and substance reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders, approving the Disclosure Statement (the "Disclosure Statement Order"), on or before sixty (60) calendar days following the Petition Date;

(vi) the Bankruptcy Court's entry of an order, in form and substance reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders, confirming the Prepackaged Plan (the "Plan Confirmation Order") on or before sixty (60) calendar days following the Petition Date; or

(vii) the effective date (the "Effective Date") of the Prepackaged Plan having occurred not later than seventy-five (75) calendar days following the Petition Date.

"Moelis" shall have the meaning assigned to such term in Section 4.02(e).

"Moelis Engagement Letter" shall have the meaning assigned to such term in Section 4.02(e).

"Moody's" shall mean Moody's Investors Service, Inc., or any successor thereto.

"Mortgaged Properties" shall mean the owned real properties and leasehold and subleasehold interests of the Loan Parties specified on Schedule 1.01(c).

"Multiemployer Plan" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds" shall mean (a) with respect to any Asset Sale, the cash proceeds (including cash proceeds subsequently received (as and when received) in respect of noncash consideration initially received), net of (i) selling expenses (including reasonable broker's fees or commissions, legal fees, transfer and similar taxes and the Borrower's good faith estimate of income taxes paid or payable in connection with such sale), (ii) amounts provided as a reserve, in accordance with GAAP, against, or placed in escrow to satisfy, any liabilities under any indemnification obligations or purchase price adjustment associated with such Asset Sale (provided that, to the extent and at the time any such amounts are released from such reserve or escrow, such amounts shall constitute Net Cash Proceeds) and (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money (other than the Loans) which is secured by the asset sold in such Asset Sale and which is required to be repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such asset); and (b) with respect to any issuance or incurrence of Indebtedness or any other Extraordinary Receipt, the cash proceeds thereof, net of all taxes and customary fees, commissions, costs and other expenses incurred in connection therewith.

"New York UCC" shall mean the Uniform Commercial Code as from time to time in effect in the State of New York.

"Obligations" shall mean (a) the due and punctual payment of (i) the principal of and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) each payment required to be made by the Borrower hereunder in respect of any Letter of Credit, when and as due, including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral, and (iii) all other monetary obligations of the Borrower to any of the Secured Parties hereunder and under any Loan Document, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual performance of all other obligations of the Borrower under or pursuant to this Agreement and each of the other Loan Documents, and (c) the due and punctual payment and performance of all the obligations of each other Loan Party under or pursuant to any Loan Document.

"OFAC" shall have the meaning assigned to such term in Section 3.24.

"Other Taxes" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document, excluding, however, any such amounts imposed as a result of an assignment by a Lender of its Loan or Commitments.

"Orders" shall mean, collectively, the Interim Order and the Final Order.

"Participant Register" shall have the meaning assigned to such term in Section 9.04(e).

"PBGC" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"Perfection Certificate" shall mean the Perfection Certificate substantially in the form of Exhibit B to the Guarantee and Collateral Agreement.

"Permitted Investments" shall mean:

(a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of issuance thereof;

(b) investments in commercial paper maturing within one year from the date of issuance thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c) investments in certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, the Administrative Agent or any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000 and that issues (or the parent of which issues) commercial paper rated at least "Prime-1" (or the then equivalent grade) by Moody's or "A-1" (or the then equivalent grade) by S&P;

(d) fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria of clause (c) above;

(e) investments in "money market funds" within the meaning of Rule 2a-7 of the Investment Company Act of 1940, as amended, substantially all of whose assets are invested in investments of the type described in clauses (a) through (d) above;

(f) other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments of a type analogous to the foregoing; and

(g) investments in CDARS maturing within one year from the date of acquisition thereof, if the amount so invested is unconditionally guaranteed by the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America).

"Permitted Priority Lien" shall mean any of those existing liens incurred pursuant to Section 6.02(d), (e), (f), (g), (h), (i), (k) or (l) of the Prepetition Credit Agreement, as agreed between the Lenders and the Loan Parties, that, under applicable law, are senior to, and have not been subordinated to, the Liens of the Collateral Agent, but only to the extent that such existing Liens are valid, perfected, enforceable and unavoidable Liens as of the Petition Date.

"Permitted Variance" shall mean, initially for the first four weeks after the Closing Date (commencing on May 2, 2016) and thereafter on a two-week basis (each such period, a "Testing Period"): (i) all favorable variances, (ii) an unfavorable variance of no more than 15% for each of actual aggregate receipts and disbursements as compared to the budgeted amounts of aggregate receipts and disbursements, respectively, set forth in the Budget with respect to the applicable Testing Period. The Permitted Variance with respect to each Testing Period shall be determined and reported to the Administrative Agent and the Lenders not later than Friday immediately following each such Testing Period. Additional variances, if any, from the Budget, and any proposed

21

changes to the Budget, shall be subject to the approval of the Administrative Agent at the direction of the Required Lenders.

"Person" shall mean any natural person, corporation, business trust, joint venture, association, company, limited liability company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning assigned to such term in the recitals to this Agreement.

"Plan" shall mean any employee pension benefit plan (other than a Multiemployer Plan, but including any "multiple employer" pension plan within the meaning of Sections 4063 and 4064 of ERISA) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 307 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" (as defined in Section 3(5) of ERISA) or "contributing sponsor" (as defined in Section 4001(a)(13) of ERISA).

"Platform" shall have the meaning assigned to such term in Section 9.01.

"Post-Carve-Out Trigger Notice Cap" shall have the meaning assigned to such term in Section 2.23(d).

"Prepackaged Plan" shall have the meaning assigned to such term in Section 9.20.

"Prepetition Agents" shall mean the "Agents" as defined in the Prepetition Credit Agreement as of the Closing Date.

"Prepetition Credit Agreement" shall have the meaning assigned to such term in the recitals to this Agreement.

"Prepetition Credit Agreement Liens" shall have the meaning assigned to such term in the definition of "DIP Lien".

"Prepetition Lenders" shall mean the "Lenders" as defined in the Prepetition Credit Agreement as of the Closing Date.

"Prepetition Loan Documents" shall mean the "Loan Documents" as defined in the Prepetition Credit Agreement as of the Closing Date.

"Prepetition Obligations" shall mean the "Obligations" as defined in the Prepetition Credit Agreement as of the Closing Date.

"Prepetition Payment" shall mean a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness, Trade Payables or other pre-petition claims against any Debtor.

"Prepetition Superpriority Claims" shall have the meaning assigned to such term in the Orders.

"Prime Rate" shall mean the rate of interest per annum determined from time to time by Credit Suisse as its prime rate in effect at its principal office in New York City and notified to the Borrower.  The prime rate is a rate set by Credit Suisse based upon various factors including Credit Suisse's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such rate.

"Professional" shall have the meaning assigned to such term in Section 2.23(d).

"Professional Fees" shall have the meaning assigned to such term in Section 2.23(d).

"Pro Rata Percentage" of any L/C Credit Lender at any time shall mean the percentage of the Total L/C Credit Commitment represented by such Lender's L/C Credit Commitment. In the event the L/C Credit Commitments shall have expired or been terminated, the Pro Rata Percentages shall be determined on the basis of the L/C Credit Commitments most recently in effect, giving effect to any subsequent assignments.

"Public Lender" shall have the meaning assigned to such term in Section 9.01.

"Recovery Event":  any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of any Loan Party giving rise to Net Cash Proceeds to such Loan Party, as the case may be, to the extent that such settlement or payment does not constitute reimbursement or compensation for amounts previously paid by the Borrower or any other Loan Party in respect of such casualty or condemnation.

"Register" shall have the meaning assigned to such term in Section 9.04(d).

"Regulation T" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation U" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Fund" shall mean, with respect to any Lender that is a fund, account or investment vehicle that invests in bank loans, any other fund, account or investment vehicle that invests in bank loans and is managed, advised or sub-advised by the same investment advisor or sub-advisor as such Lender or by an Affiliate of such investment advisor or sub-advisor.

23

"Related Parties" shall mean, with respect to any specified Person, such Person's Affiliates and the respective officers, directors, employees, controlling persons, agents, advisors, attorneys and representatives of such Person and such Person's Affiliates.

"Related Persons" shall mean the Sponsor and each of the Sponsor's direct and indirect subsidiaries and Affiliates, other than the Loan Parties.

"Release" shall mean any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within, under, from or upon any building, structure, facility or fixture.

"Released DIP Parties" shall have the meaning assigned to such term in Section 2.25(d).

"Released Parties" shall have the meaning assigned to such term in Section 5.08(c).

"Releasing Parties" shall have the meaning assigned to such term in Section 2.25(d).

"Required Lenders" shall mean, at any time, Lenders having Loans (excluding Loans held, directly or indirectly, by Sponsor or any of its Affiliates), L/C Exposure and unused L/C Credit Commitments and Term Loan Commitments representing more than 50% of the sum of all Loans outstanding (excluding Loans held, directly or indirectly, by Sponsor or any of its Affiliates), L/C Exposure and unused L/C Credit Commitments and Term Loan Commitments at such time; provided that the L/C Loans, L/C Exposure and unused L/C Credit Commitments and Term Loan Commitments of any Defaulting Lender shall be disregarded in the determination of the Required Lenders at any time.

"Requisite Consenting Lenders" shall have the meaning assigned to such term in Section 9.20.

"Responsible Officer" of any Person shall mean any executive officer or Financial Officer of such Person and any other officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

"Restricted Payment" shall mean (i) any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Holdings, the Borrower or any Subsidiary, (ii) any payment (whether in cash or other property (excluding Equity Interests of Holdings that are not Disqualified Stock)), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in Holdings, the Borrower or any Subsidiary, (iii) any payment or distribution to Sponsor or Manager, (iv) any bonus payments in respect of any warrants, options, repurchase of stock or any other related distributions or (v) any bonus payments to executive officers of the Loan Parties and their Subsidiaries in excess of the amounts set forth in the Budget, if any.

"RSA" shall have the meaning assigned to such term in Section 4.02(w).

"S&P" shall mean Standard & Poor's Ratings Service, or any successor thereto.

"Secured Parties" shall mean (a) the Lenders, (b) the Administrative Agent, (c) the Collateral Agent, (d) any Issuing Bank, (e) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (f) the successors and assigns of each of the foregoing.

"Security Documents" shall mean the Mortgages, the Guarantee and Collateral Agreement and each of the security agreements, mortgages and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to Section 5.12.

"SPV" shall have the meaning assigned to such term in Section 9.04(i).

"Sponsor" shall mean collectively, Sterling Investment Partners, L.P., Sterling Investment Partners II, L.P., Sterling Investment Partners III, L.P. and any fund formed after the date hereof that is sponsored by Sterling Investment Partners and managed by Sterling Investment Partners or an Affiliate thereof.

"Statutory Reserves" shall mean a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the Board).  Eurodollar Loans shall be deemed to constitute Eurocurrency Liabilities (as defined in Regulation D of the Board) and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D. Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"subsidiary" shall mean, with respect to any Person (herein referred to as the "parent"), any corporation, partnership, limited liability company, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" shall mean any subsidiary of the Borrower, including any newly formed subsidiary of the Borrower.

WEIL:\95701648\1\44444.0005

"Subsidiary Guarantor" shall mean each Subsidiary listed on Schedule 1.01(b), and each other Subsidiary that is or becomes a party to the Guarantee and Collateral Agreement, other than a Foreign Subsidiary.

"Taxes" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Term Borrowing" shall mean a Borrowing comprised of Term Loans.

"Term Lender" shall mean a Lender with a Term Loan Commitment or an outstanding Term Loan.

"Term Loan Commitment" shall mean, with respect to each Lender, the commitment of such Lender to make Term Loans hereunder as set forth on Schedule 2.01, or in the Assignment and Acceptance pursuant to which such Lender assumed its Term Loan Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.09 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04; provided, notwithstanding the foregoing, until the ratings described in Section 5.16 have been obtained, the Lenders designated on Schedule 2.01 as being "Ratings required" shall have no Term Loan Commitment hereunder and any such Lender's portion of the Term Loan Commitments set forth on Schedule 2.01 shall be deemed ratably allocated to the Term Lenders not so designated.

"Term Loan Maturity Date" shall mean the DIP Termination Date.

"Term Loans" shall mean the term loans made by the Lenders to the Borrower pursuant to clause (i) of Section 2.01(a).

"Total L/C Credit Commitment" shall mean, at any time, the aggregate amount of the L/C Credit Commitments, as in effect at such time. The initial Total L/C Credit Commitment is $30,611,941.

"Trade Payables":  with respect to any Person, any accounts payable or any indebtedness or monetary obligation to trade creditors created, assumed or guaranteed by such Person arising in the ordinary course of business in connection with the acquisition of goods or services.

"Transactions" shall mean, collectively, (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party, the Borrowings hereunder and the use of the proceeds thereof, and the grant of Liens by the Loan Parties on the Collateral pursuant to this Agreement, the Orders and the Security Documents, (ii) the commencement and filing of the Chapter 11 Cases and (iii) the payment of all fees, costs and expenses associated with all of the foregoing.

"Trigger Date" shall have the meaning assigned to such term in Section 2.23(d).

26

"Type", when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined. For purposes hereof, the term "Rate" shall mean the Adjusted LIBO Rate and the Alternate Base Rate.

"Uniform Customs" shall have the meaning assigned to such term in Section 9.07.

"USA PATRIOT Act" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"Variance Report" shall have the meaning assigned to such term in Section 5.04(l)

"Voluntary Prepayments" shall mean a prepayment of principal of Term Loans pursuant to Section 2.12 in any fiscal year to the extent that such prepayment reduces the scheduled installments of principal due in respect of Term Loans in any subsequent fiscal year.

"Wholly Owned Subsidiary" of any Person shall mean a subsidiary of such Person of which securities (except for directors' qualifying shares) or other ownership interests representing 100% of the Equity Interests are, at the time any determination is being made, owned, Controlled or held by such Person or one or more wholly owned Subsidiaries of such Person or by such Person and one or more wholly owned Subsidiaries of such Person.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

SECTION 1.02.  **Terms Generally**.  The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall"; and the words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all types of tangible and intangible assets and properties, including cash, securities, accounts and contract rights. All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. Except as otherwise expressly provided herein, (a) any reference in this Agreement to any Loan Document shall mean

27

such document as amended, restated, supplemented or otherwise modified from time to time, in each case, in accordance with the express terms of this Agreement, and (b) all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided, however, that if the Borrower notifies the Administrative Agent that the Borrower wishes to amend any covenant in Article VI or any related definition to eliminate the effect of any change in GAAP occurring after the date of this Agreement on the operation of such covenant (or if the Administrative Agent notifies the Borrower that the Required Lenders wish to amend Article VI or any related definition for such purpose), then the Borrower's compliance with such covenant shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective, until either such notice is withdrawn or such covenant is amended in a manner satisfactory to the Borrower and the Required Lenders.

SECTION 1.03. *[Reserved].* .

SECTION 1.04. ***Classification of Loans and Borrowings***.  For purposes of this Agreement, Loans may be classified and referred to by Class (e.g., a "L/C Loan") or by Type (e.g., a "Eurodollar Loan") or by Class and Type (e.g., a "Eurodollar L/C Loan"). Borrowings also may be classified and referred to by Class (*e.g.*, a "L/C Credit Borrowing") or by Type (e.g., a "Eurodollar Borrowing") or by Class and Type (e.g., a "Eurodollar L/C Credit Borrowing").

## ARTICLE II

### *The Credits*

SECTION 2.01. ***Commitments***.  (a) Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly, (i) to make a Term Loan to the Borrower on the Closing Date in a principal amount not to exceed its pro rata share of $15,000,000 (the "Initial Borrowing") based on its Term Loan Commitment, (ii) following entry of the Final Order and upon five (5) business days' prior written notice,, to make a Term Loan to the Borrower in a principal amount not to exceed its pro rata share of $40,000,000 (the "Final Borrowing") based on its Term Loan Commitment, and (iii) to make L/C Loans in accordance with Section 2.02(f) until the earlier of the L/C Credit Maturity Date and the termination of the L/C Credit Commitment of such Lender in accordance with the terms hereof, in an aggregate principal amount at any time outstanding that will not result in such Lender's L/C Credit Exposure exceeding such Lender's L/C Credit Commitment. Within the limits set forth in clause (iii) of the preceding sentence and subject to the terms, conditions and limitations set forth herein, the Borrower may borrower, pay or prepay and reborrow L/C Loans. Amounts paid or prepaid in respect of Term Loans may not be reborrowed.

SECTION 2.02. ***Loans***.  (a) Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Commitments; provided, however, that the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being

understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender). Except for Loans deemed made pursuant to Section 2.02(f), the Loans comprising any Borrowing shall be in an aggregate principal amount that is (i) an integral multiple of $1,000,000 and not less than $2,000,000 or (ii) equal to the remaining available balance of the applicable Commitments.

(b)   Subject to Sections 2.02(f), 2.08 and 2.15, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request pursuant to Section 2.03. Each Lender may at its option make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement. Borrowings of more than one Type may be outstanding at the same time; provided, however, that the Borrower shall not be entitled to request any Borrowing that, if made, would result in more than six Eurodollar Borrowings outstanding hereunder at any time. For purposes of the foregoing, Borrowings having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Borrowings.

(c)   Except with respect to Loans made pursuant to Section 2.02(f), each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate not later than 1:00 p.m., New York City time, and the Administrative Agent shall promptly credit the amounts so received to an account designated by the Borrower in the applicable Borrowing Request or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders.

(d)   Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (c) above and the Administrative Agent may, but shall not be obligated to, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower to but excluding the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrower, a rate per annum equal to the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, a rate determined by the Administrative Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error). If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement.

WEIL:\95701648\1\44444.0005

(e)   [Reserved].

(f)   If the Issuing Bank shall not have received from the Borrower the payment required to be made by Section 2.22(e) within the time specified in such Section, the Issuing Bank will promptly notify the Administrative Agent of the L/C Disbursement and the Administrative Agent will promptly notify each L/C Credit Lender of such L/C Disbursement and its Pro Rata Percentage thereof. Each L/C Credit Lender shall pay by wire transfer of immediately available funds to the Administrative Agent not later than 2:00 p.m., New York City time, on such date (or, if such L/C Credit Lender shall have received such notice later than 12:00 (noon), New York City time, on any day, not later than 10:00 a.m., New York City time, on the immediately following Business Day), an amount equal to such Lender's Pro Rata Percentage of such L/C Disbursement (it being understood that (i) if the conditions precedent to borrowing set forth in Sections 4.01(b) and (c) have been satisfied, such amount shall be deemed to constitute an ABR L/C Loan of such Lender and, to the extent of such payment, the obligations of the Borrower in respect of such L/C Disbursement shall be discharged and replaced with the resulting ABR L/C Credit Borrowing, and (ii) if such conditions precedent to borrowing have not been satisfied, then any such amount paid by any L/C Credit Lender shall not constitute a Loan and shall not relieve the Borrower from its obligation to reimburse such L/C Disbursement), and the Administrative Agent will promptly pay to the Issuing Bank amounts so received by it from the L/C Credit Lenders. The Administrative Agent will promptly pay to the Issuing Bank any amounts received by it from the Borrower pursuant to Section 2.22(e) prior to the time that any L/C Credit Lender makes any payment pursuant to this paragraph (f); any such amounts received by the Administrative Agent thereafter will be promptly remitted by the Administrative Agent to the L/C Credit Lenders that shall have made such payments and to the Issuing Bank, as their interests may appear. If any L/C Credit Lender shall not have made its Pro Rata Percentage of such L/C Disbursement available to the Administrative Agent as provided above, such Lender and the Borrower severally agree to pay interest on such amount, for each day from and including the date such amount is required to be paid in accordance with this paragraph to but excluding the date such amount is paid, to the Administrative Agent for the account of the Issuing Bank at (i) in the case of the Borrower, a rate per annum equal to the interest rate applicable to L/C Loans pursuant to Section 2.06(a), and (ii) in the case of such Lender, for the first such day, the Federal Funds Effective Rate, and for each day thereafter, the Alternate Base Rate.

(g)   Pending use in accordance with the Budget, all proceeds of the Term Loans shall be deposited into a Controlled Account (after the establishment thereof in accordance with Section 5.15) and invested at all times in cash and Permitted Investments.

SECTION 2.03.  ***Borrowing Procedure***.  In order to request a Borrowing (other than a deemed Borrowing pursuant to Section 2.02(f), as to which this Section 2.03 shall not apply), the Borrower shall notify the Administrative Agent in writing of such request (a) subject to clause (c) below, in the case of a Eurodollar Borrowing, not later than 12:00 (noon), New York City time, three Business Days before a proposed Borrowing (or, in the case of the Closing Date, such later date on or before the Closing Date as the

WEIL:\95701648\1\44444.0005

Administrative Agent may agree), (b) subject to clause (c) below, in the case of an ABR Borrowing, not later than 10:00 a.m., New York City time, on the day of the proposed Borrowing and (c) in the case of the Term Loan borrowed pursuant to Section 2.01(a)(ii), not later than 12:00 (noon), New York City time, five Business Days before a proposed Borrowing.   Each such Borrowing Request shall be irrevocable and shall specify the following information: (i) whether the Borrowing is to be a Eurodollar Borrowing with an Interest Period in excess of one month or an ABR Borrowing; (ii) the date of such Borrowing (which shall be a Business Day); (iii) [reserved]; (iv) the amount of such Borrowing; and (v) if such Borrowing is to be a Eurodollar Borrowing, the Interest Period with respect thereto; provided, however, that, notwithstanding any contrary specification in any Borrowing Request, each requested Borrowing shall comply with the requirements set forth in Section 2.02. If no election as to the Type of Borrowing is specified in any such notice, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period with respect to any Eurodollar Borrowing is specified in any such notice, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. The Administrative Agent shall promptly advise the applicable Lenders of any notice given pursuant to this Section 2.03 (and the contents thereof) and of each Lender's portion of the requested Borrowing (it being understood that in the event that any Lender does not fund the full amount of its pro rata share of the Loans, each remaining Lender shall have the option of participating in the resulting shortfall in a pro rata amount based on its respective portion of the Commitments).

SECTION 2.04. *Evidence of Debt; Repayment of Loans*.   (a) The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender (i) the principal amount of each Term Loan of such Lender as provided in Section 2.11 and (ii) the then unpaid principal amount of each L/C Loan of such Lender on the L/C Credit Maturity Date.

(b)   Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)   The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Class and Type thereof and, if applicable, the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower or any Guarantor and each Lender's share thereof.

(d)   The entries made in the accounts maintained pursuant to paragraphs (b) and (c) above shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms.

31

(e)   Any Lender may request that Loans made by it hereunder be evidenced by a promissory note.  In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns and in a form and substance reasonably acceptable to the Administrative Agent and the Borrower. Notwithstanding any other provision of this Agreement, in the event any Lender shall request and receive such a promissory note, the interests represented by such note shall at all times (including after any assignment of all or part of such interests pursuant to Section 9.04) be represented by one or more promissory notes payable to the payee named therein or its registered assigns.

SECTION 2.05.  *Fees*.  (a)  The Borrower agrees to pay to each Lender (which is not a Defaulting Lender), through the Administrative Agent, on the last Business Day of each Fiscal Quarter and on each date on which any Commitment of such Lender shall expire or be terminated as provided herein, a commitment fee (a "<u>Commitment Fee</u>") equal to 1.00% per annum on the daily unused amount of the L/C Credit Commitment of such Lender during the preceding quarter (or other period commencing with the date hereof or ending with the L/C Credit Maturity Date or the date on which the L/C Credit Commitments of such Lender shall expire or be terminated). All Commitment Fees shall be computed on the basis of the actual number of days elapsed in a year of 360 days.

(b)   The Borrower agrees to pay to the Administrative Agent the fees set forth in the Fee Letter at the times and in the amounts specified therein (the "<u>Administrative and Upfront Fees</u>").

(c)   The Borrower agrees to pay (i) to each L/C Credit Lender (which is not a Defaulting Lender), through the Administrative Agent, on the last Business Day of each Fiscal Quarter and on the date on which the L/C Credit Commitment of such Lender shall be terminated as provided herein, a fee (an "<u>L/C Participation Fee</u>") calculated on such Lender's Pro Rata Percentage of the daily aggregate L/C Exposure (excluding the portion thereof attributable to unreimbursed L/C Disbursements) during the preceding quarter (or shorter period commencing with the date hereof or ending with the L/C Credit Maturity Date or the date on which all Letters of Credit have been canceled or have expired and the L/C Credit Commitments of all Lenders shall have been terminated) at a rate equal to 4.00% per annum, and (ii) to the Issuing Bank with respect to each Letter of Credit (A) a 0.25% per annum fronting fee payable on the daily issued but undrawn amount of all outstanding Letters of Credit and (B) the Issuing Bank's customary and reasonable fees and charges in connection with all amendments, extensions, draws and other actions with respect to the Letters of Credit specified from time to time by the Issuing Bank (collectively, the "<u>Issuing Bank Fees</u>"). All L/C Participation Fees and Issuing Bank Fees shall be computed on the basis of the actual number of days elapsed in a year of 360 days.

(d)   All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders, except that the Issuing Bank Fees shall be paid directly to the Issuing Bank. Once paid, none of the Fees shall be refundable under any circumstances.

WEIL:\95701648\1\44444.0005

SECTION 2.06. *Interest on Loans*. (a) Subject to the provisions of Section 2.07, the Loans comprising each ABR Borrowing, shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days at all times and calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin.

(b) Subject to the provisions of Section 2.07, the Loans comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin.

(c) Interest on each Loan shall be payable on the Interest Payment Dates applicable to such Loan except as otherwise provided in this Agreement. The applicable Alternate Base Rate or Adjusted LIBO Rate for each Interest Period or day within an Interest Period, as the case may be, shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.07. *Default Interest*. If any Event of Default has occurred and is continuing then, from the date of such occurrence and for so long as such Event of Default is continuing, to the extent permitted by law, all amounts outstanding under this Agreement and the other Loan Documents shall bear interest (after as well as before judgment), payable on demand, (a) in the case of principal, at the rate otherwise applicable to such Loan pursuant to Section 2.06 plus 2.00% per annum and (b) in all other cases, at a rate per annum (computed on the basis of the actual number of days elapsed over a year of 360 days at all times) equal to the rate that would be applicable to an ABR Loan plus 2.00% per annum.

SECTION 2.08. *Alternate Rate of Interest*. In the event, and on each occasion, that on the day two Business Days prior to the commencement of any Interest Period for a Eurodollar Borrowing the Administrative Agent shall have determined that Dollar deposits in the principal amounts of the Loans comprising such Borrowing are not generally available in the London interbank market, or that the rates at which such Dollar deposits are being offered will not adequately and fairly reflect the cost to the Required Lenders of making or maintaining Eurodollar Loans during such Interest Period, or that reasonable means do not exist for ascertaining the Adjusted LIBO Rate, the Administrative Agent shall, as soon as practicable thereafter, give written or fax notice of such determination to the Borrower and the Lenders. In the event of any such determination, until the Administrative Agent shall have advised the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, any request by the Borrower for a Eurodollar Borrowing pursuant to Section 2.03 or 2.10 shall be deemed to be a request for an ABR Borrowing. Each determination by the Administrative Agent under this Section 2.08 shall be conclusive absent manifest error.

SECTION 2.09. *Termination and Reduction of Commitments*. (a) The Term Loan Commitments shall automatically terminate upon the making of the Final Borrowing, with the portion thereof applicable to the Initial Borrowing terminating upon

WEIL:\95701648\1\44444.0005

the making of the Term Loan on the Closing Date. The L/C Credit Commitments shall automatically terminate on the L/C Credit Maturity Date. The L/C Issuing Commitment shall automatically terminate on the earlier to occur of (i) the termination of the L/C Credit Commitments and (ii) the date 5 days prior to the L/C Credit Maturity Date.

SECTION 2.10. *Conversion and Continuation of Borrowings*. The Borrower shall have the right at any time upon prior irrevocable written notice to the Administrative Agent (a) not later than 12:00 (noon), New York City time, three Business Days prior to conversion, to convert any Eurodollar Borrowing into an ABR Borrowing, (b) not later than 12:00 (noon), New York City time, three Business Days prior to conversion or continuation, to convert any ABR Borrowing into a Eurodollar Borrowing or to continue any Eurodollar Borrowing as a Eurodollar Borrowing for an additional Interest Period, and (c) not later than 12:00 (noon), New York City time, three Business Days prior to conversion, to convert the Interest Period with respect to any Eurodollar Borrowing to another permissible Interest Period, subject in each case to the following:

(i) each conversion or continuation shall be made pro rata among the Lenders in accordance with the respective principal amounts of the Loans comprising the converted or continued Borrowing;

(ii) if less than all the outstanding principal amount of any Borrowing shall be converted or continued, then each resulting Borrowing shall satisfy the limitations specified in Sections 2.02(a) and 2.02(b) regarding the principal amount and maximum number of Borrowings of the relevant Type;

(iii) each conversion shall be effected by each Lender and the Administrative Agent by recording for the account of such Lender the new Loan of such Lender resulting from such conversion and reducing the Loan (or portion thereof) of such Lender being converted by an equivalent principal amount; accrued interest on any Eurodollar Loan (or portion thereof) being converted shall be paid by the Borrower at the time of conversion;

(iv) if any Eurodollar Borrowing is converted at a time other than the end of the Interest Period applicable thereto, the Borrower shall pay, upon demand, any amounts due to the Lenders pursuant to Section 2.16;

(v) any portion of a Borrowing maturing or required to be repaid in less than one month may not be converted into or continued as a Eurodollar Borrowing;

(vi) any portion of a Eurodollar Borrowing that cannot be converted into or continued as a Eurodollar Borrowing by reason of the immediately preceding clause shall be automatically converted at the end of the Interest Period in effect for such Borrowing into an ABR Borrowing;

(vii) no Interest Period may be selected for any Eurodollar Term Borrowing that would end later than the Term Loan Maturity Date occurring on

34

or after the first day of such Interest Period if, after giving effect to such selection, the aggregate outstanding amount of (A) the Eurodollar Term Borrowings comprised of Term Loans, with Interest Periods ending on or prior to the Term Loan Maturity Date and (B) the ABR Term Borrowings comprised of Term Loans, would not be at least equal to the principal amount of Term Borrowings to be paid on the Term Loan Maturity Date; and

(viii)  upon notice to the Borrower from the Administrative Agent given at the request of the Required Lenders, after the occurrence and during the continuance of an Event of Default, no outstanding Loan may be converted into, or continued as, a Eurodollar Loan.

Each notice pursuant to this Section 2.10 shall be irrevocable and shall refer to this Agreement and specify (i) the identity and amount of the Borrowing that the Borrower requests be converted or continued, (ii) whether such Borrowing is to be converted to or continued as a Eurodollar Borrowing or an ABR Borrowing, (iii) if such notice requests a conversion, the date of such conversion (which shall be a Business Day) and (iv) if such Borrowing is to be converted to or continued as a Eurodollar Borrowing, the Interest Period with respect thereto. If no Interest Period is specified in any such notice with respect to any conversion to or continuation as a Eurodollar Borrowing, the Borrower shall be deemed to have selected an Interest Period of one month's duration. The Administrative Agent shall advise the Lenders of any notice given pursuant to this Section 2.10 and of each Lender's portion of any converted or continued Borrowing. If the Borrower shall not have given notice in accordance with this Section 2.10 to continue any Borrowing into a subsequent Interest Period (and shall not otherwise have given notice in accordance with this Section 2.10 to convert such Borrowing), such Borrowing shall, at the end of the Interest Period applicable thereto (unless repaid pursuant to the terms hereof), automatically be continued as the same Type of Borrowing (provided that in the case of a continuation as a Eurodollar Borrowing, the Interest Period shall be of one month's duration).

SECTION 2.11.  *Repayment of Term Borrowings*.  (a)  [Reserved].

(b)  All Loans shall be due and payable on the DIP Termination Date without further application to or order from the Bankruptcy Court, together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment.

(c)  All repayments pursuant to this Section 2.11 shall be subject to Section 2.16, but shall otherwise be without premium or penalty.

SECTION 2.12.  *Voluntary Prepayment*.  (a)  The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, upon at least three Business Days' prior written or fax notice (or telephone notice promptly confirmed by written or fax notice) to the Administrative Agent before 12:00 (noon), New York City time, in the case of Eurodollar Loans, or written or fax notice (or telephone notice promptly confirmed by written or fax notice) to the Administrative Agent before 10:00 a.m., New York City time, on the date of prepayment, in the case of

35

ABR Loans; provided, however, that each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 and not less than $2,000,000, in the case of Term Loans, or $200,000 and not less than $1,000,000, in the case of L/C Loans.

(b)    [Reserved].

(c)    Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable and shall commit the Borrower to prepay such Borrowing by the amount stated therein on the date stated therein; provided, however, that if such prepayment is for all of the then outstanding Loans, then the Borrower may revoke such notice and/or extend the prepayment date by not more than five Business Days; provided further, however, that the provisions of Section 2.16 shall apply with respect to any such revocation or extension.   All prepayments under this Section 2.12 shall be subject to Section 2.16, but otherwise without premium or penalty, and other than prepayments of ABR L/C Loans that are not made in connection with the termination or permanent reduction of the L/C Credit Commitments, shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.13.  *Mandatory Prepayments*.  (a)  In the event of any termination of all the L/C Credit Commitments, the Borrower shall, on the date of such termination, repay or prepay all its outstanding L/C Credit Borrowings and replace or cause to be canceled (or make other arrangements reasonably satisfactory to the Administrative Agent and the Issuing Bank with respect to) all outstanding Letters of Credit. If, after giving effect to any partial reduction of the L/C Credit Commitments or at any other time, the Aggregate L/C Credit Exposure would exceed the Total L/C Credit Commitment, then the Borrower shall, on the date of such reduction or at such other time, repay or prepay L/C Credit Borrowings and, after the L/C Credit Borrowings shall have been repaid or prepaid in full, replace or cause to be canceled (or make other arrangements reasonably satisfactory to the Administrative Agent and the Issuing Bank with respect to) Letters of Credit, in each case in an amount sufficient to eliminate such excess.

(b)    In the event that on or after the Closing Date the Borrower or any Subsidiary shall make an Asset Sale of Collateral that is not permitted by Section 6.05, or a Recovery Event in respect of Collateral shall occur, not later than the third Business Day following the receipt of Net Cash Proceeds therefrom, the Borrower shall apply 100% of the Net Cash Proceeds received with respect thereto to prepay outstanding Loans in accordance with Section 2.13(f); provided, however, that, so long as no Default or Event of Default has occurred and is continuing, Net Cash Proceeds from any Recovery Event shall not be required to be applied to prepay the Loans to the extent the Borrower delivers to the Administrative Agent a certificate stating that the Loan Parties intend to use such Net Cash Proceeds to acquire capital assets useful to the business of the Loan Parties within 180 days of the receipt of such Net Cash Proceeds, it being expressly agreed that any Net Cash Proceeds not so reinvested shall be applied to prepay the Loans immediately thereafter.

36

(c)  Promptly upon receipt by any Loan Party or any of its Subsidiaries of cash proceeds from any Extraordinary Receipt not described in Section 2.13(b), the Borrower shall prepay the Loans in an aggregate amount equal to one hundred percent (100%) of the Net Cash Proceeds of such Extraordinary Receipt.

(d)  [Reserved].

(e)  In the event that any Loan Party or any subsidiary of a Loan Party shall receive Net Cash Proceeds from the issuance or incurrence of Indebtedness for money borrowed or Equity Interests of any Loan Party or any subsidiary of a Loan Party (other than any cash proceeds from the issuance or incurrence of Indebtedness for money borrowed permitted pursuant to Section 6.01), the Borrower shall, substantially simultaneously with (and in any event not later than the third Business Day next following) the receipt of such Net Cash Proceeds by such Loan Party or such subsidiary, apply an amount equal to 100% of such Net Cash Proceeds to prepay outstanding Loans in accordance with Section 2.13(f).

(f)  Mandatory prepayments under this Agreement (other than pursuant to Section 2.13(a)) shall be allocated *first,* pro rata among the Term Loans, *next,* to prepay outstanding L/C Loans without permanent reduction of the Total L/C Credit Commitment and *thereafter* to cash collateralize Letters of Credit in the manner set forth in Section 2.22(j).

(g)  The Borrower shall deliver to the Administrative Agent, at the time of each prepayment required under this Section 2.13, (i) a certificate signed by a Financial Officer of the Borrower setting forth in reasonable detail the calculation of the amount of such prepayment and (ii) to the extent practicable, at least four days' prior irrevocable written notice of such prepayment. Each notice of prepayment shall specify the prepayment date, the Type of each Loan being prepaid and the principal amount of each Loan (or portion thereof) to be prepaid. All prepayments of Borrowings under this Section 2.13 shall be subject to Section 2.16, but shall otherwise be without premium or penalty, and shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.14. ***Reserve Requirements; Change in Circumstances***.   (a) Notwithstanding any other provision of this Agreement, if any Change in Law shall impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of or credit extended by any Lender or the Issuing Bank (except any such reserve requirement which is reflected in the Adjusted LIBO Rate) or shall impose on such Lender or the Issuing Bank or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender or any Letter of Credit or participation therein, and the result of any of the foregoing shall be to increase the cost to such Lender or the Issuing Bank of making or maintaining any Eurodollar Loan or increase the cost to any Lender of issuing or maintaining any Letter of Credit or purchasing or maintaining a participation therein or to reduce the amount of any sum received or receivable by such Lender or the Issuing Bank hereunder (whether of principal, interest or otherwise) by an amount deemed by such

Lender or the Issuing Bank to be material (except for any Taxes, since the treatment of Taxes is governed by Section 2.20), then the Borrower will pay to such Lender or the Issuing Bank, as the case may be, upon demand such additional amount or amounts as will compensate such Lender or the Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered.

(b)  If any Lender or the Issuing Bank shall have determined that any Change in Law regarding capital adequacy has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made or participations in Letters of Credit purchased by such Lender pursuant hereto or the Letters of Credit issued by the Issuing Bank pursuant hereto to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy) by an amount deemed by such Lender or the Issuing Bank to be material, then from time to time the Borrower shall pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

(c)  A certificate of a Lender, the Issuing Bank or the Administrative Agent setting forth the amount or amounts necessary to compensate such Lender, the Issuing Bank or its holding company or the Administrative Agent, as applicable, as specified in paragraph (a) or (b) above shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender, the Issuing Bank or the Administrative Agent the amount shown as due on any such certificate delivered by it within 10 days after its receipt of the same.

(d)  Failure or delay on the part of any Lender or the Issuing Bank to demand compensation for any increased costs or reduction in amounts received or receivable or reduction in return on capital shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation; provided that the Borrower shall not be under any obligation to compensate any Lender or the Issuing Bank under paragraph (a) or (b) above with respect to increased costs or reductions with respect to any period prior to the date that is 120 days prior to such request if such Lender or the Issuing Bank knew or could reasonably have been expected to know of the circumstances giving rise to such increased costs or reductions and of the fact that such circumstances would result in a claim for increased compensation by reason of such increased costs or reductions; provided further that the foregoing limitation shall not apply to any increased costs or reductions arising out of the retroactive application of any Change in Law within such 120-day period. The protection of this Section 2.14 shall be available to each Lender and the Issuing Bank regardless of any possible contention of the invalidity or inapplicability of the Change in Law that shall have occurred or been imposed.

SECTION 2.15.  *Change in Legality*.  (a)  Notwithstanding any other provision of this Agreement, if any Change in Law shall make it unlawful for any Lender to make or

WEIL:\95701648\1\44444.0005

maintain any Eurodollar Loan or to give effect to its obligations as contemplated hereby with respect to any Eurodollar Loan, then, by written notice to the Borrower and to the Administrative Agent:

(i) such Lender may declare that Eurodollar Loans will not thereafter (for the duration of such unlawfulness) be made by such Lender hereunder (or be continued for additional Interest Periods) and ABR Loans will not thereafter (for such duration) be converted into Eurodollar Loans, whereupon any request for a Eurodollar Borrowing (or to convert an ABR Borrowing to a Eurodollar Borrowing or to continue a Eurodollar Borrowing for an additional Interest Period) shall, as to such Lender only, be deemed a request for an ABR Loan (or a request to continue an ABR Loan as such for an additional Interest Period or to convert a Eurodollar Loan into an ABR Loan, as the case may be), unless such declaration shall be subsequently withdrawn; and

(ii) such Lender may require that all outstanding Eurodollar Loans made by it be converted to ABR Loans, in which event all such Eurodollar Loans shall be automatically converted to ABR Loans as of the effective date of such notice as provided in paragraph (b) below.

In the event any Lender shall exercise its rights under (i) or (ii) above, all payments and prepayments of principal that would otherwise have been applied to repay the Eurodollar Loans that would have been made by such Lender or the converted Eurodollar Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such Eurodollar Loans.

(b)  For purposes of this Section 2.15, a notice to the Borrower by any Lender shall be effective as to each Eurodollar Loan made by such Lender, if lawful, on the last day of the Interest Period then applicable to such Eurodollar Loan; in all other cases such notice shall be effective on the date of receipt by the Borrower.

SECTION 2.16. *Breakage*.  The Borrower shall indemnify each Lender against any loss (excluding loss of margin) or expense that such Lender may sustain or incur as a consequence of (a) any event, other than a default by such Lender in the performance of its obligations hereunder, which results in (i) such Lender receiving or being deemed to receive any amount on account of the principal of any Eurodollar Loan prior to the end of the Interest Period in effect therefor, (ii) the conversion of any Eurodollar Loan to an ABR Loan, or the conversion of the Interest Period with respect to any Eurodollar Loan, in each case other than on the last day of the Interest Period in effect therefor, or (iii) any Eurodollar Loan to be made by such Lender (including any Eurodollar Loan to be made pursuant to a conversion or continuation under Section 2.10) not being made after notice of such Loan shall have been given by the Borrower hereunder (any of the events referred to in this clause (a) being called a "Breakage Event") or (b) any default in the making of any payment or prepayment required to be made hereunder. In the case of any Breakage Event, such loss shall include an amount equal to the excess, as reasonably determined by such Lender, of (i) its cost of obtaining funds for the Eurodollar Loan that is the subject of such Breakage Event for the period from the date of such Breakage Event to the last

39

day of the Interest Period in effect (or that would have been in effect) for such Loan over (ii) the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such Breakage Event for such period. A certificate of any Lender setting forth any amount or amounts which such Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Borrower and shall be conclusive absent manifest error.

SECTION 2.17. **Pro Rata Treatment**. Subject to the express provisions of this Agreement which require, or permit, differing payments to be made to non-Defaulting Lenders as opposed to Defaulting Lenders, and as required under Section 2.15, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest on the Loans, each payment of the Commitment Fees, each reduction of the Term Loan Commitments or the L/C Credit Commitments and each conversion of any Borrowing to or continuation of any Borrowing as a Borrowing of any Type shall be allocated pro rata among the Lenders in accordance with their respective applicable Commitments (or, if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans). Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole Dollar amount.

SECTION 2.18. **Sharing of Setoffs**. Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrower or any other Loan Party, or pursuant to a secured claim under Section 506 of the Bankruptcy Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of any Loan or Loans or L/C Disbursement as a result of which the unpaid principal portion of its Loans and participations in L/C Disbursements shall be proportionately less than the unpaid principal portion of the Loans and participations in L/C Disbursements of any other Lender, it shall be deemed simultaneously to have purchased from such other Lender at face value, and shall promptly pay to such other Lender the purchase price for, a participation in the Loans and L/C Exposure of such other Lender, so that the aggregate unpaid principal amount of the Loans and L/C Exposure and participations in Loans and L/C Exposure held by each Lender shall be in the same proportion to the aggregate unpaid principal amount of all Loans and L/C Exposure then outstanding as the principal amount of its Loans and L/C Exposure prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Loans and L/C Exposure outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; provided, however, that (i) if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.18 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest, and (ii) the provisions of this Section 2.18 shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant. The Borrower

and Holdings expressly consent to the foregoing arrangements and agree that any Lender holding a participation in a Loan or L/C Disbursement deemed to have been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the Borrower and Holdings to such Lender by reason thereof as fully as if such Lender had made a Loan directly to the Borrower in the amount of such participation.

SECTION 2.19. *Payments*.    (a) The Borrower shall make each payment (including principal of or interest on any Borrowing or any L/C Disbursement or any Fees or other amounts) hereunder and under any other Loan Document not later than 12:00 (noon), New York City time, on the date when due in immediately available Dollars, without setoff, defense or counterclaim. Each such payment (other than Issuing Bank Fees, which shall be paid directly to the Issuing Bank) shall be made to the Administrative Agent at its offices at Eleven Madison Avenue, New York, NY 10010. All payments received by the Administrative Agent after 12:00 (noon), New York City time shall be deemed received on the next Business Day (in the Administrative Agent's sole discretion) and any applicable interest shall continue to accrue.  The Administrative Agent shall promptly distribute to each Lender any payments received by the Administrative Agent on behalf of such Lender.

(b)  Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or Fees, if applicable.

SECTION 2.20. *Taxes*.    (a) Any and all payments by or on account of any obligation of the Borrower or any other Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes; underlined provided that if the Borrower or any other Loan Party shall be required by law to deduct any Indemnified Taxes from such payments, then (i) the Borrower or such Loan Party shall make such deductions, (ii) the Borrower or such Loan Party shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law and (iii) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.20) the Administrative Agent, each Lender  and the Issuing Bank (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made.

(b)  In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)  The Borrower shall indemnify the Administrative Agent, each Lender and the Issuing Bank, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes paid by the Administrative Agent, such Lender or the Issuing Bank, as the case may be, on or with respect to any payment by or on account of any obligation of

41

the Borrower or any other Loan Party hereunder or under any other Loan Document (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.20) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto (other than penalties, interest or expenses attributable to the failure or delay by the Administrative Agent, such Lender or the Issuing Bank to make such written demand to the Borrower within 30 days of becoming aware that such Indemnified Taxes have been levied, imposed or asserted against it), whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or the Issuing Bank, or by the Administrative Agent on behalf of itself, a Lender or the Issuing Bank, shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Indemnified Taxes by the Borrower or any other Loan Party to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Each Foreign Lender shall deliver to the Borrower (with a copy to the Administrative Agent), on or prior to the date on which such Foreign Lender becomes a Lender hereunder, and at such other time or times prescribed by applicable law, or as reasonably requested by the Borrower:

(i) Duly completed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or applicable successor form) claiming eligibility for benefits of an income tax treaty to which the United States is a party; or

(ii) Duly completed copies of Internal Revenue Service Form W-8ECI (or applicable successor form); or

(iii) in the case of a Foreign Lender that is not legally entitled to deliver a form described in Section 2.20(e)(i), both (1) a true, correct and properly completed and executed certificate of a duly authorized officer of such Foreign Lender in substantially the form of Exhibit J (the "Exemption Certificate") to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a controlled foreign corporation receiving interest from a related person within the meaning of Section 881(c)(3)(C) of the Code, and (2) a true, correct and properly completed and executed Form W-8BEN or W-8BEN-E (or applicable successor form), together establishing that payments to such Foreign Lender under this Agreement or any other Loan Document are completely exempt from withholding tax under the portfolio interest exemption; or

42

(iv) in the case of a Foreign Lender that is not the beneficial owner of payments made under any Loan Document (including a partnership or a participating Lender), both (x) an IRS Form W-8IMY (or applicable successor form) on behalf of itself and (y) the relevant forms prescribed in clauses (i), (ii), and (iii) of this paragraph (e) that would be required of each such beneficial owner or partner of such partnership if such beneficial owner or partner were a Lender; provided, however, that if the Lender is a partnership and one or more of its partners are claiming the exemption for portfolio interest under Section 881(c) of the Code, such Lender may provide the certificate described in the foregoing clause (iii) above on behalf of such partners.

Any Lender that is not a Foreign Lender shall, upon written request of the Borrower, provide the Borrower (with a copy to the Administrative Agent) with two (2) true, correct and properly completed and executed Form W-9 (or applicable successor form) certifying that such Lender is entitled to an exemption from U.S. backup withholding tax. Notwithstanding any other provision of this Section 2.20, a Lender shall not be required to deliver any form or documentation pursuant to this paragraph that such Lender is not legally able to deliver.

If a payment made to a recipient under any Loan Document would be subject to United States federal withholding tax imposed by FATCA if such recipient were to fail to comply with the applicable reporting requirements of FATCA, such recipient shall deliver to the Administrative Agent and Borrower at the time or times prescribed by law and at such time or times reasonably requested by the Administrative Agent or Borrower such documentation prescribed by applicable law and such additional documentation reasonably requested by the Administrative Agent or Borrower as may be necessary for the Administrative Agent and the Borrower to comply with their obligations under FATCA and to determine that such recipient has complied with such recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of the preceding sentence, "FATCA" shall include any amendments made to FATCA after the Closing Date.

In addition, each Lender agrees to provide to the Borrower and Administrative Agent, upon the reasonable request of the Borrower, such other forms or documents as may be reasonably required under applicable law in order to establish an exemption from or eligibility for a reduction in the rate of imposition or assessment of any Indemnified Taxes imposed in respect of this Agreement or any other Loan Document.

On or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), the Administrative Agent will deliver to the Borrower either (i) an executed original copy of IRS Form W-9, or (ii) (x) with respect to any amounts received on its own account, an executed original copy of an applicable IRS Form W-8, and (y) with respect to any amounts received for or on account of any Lender, an executed original copy of IRS Form W-8 IMY certifying on Part I, Part II and Part VI thereof that it is a U.S. branch that has agreed to be treated as a U.S. person for U.S. federal tax purposes with respect to payments received by it from the Borrower in its

WEIL:\95701648\1\44444.0005

capacity as Administrative Agent, as applicable. The Administrative Agent shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide the certification described in the prior sentence.

(f)   In the event any Person determines that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.20, then such Person shall pay over such refund (but only to the extent of indemnity payments made or additional amounts paid by the Borrower under this Section 2.20 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of such Person and without interest (other than interest paid by the relevant Governmental Authority with respect to such refund) to the Borrower within 20 Business Days from the date of receipt; provided, however, that the Borrower, upon the request of such Person, agrees to repay the amount paid over to the Borrower (plus any penalties, interest, or other charges imposed by the relevant Governmental Authority) to such Person in the event such Person is required to repay such refund to such Governmental Authority.  This clause (f) shall not be construed to require the Administrative Agent, any Lender or the Issuing Bank to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

(g)   Each Lender shall severally indemnify the Administrative Agent for the full amount of (i) any Excluded Taxes attributable to such Lender, (ii) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), and (iii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(e) relating to the maintenance of a Participant Register, in each case, that are paid or payable by the Administrative Agent in connection with any Loan Document and any reasonable expenses arising therefrom or with respect thereto, whether or not such Excluded Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. The indemnity under this paragraph (g) shall be paid within 10 days after the Administrative Agent delivers to the applicable Lender a certificate stating the amount of Excluded Taxes so payable by the Administrative Agent.   Such certificate shall be conclusive of the amount so payable absent manifest error.

SECTION 2.21. ***Assignment of Commitments Under Certain Circumstances; Duty to Mitigate***.   (a) In the event (i) any Lender or the Issuing Bank delivers a certificate requesting compensation pursuant to Section 2.14, (ii) any Lender or the Issuing Bank delivers a notice described in Section 2.15, (iii) the Borrower is required to pay any additional amount to any Lender or the Issuing Bank or any Governmental Authority on account of any Lender or the Issuing Bank pursuant to Section 2.20, or (iv) any Lender refuses to consent to any amendment, waiver or other modification of any Loan Document requested by the Borrower that requires the consent of a greater percentage of the Lenders than the Required Lenders and such amendment, waiver or other modification is consented to by the Required Lenders, then, in each case, the Borrower may (to the extent no Default or Event of Default is continuing), at its sole expense and effort (including with respect to the processing and recordation fee referred

WEIL:\95701648\1\44444.0005

to in Section 9.04(b)), or the Required Lenders may, in each case, upon notice to such Lender or the Issuing Bank, as the case may be, and the Administrative Agent, require such Lender or the Issuing Bank to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all of its interests, rights and obligations under this Agreement (or, in the case of clause (iv) above, all of its interests, rights and obligation with respect to the Class of Loans or Commitments that is the subject of the related consent, amendment, waiver or other modification) to an Eligible Assignee that shall assume such assigned obligations and, with respect to clause (iv) above, shall consent to such requested amendment, waiver or other modification of any Loan Documents (which assignee may be another Lender, if a Lender accepts such assignment); provided that (A) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction, (B) the Borrower, as applicable, shall have received the prior written consent of the Administrative Agent (and, if a L/C Credit Commitment is being assigned, of the Issuing Bank), which consents shall not unreasonably be withheld or delayed and (C) the Borrower or such assignee shall have paid to the affected Lender or the Issuing Bank in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Loans or L/C Disbursements of such Lender or the Issuing Bank, respectively, plus all Fees and other amounts accrued for the account of such Lender or the Issuing Bank hereunder with respect thereto (including any amounts under Sections 2.14 and 2.16), provided that, if prior to any such transfer and assignment the circumstances or event that resulted in such Lender's or the Issuing Bank's claim for compensation under Section 2.14, notice under Section 2.15 or the amounts paid pursuant to Section 2.20, as the case may be, cease to cause such Lender or the Issuing Bank to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to have the consequences specified in Section 2.15, or cease to result in amounts being payable under Section 2.20, as the case may be (including as a result of any action taken by such Lender or the Issuing Bank pursuant to paragraph (b) below), or if such Lender or the Issuing Bank shall waive its right to claim further compensation under Section 2.14 in respect of such circumstances or event or shall withdraw its notice under Section 2.15 or shall waive its right to further payments under Section 2.20 in respect of such circumstances or event or shall consent to the proposed amendment, waiver, consent or other modification, as the case may be, then such Lender or the Issuing Bank shall not thereafter be required to make any such transfer and assignment hereunder. Each Lender and the Issuing Bank hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender or the Issuing Bank, as the case may be, as assignor, any Assignment and Acceptance necessary to effectuate any assignment of such Lender's or the Issuing Bank's interests hereunder in the circumstances contemplated by this paragraph (a) of Section 2.21.

(b)  If (i) any Lender or the Issuing Bank shall request compensation under Section 2.14, (ii) any Lender or the Issuing Bank delivers a notice described in Section 2.15 or (iii) the Borrower is required to pay any additional amount to any Lender or the Issuing Bank or any Governmental Authority on account of any Lender or the Issuing Bank, pursuant to Section 2.20, then such Lender or the Issuing Bank shall use reasonable efforts (which shall not require such Lender or the Issuing Bank to incur an

WEIL:\95701648\1\44444.0005

unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden deemed by it to be significant) (A) to file any certificate or document reasonably requested in writing by the Borrower or (B) to assign its rights and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if such filing or assignment would reduce its claims for compensation under Section 2.14 or enable it to withdraw its notice pursuant to Section 2.15 or would reduce amounts payable pursuant to Section 2.20, as the case may be, in the future. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender or the Issuing Bank in connection with any such filing or assignment, delegation and transfer.

SECTION 2.22. *Letters of Credit*. (a) *General*. The Borrower may request the issuance of a Letter of Credit for its own account or for the account of any of its Wholly Owned Subsidiaries (in which case the Borrower and such Wholly Owned Subsidiary shall be co-applicants with respect to such Letter of Credit), in a form reasonably acceptable to the Administrative Agent and the Issuing Bank, at any time and from time to time while the L/C Issuing Commitment remains in effect as set forth in Section 2.09(a). This Section 2.22 shall not be construed to impose an obligation upon the Issuing Bank to issue any Letter of Credit that is inconsistent with the terms and conditions of this Agreement. Notwithstanding anything to the contrary contained in this Section 2.22 or elsewhere in this Agreement, in the event that a L/C Credit Lender is a Defaulting Lender, the Issuing Bank shall not be required to issue any Letter of Credit unless the Issuing Bank has entered into arrangements satisfactory to it and the Borrower to eliminate the Issuing Bank's risk with respect to the participation in Letters of Credit by all such Defaulting Lenders, including by cash collateralizing each such Defaulting Lender's Pro Rata Percentage of each L/C Disbursement. The Borrower's reimbursement obligations in respect of each Existing Letter of Credit, and each L/C Credit Lender's participation obligations in connection therewith, shall be governed by the terms of this Agreement.

(b) *Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions*. In order to request the issuance of a Letter of Credit (or to amend, renew or extend an existing Letter of Credit), the Borrower shall hand deliver or fax to the Issuing Bank and the Administrative Agent (reasonably in advance of the requested date of issuance, amendment, renewal or extension) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, the date of issuance, amendment, renewal or extension, the date on which such Letter of Credit is to expire (which shall comply with paragraph (c) below), the amount of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to prepare such Letter of Credit. A Letter of Credit shall be issued, amended, renewed or extended only if, and upon issuance, amendment, renewal or extension of each Letter of Credit the Borrower shall be deemed to represent and warrant that, after giving effect to such issuance, amendment, renewal or extension (i) the L/C Exposure shall not exceed $30,611,941 and (ii) the Aggregate L/C Credit Exposure shall not exceed the Total L/C Credit Commitment.

(c) *Expiration Date*.  Each Letter of Credit shall expire at the close of business on the earlier of the date one year after the date of the issuance of such Letter of Credit and the date that is five Business Days prior to the L/C Credit Maturity Date, unless such Letter of Credit expires by its terms on an earlier date; provided, however, that a Letter of Credit may, upon the request of the Borrower, include a provision whereby such Letter of Credit shall be renewed automatically for additional consecutive periods of 12 months or less (but not beyond the date that is five Business Days prior to the L/C Credit Maturity Date unless rolled into an exit credit facility, cash collateralized or backstopped pursuant to arrangements reasonably satisfactory to the applicable Issuing Bank) unless the Issuing Bank notifies the beneficiary thereof at least 30 days (or such longer period as may be specified in such Letter of Credit) prior to the then-applicable expiration date that such Letter of Credit will not be renewed.

(d) *Participations*.  By the issuance of a Letter of Credit (Existing Letters of Credit shall be deemed issued on the Closing Date solely for purposes of this Section 2.22(d)) and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank hereby grants to each L/C Credit Lender, and each such Lender hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such Lender's Pro Rata Percentage of the aggregate amount available to be drawn under such Letter of Credit, effective upon the issuance of such Letter of Credit (or, in the case of the Existing Letters of Credit, effective upon the Closing Date). In consideration and in furtherance of the foregoing, each L/C Credit Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Pro Rata Percentage of each L/C Disbursement made by the Issuing Bank and not reimbursed by the Borrower (or, if applicable, another party pursuant to its obligations under any other Loan Document) forthwith on the date due as provided in Section 2.02(f). Each L/C Credit Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or an Event of Default, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e) *Reimbursement*.  If the Issuing Bank shall make any L/C Disbursement in respect of a Letter of Credit, the Borrower shall pay to the Administrative Agent an amount equal to such L/C Disbursement not later than two hours after the Borrower shall have received notice from the Issuing Bank that payment of such draft will be made, or, if the Borrower shall have received such notice later than 10:00 a.m., New York City time, on any Business Day, not later than 10:00 a.m., New York City time, on the immediately following Business Day.

(f) *Obligations Absolute*.  The Borrower's obligations to reimburse L/C Disbursements as provided in paragraph (e) above shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement, under any and all circumstances whatsoever, and irrespective of:

WEIL:\95701648\1\44444.0005

(i) any lack of validity or enforceability of any Letter of Credit or any Loan Document, or any term or provision therein;

(ii) any amendment or waiver of or any consent to departure from all or any of the provisions of any Letter of Credit or any Loan Document;

(iii) the existence of any claim, setoff, defense or other right that the Borrower, any other party guaranteeing, or otherwise obligated with, the Borrower, any Subsidiary or other Affiliate thereof or any other Person may at any time have against the beneficiary under any Letter of Credit, the Issuing Bank, the Administrative Agent or any Lender or any other Person, whether in connection with this Agreement, any other Loan Document or any other related or unrelated agreement or transaction;

(iv) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(v) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit; and

(vi) any other act or omission to act or delay of any kind of the Issuing Bank, the Lenders, the Administrative Agent or any other Person or any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.22, constitute a legal or equitable discharge of the Borrower's obligations hereunder.

Without limiting the generality of the foregoing, it is expressly understood and agreed that the absolute and unconditional obligation of the Borrower hereunder to reimburse L/C Disbursements will not be excused by the gross negligence or willful misconduct of the Issuing Bank. However, the foregoing shall not be construed to excuse the Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Issuing Bank's gross negligence or willful misconduct in determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. It is further understood and agreed that the Issuing Bank may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary and, in making any payment under any Letter of Credit (i) the Issuing Bank's exclusive reliance on the documents presented to it under such Letter of Credit as to any and all matters set forth therein, including reliance on the amount of any draft presented under such Letter of Credit, whether or not the amount due to the beneficiary thereunder equals the amount of such draft and whether or not any document presented pursuant to such Letter of Credit proves to be insufficient in any respect, if such document on its face appears to be in order, and whether or not any other statement or any other document presented pursuant

WEIL:\95701648\1\44444.0005

to such Letter of Credit proves to be forged or invalid or any statement therein proves to be inaccurate or untrue in any respect whatsoever and (ii) any noncompliance in any immaterial respect of the documents presented under such Letter of Credit with the terms thereof shall, in each case, be deemed not to constitute gross negligence or willful misconduct of the Issuing Bank.

(g) *Disbursement Procedures*.  The Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  The Issuing Bank shall as promptly as possible give telephonic notification, confirmed by fax, to the Administrative Agent and the Borrower of such demand for payment and whether the Issuing Bank has made or will make an L/C Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Issuing Bank and the L/C Credit Lenders with respect to any such L/C Disbursement.

(h) *Interim Interest*.  If the Issuing Bank shall make any L/C Disbursement in respect of a Letter of Credit, then, unless the Borrower shall reimburse such L/C Disbursement in full on such date, the unpaid amount thereof shall bear interest for the account of the Issuing Bank, for each day from and including the date of such L/C Disbursement, to but excluding the earlier of the date of payment by the Borrower or the date on which interest shall commence to accrue thereon as provided in Section 2.02(f), at the rate per annum that would apply to such amount if such amount were an ABR L/C Loan.

(i) *Resignation or Removal of the Issuing Bank*.  The Issuing Bank may resign at any time by giving 30 days' prior written notice to the Administrative Agent, the Lenders and the Borrower, and may be removed at any time by the Borrower by notice to the Issuing Bank, the Administrative Agent and the Lenders.  Upon the acceptance of any appointment as the Issuing Bank hereunder by a Lender that shall agree to serve as successor Issuing Bank, such successor shall succeed to and become vested with all the interests, rights and obligations of the retiring Issuing Bank. At the time such removal or resignation shall become effective, the Borrower shall pay all accrued and unpaid fees pursuant to Section 2.05(c)(ii). The acceptance of any appointment as the Issuing Bank hereunder by a successor Lender shall be evidenced by an agreement entered into by such successor, in a form satisfactory to the Borrower and the Administrative Agent, and, from and after the effective date of such agreement, (i) such successor Lender shall have all the rights and obligations of the previous Issuing Bank under this Agreement and the other Loan Documents and (ii) references herein and in the other Loan Documents to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require. After the resignation or removal of the Issuing Bank hereunder, the retiring Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement and the other Loan Documents with respect to Letters of Credit issued by it prior to such resignation or removal, but shall not be required to issue additional Letters of Credit.

49

(j) *Cash Collateralization*.    If any Event of Default shall occur and be continuing, the Borrower shall, on the Business Day it receives notice from the Administrative Agent or the Required Lenders (or, if the maturity of the Loans has been accelerated, L/C Credit Lenders holding participations in outstanding Letters of Credit representing greater than 50% of the aggregate undrawn amount of all outstanding Letters of Credit) thereof and of the amount to be deposited, deposit in an account with the Collateral Agent, for the benefit of the L/C Credit Lenders, an amount in cash equal to 105% of the L/C Exposure as of such date; underline(provided) that the obligation to deposit such cash will become effective immediately, and such deposit will become immediately payable in immediately available funds, without demand or notice of any kind, upon the exercise of any of the remedies provided in the last paragraph of Section 7.01 or in Section 7.02.   Such deposit shall be held by the Collateral Agent as collateral for the payment and performance of the Obligations. The Collateral Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits in Permitted Investments, which investments shall be made at the option and sole discretion of the Collateral Agent, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall (i) automatically be applied by the Administrative Agent to reimburse the Issuing Bank for L/C Disbursements for which it has not been reimbursed, (ii) be held for the satisfaction of the reimbursement obligations of the Borrower for the L/C Exposure at such time and (iii) if the maturity of the Loans has been accelerated (but subject to the consent of L/C Credit Lenders holding participations in outstanding Letters of Credit representing greater than 50% of the aggregate undrawn amount of all outstanding Letters of Credit), be applied to satisfy the Obligations. If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three Business Days after all Events of Default have been cured or waived.

(k) *Additional Issuing Banks*.  The Borrower may, at any time and from time to time with the consent of the Administrative Agent (which consent shall not be unreasonably withheld or delayed) and such Lender, designate one or more additional Lenders to act as an issuing bank under the terms of this Agreement, subject to reporting requirements reasonably satisfactory to the Administrative Agent with respect to issuances, amendments, extensions and terminations of Letters of Credit by such additional issuing bank. Any Lender designated as an issuing bank pursuant to this paragraph (k) shall be deemed to be an "Issuing Bank" (in addition to being a Lender) in respect of Letters of Credit issued or to be issued by such Lender, and, with respect to such Letters of Credit, such term shall thereafter apply to the other Issuing Bank and such Lender.

SECTION 2.23. *Super Priority Nature of Obligations and Lenders' DIP Liens*.

(a)   The priority of the Secured Parties' DIP Liens on the Collateral owned by the Debtors shall be set forth in the Interim Order and the Final Order.

(b)   All of the claims of the Agents and the Lenders on account of the Obligations (other than the Obligations with respect to Lake Grove) shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having superpriority over any and all administrative expenses of the kind that are specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code (the "Superpriority DIP Claims"), subject only to the Carve-Out.

(c)   The Superpriority DIP Claims will, at all times during the period that the Loans remain outstanding, remain senior in priority to all other claims or administrative expenses, including (a) any claims allowed pursuant to the obligations of the Debtors under the Prepetition Loan Documents, and (b) the Prepetition Superpriority Claims, subject only to the Carve-Out.

(d)   The Liens granted to the Collateral Agent for the benefit of the Secured Parties on the Collateral owned by the Debtors shall be valid and perfected on the basis and with the priority set forth herein, including in the definition of "DIP Lien" with respect thereto, and in the Orders.

(e)   The "Carve-Out" means the following: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000; (iii) to the extent allowed by the Bankruptcy Court at any time and, solely with respect to any Committee, strictly subject to the Budget and the line items applicable to such Committee's professionals set forth therein, all accrued and unpaid fees, costs and expenses incurred by professionals and professional firms retained by the Debtors and any such Committee at any time before the date and time of the delivery by the DIP Agent at the direction of the Required Lenders (the "Trigger Date") of a Carve-Out Trigger Notice (as defined below) plus any monthly or success or transaction fees payable to the Debtors' professionals or professional firms retained by the Debtors, including a Chief Restructuring Officer (a "CRO") and any Committee (each, a "Professional" and the fees, costs and expenses of Professionals, the "Professional Fees") to the extent such Professional Fees are allowed by the Bankruptcy Court at any time, whether before or after the Trigger Date; and (iv) after the Trigger Date to the extent allowed by the Bankruptcy Court at any time, all unpaid fees, disbursements, costs and expenses incurred by Professionals in an aggregate amount not to exceed $1,000,000 (the amount set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap") plus any success or transaction fees that may become due and payable to any Professional which shall not be included in or subject to the Post-Carve-Out Trigger Notice Cap; provided, however, that nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement or compensation sought by any such Professionals or any other person or entity.  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the Administrative Agent at the direction of the Required Lenders to the Debtors and their counsel, the United States Trustee, and lead counsel to any official committee, which notice may be delivered following the occurrence of an Event of Default and stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

WEIL:\95701648\1\44444.0005

Immediately upon delivery of a Carve-Out Trigger Notice, the Debtors shall be required to transfer into a segregated account (the "Carve-Out Account") not subject to the control of the Administrative Agent or the Prepetition Agent an amount equal to the Post-Carve-Out Trigger Notice Cap plus an amount equal to the aggregate unpaid fees, costs and expenses described above in clauses (iii) and (iv) of this section, in each case, as determined by a good faith estimate of the applicable Professional. The proceeds on deposit in the Carve-Out Account shall be available only to satisfy obligations benefitting from the Carve-Out, and the Administrative Agent or the Prepetition Agent (i) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve-Out Account and (ii) shall only have a security interest in any residual interest in the Carve-Out Account available following satisfaction in full of all obligations benefitting from the Carve-Out. For the avoidance of doubt and notwithstanding anything to the contrary herein or elsewhere, the Carve-Out shall be senior to all liens securing the Obligations, the adequate protection liens, all claims and any and all other forms of adequate protection, liens or claims securing the Obligations.

(f)    Except as set forth herein or in the Orders, no other claim having a priority superior or *pari passu* to that granted to Administrative Agent, Collateral Agent and Lenders by the Final Order shall be granted or approved while any Obligations remain outstanding. Except for the Carve-Out and subject to entry of the Final Order, no costs or expenses of administration shall be imposed against the Administrative Agent, Collateral Agent, Lenders or any of the Collateral or any of the Prepetition Agents, the Prepetition Lenders or the Collateral (as defined in the Prepetition Credit Agreement) under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and each of the Loan Parties hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105, 506(c) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the Administrative Agent, Collateral Agent, Lenders or any of the Collateral or any of the Prepetition Agents or the Prepetition Lenders.

SECTION 2.24. ***No Discharge; Survival of Claims.***    Except as otherwise contemplated by the RSA, until payment in full of the Loans and all other Obligations, each of the Borrower and the Guarantors agrees that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization or liquidation in any Chapter 11 Case (and each of the Borrower and the Guarantors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the Superpriority DIP Claim and the DIP Liens granted to the Agents pursuant to the Orders and described in this Section 2.24 shall not be affected in any manner by the entry of an order confirming a plan of reorganization or liquidation in any Chapter 11 Case.

SECTION 2.25. ***Release.***    Each of the Borrower and the Guarantors hereby acknowledges effective upon entry of the Final Order, and subject to the terms thereof, that the Borrower, the Guarantors and any of their Subsidiaries have no defense, counterclaim, offset, recoupment, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Borrower's, the Guarantors' or their Subsidiaries' liability to repay the Administrative Agent, Collateral Agent or any

WEIL:\95701648\1\44444.0005

Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from the Administrative Agent, Collateral Agent or any Lender. The Borrower and the Guarantors, each in their own right and on behalf of their bankruptcy estates, and on behalf of all their successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "Releasing Parties"), hereby fully, finally and forever release and discharge the Administrative Agent, the Collateral Agent and Lenders and all of Administrative Agent's, Collateral Agent's and Lenders' officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Released DIP Parties") of and from any and all actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), directly or indirectly arising out of, connected with or relating to this Agreement, the Interim Order, the Final Order and the transactions (including, for avoidance of doubt, the Transactions) contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

SECTION 2.26. *Waiver of any Priming Rights.* On and after the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, the Borrower and the Guarantors hereby irrevocably waive any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the DIP Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations.

ARTICLE III

*Representations and Warranties*

Each of Holdings and the Borrower represents and warrants to the Administrative Agent, the Collateral Agent, the Issuing Bank and each of the Lenders that:

SECTION 3.01. *Organization; Powers.* Holdings, the Borrower and each of the Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) subject to the entry by the Bankruptcy Court of the applicable Orders, has all requisite power and authority to own its property and assets and to carry on its business as now conducted and as proposed to be conducted, except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect, (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure so to qualify could not reasonably be expected to result in a Material Adverse Effect, and (d) subject to the entry by the Bankruptcy Court of the applicable Orders, has the power and authority to execute, deliver and perform its obligations under each of the Loan Documents and each other

agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Borrower, to borrow hereunder.

SECTION 3.02. *Authorization*.  Subject to the entry by the Bankruptcy Court of the applicable Orders, the Transactions (a) have been duly authorized by all requisite corporate, limited liability company, partnership and, if required, stockholder, member and partner action and (b) will not (i) violate (A) any provision of (1) law, statute, rule or regulation, or (2) the certificate, articles of incorporation, operating agreements, partnership agreements or other constitutive documents or by-laws of Holdings, the Borrower or any Subsidiary, (B) any order of any Governmental Authority or (C) any provision of any indenture, agreement or other instrument to which Holdings, the Borrower or any Subsidiary is a party or by which any of them or any of their property is or may be bound, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by Holdings, the Borrower or any Subsidiary (other than any Lien created hereunder or under the Security Documents), except to the extent that any failure or failures of clause (b)(i)(C) or (b)(ii) of this Section 3.02 to be true and correct has not, individually or in the aggregate, resulted in, and could not, individually or in the aggregate, reasonably be expected to result in, any liability or loss that is not subject to the Automatic Stay and is adverse to the Lenders in any material respect.

SECTION 3.03. *Enforceability*.  Subject to the entry of the applicable Orders, this Agreement has been duly executed and delivered by Holdings and the Borrower and constitutes, and each other Loan Document when executed and delivered by each Loan Party party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally or by equitable principles (whether enforcement is sought by proceedings in equity or at law).

SECTION 3.04. *Governmental Approvals*.  No action, consent or approval of, registration or filing with or any other action by any Governmental Authority is or will be required to be made or obtained by Holdings, the Borrower or any Subsidiary in connection with the Transactions, except for (a) the filing of Uniform Commercial Code financing statements and filings with the United States Patent and Trademark Office and the United States Copyright Office, (b) recordation of a leasehold mortgage with respect to any Mortgaged Property of Lake Grove, (c) the Interim Order and the Final Order, as applicable, and (c) such as have been made or obtained and are in full force and effect.

SECTION 3.05. *Financial Statements; Budget*.  (a) Holdings has heretofore furnished to the Lenders its consolidated balance sheets and related statements of income, stockholder's equity and cash flows (a) as of and for the fiscal year ended March 29, 2015, audited by and accompanied by the opinion of Grant Thornton LLP, independent public accountants and (b) as of and for the Fiscal Quarter and the portion of the fiscal

year ended December 27, 2015, certified by its chief financial officer. Such financial statements present fairly in all material respects the financial condition and results of operations and cash flows of Holdings and its consolidated subsidiaries as of such dates and for such periods, subject to any adjustments required as a result of the recognition of a valuation allowance. Such balance sheets and the notes thereto disclose all material liabilities, direct or contingent, of Holdings and its consolidated subsidiaries as of the dates thereof. Such financial statements were prepared in accordance with GAAP applied on a consistent basis (except as otherwise expressly noted therein), subject to any adjustments required as a result of the recognition of a valuation allowance and, in the case of unaudited financial statements, subject to year-end audit adjustments and the absence of footnotes.

(b)   The Initial Budget delivered pursuant to Section 4.02(o) and each Budget delivered thereafter are based on are based on good faith estimates and assumptions believed by management of the Borrower to be reasonable and fair in light of current conditions and facts known to the Borrower at the time delivered (it being understood that such Budgets and the assumptions on which they were based, may or may not prove to be correct).

SECTION 3.06.  *No Material Adverse Change*.  No event, change or condition has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect since the Petition Date.

SECTION 3.07.  *Title to Properties; Possession Under Leases*.  (a)  Except as set forth on Schedule 3.07, each of Holdings, the Borrower and the Subsidiaries has good and marketable title to, or valid leasehold interests in, all its material properties and assets (including all Mortgaged Property), except for minor defects in title that do not interfere in any material respect with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes. All such material properties and assets are free and clear of Liens, other than Liens expressly permitted by Section 6.02.

(b)   Except as set forth on Schedule 3.07, each of Holdings, the Borrower and the Subsidiaries has complied in all material respects with all obligations under all material leases to which it is a party and all such leases are in full force and effect.  Each of Holdings, the Borrower and the Subsidiaries enjoys peaceful and undisturbed possession under all such material leases.

(c)   As of the Closing Date, neither Holdings nor the Borrower has received any written notice of, nor do any officers of the Borrower have any knowledge of, any pending or contemplated condemnation proceeding affecting the Mortgaged Properties or any sale or disposition thereof in lieu of condemnation.

(d)   As of the Closing Date, none of Holdings, the Borrower or any of the Subsidiaries is obligated under any right of first refusal, option or other contractual right to sell, assign or otherwise dispose of any Mortgaged Property or any interest therein.

WEIL:\95701648\1\44444.0005

SECTION 3.08. *Equity Interests*. (a) Schedule 3.08 sets forth as of the Closing Date a list of all Loan Parties (other than Holdings) and the percentage ownership interest of each legal and beneficial holder therein. The shares of capital stock or other ownership interests so indicated on Schedule 3.08 are fully paid and non-assessable and are owned by Holdings or the Borrower, as applicable, directly or indirectly, free and clear of all Liens (other than Liens created under the Security Documents).

(b) Holdings has no direct subsidiaries other than the Borrower. Holdings owns 100% of the outstanding Equity Interests of the Borrower. The shares of capital stock of the Borrower are fully paid and non-assessable and are owned by Holdings directly, free and clear of all Liens (other than Liens created under the Security Documents).

(c) Except for the rights and obligations set forth on Schedule 3.08, there are no subscriptions, warrants, options, calls, commitments, rights or agreement by which any Loan Party or any of their Subsidiaries or any of the shareholders of any Loan Party or any of their Subsidiaries is bound relating to the issuance, transfer, voting or redemption of shares of its Equity Interests or any pre-emptive rights held by any Person with respect to the Equity Interests of any Loan Party or any of their Subsidiaries. Except as set forth on Schedule 3.08, no Loan Party and none of their Subsidiaries has issued any securities convertible into or exchangeable for shares of its Equity Interests or any options, warrants or other rights to acquire such shares or securities convertible into or exchangeable for such shares.

SECTION 3.09. *Litigation; Compliance with Laws*. (a) other than the Chapter 11 Cases, or as stayed upon the commencement of the Chapter 11 Cases or except as set forth on Schedule 3.09(a), there are no actions, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of Holdings or the Borrower, threatened (in writing) against Holdings or the Borrower or any Subsidiary or any business, property or rights of any such Person (i) restrains, prevents or imposes or can reasonably be expected to impose materially adverse conditions under the DIP Facility or (ii) that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b) Since the date of this Agreement, there has been no change in the status of the matters disclosed on Schedule 3.09(a) that, individually or in the aggregate, has resulted in, or could reasonably be expected to result in, a Material Adverse Effect and is not subject to the Automatic Stay.

(c) Subject to the entry of the Interim Order and the Final Order, as applicable, none of Holdings, the Borrower or any of the Subsidiaries or any of their respective material properties or assets is in violation of, nor will the continued operation of their material properties and assets as currently conducted violate, any law, rule or regulation (including any zoning and building law, ordinance, code or approval, permit, Environmental Law and Environmental Permit) or any restrictions of record or agreements affecting the Mortgaged Property, or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default could reasonably be expected to result in a Material Adverse Effect

56

except to the extent any consequence of such violation or default is subject to the Automatic Stay.

(d)  Except as set forth on Schedule 3.09(d), certificates of occupancy and permits are in effect for each Mortgaged Property as currently constructed, and true and complete copies of such certificates of occupancy have been delivered to the Collateral Agent as mortgagee with respect to each Mortgaged Property.

SECTION 3.10.  *Agreements*.  None of Holdings, the Borrower or any of the Subsidiaries is a party to any agreement or instrument or subject to any corporate restriction that has resulted or could reasonably be expected to result in a Material Adverse Effect.

SECTION 3.11.  *Federal Reserve Regulations*.  (a) None of Holdings, the Borrower or any of the Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)  No part of the proceeds of any Loan or any Letter of Credit will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation T, U or X.

SECTION 3.12.  *Investment Company Act*.  None of Holdings, the Borrower or any Subsidiary is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.13.  *Use of Proceeds*.  The Borrower intends to use the proceeds of Loans only for the purposes set forth in Section 5.08.

SECTION 3.14.  *Tax Returns*.  Each of Holdings, the Borrower and the Subsidiaries has filed or caused to be filed all material Federal, state, local and foreign tax returns or materials required to have been filed by it and has paid or caused to be paid all post-petition material taxes due and payable by it and all assessments received by it, except taxes that are being contested in good faith by appropriate proceedings and for which Holdings, the Borrower or such Subsidiary, as applicable, shall have set aside on its books adequate reserves.

SECTION 3.15.  *No Material Misstatements*.  No information, report, financial statement, exhibit or schedule furnished by or on behalf of Holdings or the Borrower to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, when taken together, contained, as of the date such information was provided, any material misstatement of fact or omitted to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; <u>provided</u> that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, each of Holdings and the Borrower represents and warrants only that it acted in good faith and utilized reasonable

57

assumptions (based upon accounting principles consistent with the historical audited financial statements of the Borrower) and due care in the preparation of such information, report, financial statement, exhibit or schedule. There is no fact known to any Loan Party which such party has not disclosed to Moelis or the Administrative Agent with respect to the Transactions which would reasonably be expected to have a Material Adverse Effect.

SECTION 3.16. *Employee Benefit Plans*.  With respect to any employee benefit plan (within the meaning of Section 3(3) of ERISA), each of the Borrower and its ERISA Affiliates is in compliance in all material respects with the applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder, except where the failure to so comply has not, individually or in the aggregate, resulted in, and could not, individually or in the aggregate, reasonably be expected to result in, a material liability to the Borrower. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, could reasonably be expected to result in a Material Adverse Effect.  Except as set forth on Schedule 3.16, the present value of all benefit liabilities under each Plan (based on the assumptions used for purposes of Accounting Standards Codification No. 715-30, as amended or revised from time to time) did not, as of the last annual valuation date applicable thereto, exceed the fair market value of the assets of such Plan by an amount that, if required to be paid by the Borrower and the Subsidiaries, could reasonably be expected to have a Material Adverse Effect, and the present value of all benefit liabilities of all underfunded Plans (based on the assumptions used for purposes of Accounting Standards Codification No. 715-30, as amended or revised from time to time) did not, as of the last annual valuation dates applicable thereto, exceed the fair market value of the assets of all such underfunded Plans by an amount that, if required to be paid by the Borrower and the Subsidiaries, could reasonably be expected to have a Material Adverse Effect.

SECTION 3.17. *Environmental Matters*.    (a) Except as set forth in Schedule 3.17 and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of Holdings, the Borrower or any of the Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any Environmental Permits, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

(b)   Since the date of this Agreement, there has been no change in the status of the matters disclosed on Schedule 3.17 that, individually or in the aggregate, has resulted in, or could, individually or in the aggregate, reasonably be expected to result in, a Material Adverse Effect.

SECTION 3.18. *Insurance*.  Schedule 3.18 sets forth a true, complete and correct description of all insurance maintained by the Borrower or by the Borrower for the Subsidiaries as of the date hereof and the Closing Date. As of each such date, such insurance is in full force and effect and all premiums have been duly paid. The Borrower and the Subsidiaries have insurance in such amounts with such deductibles and covering such risks and liabilities as management believes are customarily maintained by

companies of a similar size to the Borrower, engaged in the same or similar businesses as the Borrower and operating in the same or similar locations as the Borrower.

SECTION 3.19. *Security Interest*.  This Agreement, the Orders and the Security Documents, subject to entry of the Orders, are effective to create in favor of the Collateral Agent, subject to the Carve-Out, for the benefit of the Secured Parties, legal, valid, enforceable and continuing first-priority Liens on, and security interests in, the Collateral (other than Mortgaged Property of Lake Grove) pledged hereunder or thereunder, in each case, with respect to priority, subject to no Liens other than Permitted Priority Liens with the relative priorities granted pursuant to the terms of the Orders. Pursuant to the terms of the Interim Order and/or Final Order, no filing or other action will be necessary to perfect or protect such Liens and security interests.  Pursuant to and to the extent provided in the Interim Order and the Final Order, the Indebtedness of the Debtors under this Agreement will constitute part of the Superpriority DIP Claim (as defined in the Orders).

SECTION 3.20. *Location of Real Property and Leased Premises*.  As of the date hereof, the Borrower and the Subsidiaries do not own any real property. Schedule 1.01(c) lists completely and correctly as of the Closing Date all real property leased by the Borrower and the Subsidiaries and the addresses thereof. The Borrower and the Subsidiaries have valid leases in all the real property set forth on Schedule 1.01(c), except as set forth therein.

SECTION 3.21. *Labor Matters*.  The hours worked by and payments made to employees of Holdings, the Borrower and the Subsidiaries are not in violation in any material respect of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters.  All payments due from Holdings, the Borrower or any Subsidiary, or for which any claim may be made against Holdings, the Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of Holdings, the Borrower or such Subsidiary.

SECTION 3.22. *Chapter 11 Cases* .  The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice has been or will be given of (i) the motion seeking approval of the Loan Documents, the Interim Order and the Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order, as applicable.

SECTION 3.23. *[Reserved.]*

SECTION 3.24. *Sanctioned Persons; Trading with the Enemy*.  None of Holdings, the Borrower or any Subsidiary nor, to the knowledge of the Borrower, any director, officer, agent, employee or Affiliate of Holdings, the Borrower or any Subsidiary is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC"); and the Borrower does not intend to directly or indirectly use the proceeds of the Loans or the Letters of Credit or otherwise make available such proceeds to any Person, for the purpose of

financing the activities of any Person currently subject to any U.S. sanctions administered by OFAC.  None of Holdings, the Borrower or any Subsidiary nor, to the knowledge of the Borrower, any director, officer, agent, employee or Affiliate of Holdings, the Borrower or any Subsidiary has engaged, or intends to engage, in any business or activity that would be a violation of the Trading with the Enemy Act.

SECTION 3.25.  *Orders*.  The Loan Parties are in compliance in all material respects with the terms and conditions of the Orders.  Each of the Interim Order (with respect to the period prior to the entry of the Final Order) or the Final Order (from after the date the Final Order is entered) is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent and Required Lenders, in their sole discretion, amended or modified and no appeal of such order has been timely filed or, if timely filed, a stay pending such appeal is currently effective, in each case, except for (i) any such modification, stay, vacation, reversal, rescindment or amendment that is stayed or reversed with five Business Days and (ii) modifications and amendments that do not affect the interests of the Lenders.

SECTION 3.26.  ***Business and Property of the Loan Parties***.  Upon and after the Closing Date, no Loan Party nor any of their Subsidiaries proposes to engage in any business other than those businesses in which such entity is engaged on the date of this Agreement or that are reasonably related thereto and activities necessary to conduct the foregoing.  On the Closing Date, subject to the entry of the Interim Order and the other "first day orders," the Loan Parties and their Subsidiaries will own all the property and possess all of the rights and consents necessary for the conduct of such businesses.

ARTICLE IV

## Conditions of Lending

The obligations of the Lenders to make Loans and of the Issuing Bank to issue Letters of Credit hereunder are subject to the satisfaction of the following conditions:

SECTION 4.01.  ***All Credit Events***.  On the date of each Borrowing (other than a conversion or a continuation of a Borrowing), including on the date of each issuance, amendment, extension or renewal of a Letter of Credit (each such event being called a "Credit Event"):

(a)   The Administrative Agent shall have received a notice of such Borrowing as required by Section 2.03 (or such notice shall have been deemed given in accordance with Section 2.02) or, in the case of the issuance, amendment, extension or renewal of a Letter of Credit, the Issuing Bank and the Administrative Agent shall have received a notice requesting the issuance, amendment, extension or renewal of such Letter of Credit as required by Section 2.22(b).

(b)   The representations and warranties set forth in Article III and in each other Loan Document shall be true and correct in all material respects on and as of the date of

such Credit Event with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date.

(c)    At the time of and immediately after such Credit Event, no Default or Event of Default shall have occurred and be continuing.

(d)    Such Credit Event shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(e)    With respect to the Final Borrowing, the Bankruptcy Court shall have entered the Final Order authorizing and approving the DIP Facility, in form and substance reasonably satisfactory to the Administrative  Agent and the Required Lenders, which Final Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent at the direction of the Required Lenders.

(f)    With respect to the Final Borrowing, the Loan Parties shall have used commercially reasonably efforts to obtain private ratings for the DIP Facility from each of S&P and Moody's; provided that timely cooperation with the customary and reasonable requests of S&P and Moody's, in conferral with the Lenders, shall be deemed to be commercially reasonable.

(g)    Other than the Orders, there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the DIP Facility or the exercise by the Collateral Agent at the direction of the Lenders of its rights as a secured party with respect to the Collateral.

(h)    The RSA shall not have been terminated due to revocation of the votes to accept the Prepackaged Plan by Prepetition Lenders that has the effect of causing the percentage of funded debt owned by the Requisite Consenting Lenders to fall below $66^2/_3\%$ of the total amount outstanding under the Prepetition Loan Documents.  For the avoidance of doubt, the Requisite Consenting Lenders shall have the right to revoke their vote to accept the Prepackaged Plan as provided in the RSA.

Each Credit Event shall be deemed to constitute a representation and warranty by the Borrower and Holdings on the date of such Credit Event as to the matters specified in paragraphs (b), (c), (d) and (g) of this Section 4.01.

SECTION 4.02.  *First Credit Event*.  On the date of the first Credit Event, such date (the "Closing Date") being the date on or prior to which the following conditions have been satisfied or waived by the Required Lenders:

(a)    [Reserved.]

(b)    [Reserved.]

61

(c)   The Administrative Agent shall have received (i) a copy of the certificate, articles of incorporation or other constitutive document, including all amendments thereto, of each Loan Party, certified as of a recent date by the Secretary of State of the state of its organization, and a certificate as to the good standing of each Loan Party as of a recent date, from such Secretary of State; (ii) a certificate of the Secretary or Assistant Secretary of each Loan Party dated the Closing Date and certifying, to the extent applicable to such Loan Party, (A) that attached thereto is a true and complete copy of the by-laws, operating agreement or partnership agreement, as applicable, of such Loan Party as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in clause (B) below, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the member, the general partner or board of directors or managers, as applicable, of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate, articles of incorporation or other constitutive document of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate of good standing furnished pursuant to clause (i) above, and (D) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party; (iii) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to clause (ii) above; and (iv) such other documents as the Lenders, the Issuing Bank or the Administrative Agent may reasonably request.

(d)   The Administrative Agent shall have received a certificate, dated the Closing Date and signed by a Financial Officer of the Borrower, confirming compliance with the conditions precedent set forth in paragraphs (b) and (c) of Section 4.01.

(e)   The Administrative Agent shall have received all Fees and other amounts due and payable on or prior to the Closing Date, including all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of (i) the Agents (limited, in the case of counsel, to all reasonable fees, costs, disbursements and expenses of the Agents' outside counsel, King & Spalding LLP ("K&S")), and (ii) Moelis & Company LLC ("Moelis"), as financial advisor to the Administrative Agent (pursuant to that certain letter of engagement dated as of April 25, 2016, by and between K&S, Credit Suisse, the Borrower and Moelis (the "Moelis Engagement Letter"), in each case, to the extent invoiced to the Borrower no later than one business day prior to the Closing Date.

(f)   The Security Documents shall have been duly executed by each Loan Party that is to be a party thereto and shall be in full force and effect on the Closing Date, other than to the extent a post-closing delivery is provided therefor in Section 5.15. Subject to entry of the Interim Order, the Collateral Agent on behalf of the Secured Parties shall have a security interest in the Collateral of the type and priority described in each Security Document.

WEIL:\95701648\1\44444.0005

(g)   The Collateral Agent shall have received a Perfection Certificate with respect to the Loan Parties dated the Closing Date and duly executed by a Responsible Officer of Holdings and the Borrower, and shall have received the results of a search of the Uniform Commercial Code filings (or equivalent filings) made with respect to the Loan Parties in the states (or other jurisdictions) of formation of such Persons, in which the chief executive office of each such Person is located and in the other jurisdictions in which such Persons maintain property, in each case as indicated on such Perfection Certificate, together with copies of the financing statements (or similar documents) disclosed by such search, and accompanied by evidence satisfactory to the Collateral Agent that the Liens indicated in any such financing statement (or similar document) would be permitted under Section 6.02 or have been or will be contemporaneously released or terminated.

(h)   [Reserved].

(i)   [Reserved].

(j)   [Reserved].

(k)   [Reserved].

(l)   [Reserved].

(m)   Other than the Orders, all governmental and third party consents and approvals necessary in connection with the DIP Facility shall have been obtained (without the imposition of any conditions that are not acceptable to the Administrative Agent and the Required Lenders in their reasonable discretion) and shall remain in effect.

(n)   The Lenders shall have received, to the extent requested at least five days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(o)   The Administrative Agent and the Lenders shall have received the Initial Budget.

(p)   All first day motions, including those related to the DIP Facility, filed by the Loan Parties and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders.

(q)   Other than the Chapter 11 Cases, or as stayed upon the commencement of the Chapter 11 Cases, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality that (i) could reasonably be expected to result in a Material Adverse Effect or (ii) restrains, prevents or imposes or can reasonably be expected to impose materially adverse conditions upon the DIP Facility, the Collateral or the transactions contemplated thereby.

WEIL:\95701648\1\44444.0005

(r)  Subject to entry of the Orders, the Collateral Agent, for the benefit of the Lenders, shall have a valid and perfected Lien on and security interest in the Collateral of the Debtors on the basis and with the priority set forth herein.

(s)  The Bankruptcy Court shall have entered the Interim Order within three (3) calendar days following the Petition Date, in form and substance satisfactory to the Administrative Agent and the Required Lenders, which Interim Order shall include, without limitation, copies of the DIP Facility and the Budget as exhibits thereto, entered on notice to such parties as may be satisfactory to the Administrative Agent and the Required Lenders, (i) authorizing and approving the DIP Facility and the Transactions, including, without limitation, the granting of the superpriority status, security interests and priming liens, and the payment of all fees, referred to herein; (ii) lifting or modifying the automatic stay to permit the Borrower and the Guarantors to perform their obligations and the Lenders to exercise their rights and remedies with respect to the DIP Facility; (iii) authorizing the use of cash collateral and providing for adequate protection in favor of the Prepetition Lenders as and to the extent provided herein; and (iv) reflecting such other terms and conditions that are satisfactory to the Administrative Agent, the Required Lenders and the Loan Parties in their sole discretion, in each case, on the terms and conditions set forth herein; which Interim Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent and the Required Lenders.

(t)  The Loan Parties shall have appointed a CRO pursuant to the terms of an engagement letter in form and substance reasonably satisfactory to the to the Administrative Agent and the Lenders.

(u)  The Loan Parties shall have executed the Moelis Engagement Letter.

(v)  The Loan Parties shall have retained a real estate advisory firm reasonably acceptable to the Administrative Agent and the Lenders pursuant to the terms of an engagement letter in form and substance reasonably satisfactory to the to the Administrative Agent and the Lenders.

(w)  The Loan Parties shall have entered into a restructuring support agreement with the Requisite Consenting Lenders in form and substance reasonably satisfactory to the Administrative Agent and the Lenders (the "RSA").

ARTICLE V

*Affirmative Covenants*

Each of Holdings and the Borrower covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document shall have been paid in full and all Letters of Credit have been canceled or have expired and all amounts drawn thereunder have

been reimbursed in full, unless the Required Lenders shall otherwise consent in writing, each of Holdings and the Borrower will, and will cause each of the Subsidiaries to:

SECTION 5.01. *Existence; Compliance with Laws; Businesses and Properties*. (a) Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except as otherwise, contemplated by the Prepackaged Plan or expressly permitted under Section 6.05.

(b)   Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, franchises, authorizations, patents, copyrights, trademarks and trade names material to the conduct of its business; maintain and operate such business in substantially the manner in which it is presently conducted and operated; comply in all material respects with all applicable laws, rules, regulations and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted; and at all times maintain and preserve all property material to the conduct of such business and keep such property in good repair, working order and condition (except for ordinary wear and tear), and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times.

SECTION 5.02. *Insurance*. (a) Keep its insurable properties insured at all times by insurers that management believes are financially sound and reputable; maintain such other insurance, to such extent and against such risks, including fire and other risks insured against by extended coverage, as management believes are adequate and customarily maintained by companies of similar size as the Borrower, engaged in the same or similar businesses as the Borrower and operating in the same or similar locations as the Borrower, including public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it; and maintain such other insurance as may be required by law.

(b)   Pursuant to Section 5.15, cause all such policies covering any Collateral to be endorsed or otherwise amended to include a customary lender's loss payable endorsement, in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent, which endorsement shall provide that, from and after the delivery thereof, if the insurance carrier shall have received written notice from the Administrative Agent or the Collateral Agent of the occurrence of an Event of Default, the insurance carrier shall pay all proceeds otherwise payable to the Borrower or the Loan Parties under such policies directly to the Collateral Agent; cause all such policies to provide that neither the Borrower, the Administrative Agent, the Collateral Agent nor any other party shall be a coinsurer thereunder and to contain a "Replacement Cost Endorsement", without any deduction for depreciation, and such other provisions as the Administrative Agent or the Collateral Agent may reasonably require from time to time to protect their interests; deliver original or certified copies of all such policies to the Collateral Agent; use commercially reasonable effects to cause each such policy to provide that it shall not be canceled, modified or not renewed (i) by reason of

65

nonpayment of premium upon not less than 10 days' prior written notice thereof by the insurer to the Administrative Agent and the Collateral Agent (giving the Administrative Agent and the Collateral Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason upon not less than 30 days' prior written notice thereof by the insurer to the Administrative Agent and the Collateral Agent; deliver to the Administrative Agent and the Collateral Agent, prior to the cancellation, modification or nonrenewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Administrative Agent and the Collateral Agent) together with evidence reasonably satisfactory to the Administrative Agent and the Collateral Agent of payment of the premium therefor.

(c)    [Reserved].

(d)    With respect to any Mortgaged Property, carry and maintain comprehensive general liability insurance including the "broad form CGL endorsement" and coverage on an occurrence basis against claims made for personal injury (including bodily injury, death and property damage) and umbrella liability insurance against any and all claims, in no event for a combined single limit of less than that which management believes is customarily maintained by companies of similar size as the Borrower, engaged in the same or similar businesses as the Borrower and operating in the same or similar locations as the Borrower, naming the Collateral Agent as an additional insured pursuant to <u>Section 5.15,</u> on forms satisfactory to the Collateral Agent.

(e)    Notify the Administrative Agent and the Collateral Agent promptly whenever any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 5.02 is taken out by any Loan Party; and promptly deliver to the Administrative Agent and the Collateral Agent a duplicate original copy of such policy or policies.

SECTION 5.03.  ***Obligations, Taxes and Cash Management***.    (a) Subject to approval of the Bankruptcy Court and the Budget, pay its Indebtedness and other material obligations promptly and in accordance with their terms and pay and discharge promptly when due all material taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as, all lawful claims for labor, materials and supplies or otherwise that, if unpaid, might give rise to a Lien upon such properties or any part thereof or would be adverse to the Lenders or any Loan Party in any material respect, in each case, except to the extent such obligations are subject to the Automatic Stay; <u>provided</u>, <u>however</u>, that such payment and discharge shall not be required with respect to any such obligation, tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings and the Borrower shall have set aside on its books adequate reserves with respect thereto in accordance with GAAP and, in the case of a Mortgaged Property, there is no risk of forfeiture of such property.

(b)    Maintain a cash management system as in effect on the Petition Date.

SECTION 5.04. ***Financial Statements, Reports, etc***.   Furnish to the Administrative Agent, which shall furnish to each Lender:

(a)   within 120 days after the end of each fiscal year, Holdings' consolidated balance sheet and related statements of income, stockholders' equity and cash flows showing the financial condition of Holdings and Holdings' consolidated subsidiaries as of the close of such fiscal year and the results of its operations and the operations of such subsidiaries during such year, together with comparative figures for the immediately preceding fiscal year, all audited by Grant Thornton LLP or other independent public accountants of recognized national standing and accompanied by an opinion of such accountants (which opinion shall be without a "going concern" explanatory note or any similar qualification or exception and without any qualification or exception as to the scope of such audit other than with respect to the Chapter 11 Cases) to the effect that such consolidated financial statements fairly present in all material respects the financial condition and results of operations of Holdings and its consolidated subsidiaries on a consolidated basis in accordance with GAAP consistently applied, together with a "management's discussion and analysis of financial condition and results of operations" discussion;

(b)   within 60 days after the end of each Fiscal Quarter of each fiscal year, Holdings' consolidated balance sheet and related statements of income, stockholders' equity and cash flows showing the financial condition of Holdings and its consolidated subsidiaries as of the close of such Fiscal Quarter and the results of its operations and the operations of such subsidiaries during such Fiscal Quarter and the then elapsed portion of the fiscal year, and comparative figures for the same periods in the immediately preceding fiscal year, all certified by its Chief Financial Officer as fairly presenting in all material respects the financial condition and results of operations of Holdings and its consolidated subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, together with a "management's discussion and analysis of financial condition and results of operations" discussion;

(c)   within 30 days after the end of each fiscal month of each fiscal year, management operating reports of Holdings and its consolidated subsidiaries as of the close of such fiscal month and the then elapsed portion of the fiscal year;

(d)   concurrently with any delivery of financial statements under paragraph (a), (b) or (c) above, a certificate of the Chief Financial Officer of Holdings in the form of Exhibit H certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto;

(e)   [reserved];

(f)   [reserved];

(g)   promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by Holdings, the Borrower or any Subsidiary with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed to its shareholders, as the case may be;

(h)   promptly after the receipt thereof by Holdings or the Borrower or any of their respective subsidiaries, a copy of any "management letter" received by any such Person from its certified public accountants and the management's response thereto;

(i)   promptly after the request by any Lender, all documentation and other information that such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(j)   [reserved];

(k)   [reserved];

(l)   following the delivery of the Initial Budget on Closing Date, (i) every Friday thereafter during the Chapter 11 Cases, an updated budget for the then-upcoming thirteen (13) week period, in each case, in substance reasonably satisfactory to and approved by the Administrative Agent (at the direction of the Required Lenders) and consistent with the form of the Initial Budget delivered on the Closing Date (the "Budget"); and (ii) beginning on the fourth Friday following the Closing Date, and on every second Friday thereafter, a variance report (the "Variance Report") setting forth actual cash receipts and disbursements of the Loan Parties for the prior two week period (and four week period for the Initial Budget) and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such period as compared to the Initial Budget or the most recently approved Budget delivered prior to such Variance Report on a weekly and cumulative basis (which shall be subject to the variances set forth in the Loan Documents), and each such Variance Report shall include explanations for all material variances and shall be certified by the Chief Financial Officer or Chief Restructuring Officer of the Loan Parties; and

(m)   promptly, from time to time, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request.

The Borrower hereby acknowledges and agrees that all financial statements and certificates furnished pursuant to paragraphs (a) and (b) above are hereby deemed to be Borrower Materials suitable for distribution, and to be made available, to Public Lenders as contemplated by the fourth paragraph of Section 9.01 and may be treated by the Administrative Agent and the Lenders as if the same had been marked "PUBLIC" in accordance with such paragraph.

68

SECTION 5.05. *Litigation and Other Notices*.  Furnish to the Administrative Agent, the Issuing Bank and each Lender prompt, but in no event later than three Business Days after the date on which the Borrower or Holdings acquires knowledge thereof, written notice of the following:

(a)  (i) any Event of Default or Default or (ii) any payment default with respect to any post-petition obligation in excess of $100,000, in each case, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)  the filing or commencement of, or the receipt of any written threat or notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority, against Holdings, the Borrower or any Subsidiary that could reasonably be expected to result in a Material Adverse Effect, or any litigation, investigation or proceeding with respect to the DIP Facility; and

(c)  except as set forth in the financial statements referred to in Section 5.04(a), any development since the Closing Date that has resulted in, or could reasonably be expected to result in a Material Adverse Effect.

SECTION 5.06. *Information Regarding Collateral*.  Furnish to the Administrative Agent prompt written notice of any change (i) in any Loan Party's corporate name, (ii) in the jurisdiction of organization or formation of any Loan Party, (iii) in any Loan Party's identity or corporate structure or (iv) in any Loan Party's Federal Taxpayer Identification Number. Holdings and the Borrower also agree promptly to notify the Administrative Agent if any material portion of the Collateral is damaged or destroyed.

SECTION 5.07. *Maintaining Records; Access to Properties and Inspections*. Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all requirements of law are made of all dealings and transactions in relation to its business and activities. Each Loan Party will, and will cause each of its subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender to visit and inspect the financial records and the properties of such Person at reasonable times and as often as reasonably requested and, so long as no Default or Event of Default has occurred and is continuing, upon reasonable prior notice, and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent or any Lender to discuss the affairs, finances and condition of such Person with the officers thereof and independent accountants therefor.

SECTION 5.08. *Use of Proceeds*.  (a) The proceeds of the Term Loans will be used only for the following purposes: (i) for the payment of prepetition amounts acceptable to the Required Lenders as authorized by the Bankruptcy Court pursuant to orders approving the first day motions filed by the Loan Parties; (ii) in accordance with the terms of the DIP Facility and the Orders (a) for the payment of working capital and

other general corporate needs of the Borrower and the Guarantors in the ordinary course of business, and (b) for the payment of Chapter 11 expenses, including Taxes, allowed professional fees, costs and expenses for advisors, consultants, counsel and other professionals retained by the Borrower; and (iii) to pay fees and expenses related to the DIP Facility.

(b)    The DIP L/C Facility will be used only for the following purposes: (i) for the replacement of the Existing Letters of Credit, (ii) for issuance of new Letters of Credit, and (iii) for reimbursement obligations under the Letters of Credit, as necessary.

(c)    Without in any way limiting the foregoing in subsections (a) and (b) above, no Collateral, proceeds of the Loans, any portion of the Carve-Out or any other amounts may be used directly or indirectly by any of the Loan Parties, the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Committee"), if any, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any successor case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (a) to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the DIP Liens or the Superpriority DIP Claims (except to the extent expressly set forth herein); or (b) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against any of the Agents, the Lenders, the Prepetition Agents or the Prepetition Lenders, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing (collectively, the "Released Parties"), with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any claims or causes of action arising under chapter 5 of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the Superpriority DIP Claims, the Liens granted under the Loan Documents, the Loan Documents, the Prepetition Loan Documents or the Prepetition Obligations; (iv) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the Obligations or the Prepetition Obligations; (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (A) the Agents or the Lenders hereunder or under any of the Loan Documents, or (B) the Prepetition Agents or the Prepetition Lenders under any of the Prepetition Loan Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the Agents' or the Lenders' assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the applicable Loan Documents and the Orders); or (vi) objecting to, contesting, or interfering with, in any way, the Agents' and the Lenders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; provided, however, that no more than $25,000 in the aggregate of the Collateral, the Carve-Out, proceeds from the borrowings under the DIP Facility or any other amounts, may be used by the Committee to investigate claims and/or

liens of the Prepetition Agent and Prepetition Lenders under the Prepetition Credit Agreement.

SECTION 5.09.  **Employee Benefits**.  (a) Comply in all material respects with the applicable provisions of ERISA and the Code with respect to any "employee benefit plan" (within the meaning of Section 3(3) of ERISA) and (b) furnish to the Administrative Agent as soon as practicable after, and in any event within ten days after any responsible officer of Holdings, the Borrower or any ERISA Affiliate knows or has reason to know that, any ERISA Event has occurred that, alone or together with any other ERISA Event could reasonably be expected to result in material liability of Holdings, the Borrower or any ERISA Affiliate, a statement of a Financial Officer of Holdings or the Borrower setting forth details as to such ERISA Event and the action, if any, that Holdings or the Borrower proposes to take with respect thereto.

SECTION 5.10.  **Compliance with Environmental Laws**.  Comply, and cause all lessees and other Persons occupying or operating its properties to comply, in all material respects with all Environmental Laws applicable to its operations and properties; obtain and renew all material Environmental Permits necessary for its operations and properties; and conduct any response or remedial action in accordance in all material respects with Environmental Laws; provided, however, that none of Holdings, the Borrower or any Subsidiary shall be required to undertake any response or remedial action required by Environmental Laws to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP, except to the extent such response or remedial action is necessary to prevent or abate an imminent and substantial danger to human health or the environment.

SECTION 5.11.  **Reserved.**

SECTION 5.12.  **Further Assurances**.  (a) Execute any and all further documents, financing statements, agreements and instruments, and take all further action (including filing Uniform Commercial Code and other financing statements, mortgages and deeds of trust) that may be required under applicable law, or that the Required Lenders, the Administrative Agent or the Collateral Agent may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and first-priority of the security interests created or intended to be created by the Security Documents and the Orders.  The Borrower will cause any subsequently acquired or organized Domestic Subsidiary to become a Loan Party by executing the Guarantee and Collateral Agreement and each other applicable Security Document in favor of the Collateral Agent.

(b)  By its signature hereto, each Loan Party hereby authorizes Agent to, in connection with, and to the extent contemplated by, this Agreement, and subject to the Orders, file against such Loan Party, one or more financing, continuation or amendment statements pursuant to the Uniform Commercial Code in form and substance satisfactory to the Required Lenders (which statements may have a description of collateral which is broader than that set forth herein, including without limitation a description of collateral

71

as "all assets' and/or "all personal property" of such Loan Party). Notwithstanding anything herein to the contrary, the Collateral Agent and Lenders agree that they will not require the filing of any mortgages or entry into any control agreements with respect to the Collateral.

SECTION 5.13. *[Reserved.]*

SECTION 5.14. *Investor Calls.*  No later than the seventh day after the delivery of financial statements under Section 5.04(a) or (b), the Financial Officers of Holdings shall hold a conference call with the Lenders to present a "management's discussion and analysis of financial condition and results of operations" discussion on the financial statements so delivered, as well as to answer any reasonable questions from Lenders about such financial statements.  Holdings shall provide to Lenders notice of such conference calls at least two Business Days prior to the date thereof.

SECTION 5.15. *Post-Closing Obligations.*  Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, the parties hereto acknowledge and agree that within the time periods set forth in Schedule 5.15, or within such longer period or periods that the Administrative Agent in its sole discretion may permit, Holdings and the Subsidiaries shall deliver to the Administrative Agent the documents, and perform the actions, set forth on Schedule 5.15.

SECTION 5.16. *Ratings.*  Each of Holdings and the Borrower shall use commercially reasonable efforts to, as soon as is practicable and in any event no later than [May __], 2016 obtain private ratings for the DIP Facility from each of S&P and Moody's and thereafter, shall use commercially reasonable efforts to cause the DIP Facility to be continuously publicly rated by S&P and Moody's.

For the avoidance of doubt, a failure by Holdings or the Borrower to obtain the ratings described in this Section 5.16 hereof within the period set forth above shall not constitute a default so long as each of Holdings and the Borrower has used commercially reasonable efforts to obtain such ratings within such period.

SECTION 5.17. *Reserved.*

SECTION 5.18. *Bankruptcy Covenants.*  Notwithstanding anything in the Loan Documents to the contrary, the Debtors shall comply with all material covenants, terms and conditions and otherwise perform all obligations set forth in the Orders.

SECTION 5.19. *Chapter 11 Cases.*

(a)  Chapter 11 Case Documents and Notices.  Each Debtor shall deliver or cause to be delivered for review and comment, if reasonably practicable, at least two (2) days prior to filing (and, if not reasonably practicable, as soon as reasonably practicable prior to filing), all material pleadings, motions and other documents (provided that any of the foregoing relating to the DIP Facility shall be deemed material) to be filed on behalf of the Debtors with the Bankruptcy Court to the Administrative Agent and its counsel and shall consult in good faith with such counsel regarding the form and substance of any

WEIL:\95701648\1\44444.0005

such proposed filing.  If not otherwise provided by the Bankruptcy Court's electronic docketing system, the Borrower shall provide (x) copies to the Administrative Agent of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Debtors with the Bankruptcy Court, distributed by or on behalf of the Debtors to any Committee, filed with respect to the Chapter 11 Cases or filed with respect to any Loan Document and (y) such other reports and information as the Administrative Agent may, from time to time, reasonably request.  In connection with the Chapter 11 Cases, the Debtors shall give the proper notice for (x) the motions seeking approval of the Loan Documents and the Orders and (y) the hearings for the approval of the Orders.  The Borrower and the other Debtors shall give, on a timely basis as specified in the Orders, all notices required to be given to all parties specified in the Orders.

(b)    [Reserved.]

(c)    Restructuring Proposals.  Each Loan Party shall promptly deliver or cause to be delivered to the Administrative Agent and the Lenders copies of any term sheets, proposals, presentations or other documents, from any party, related to (i) the restructuring of the Loan Parties, or (ii) the sale of assets of one or all of the Loan Parties.

(d)    Prepetition Payments.  Except to the extent permitted hereunder, under the Orders or under the Budget, no Loan Party shall, without the express prior written consent of the Administrative Agent and Required Lenders or pursuant to an order of the Bankruptcy Court after notice and a hearing,  use the proceeds of the Loans or cash collateral to make any Prepetition Payment.

(e)    Agreements.  Except as approved in writing by the Administrative Agent (acting at the direction of the Required Lenders) or contemplated by the Prepackaged Plan or the first day orders, no Loan Party shall assume, reject, cancel, terminate, breach or modify any agreement, contract, instrument or other document if such assumption, rejection, cancellation, termination, breach or modification, either individually or in the aggregate, would have a negative effect on the value of the Collateral or a Material Adverse Effect upon the Loan Parties' operations.

ARTICLE VI

*Negative Covenants*

Each of Holdings and the Borrower covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document have been paid in full and all Letters of Credit have been cancelled or have expired and all amounts drawn thereunder have been reimbursed in full, unless the Required Lenders shall otherwise consent in writing, neither Holdings nor the Borrower will, nor will they cause or permit any of the Subsidiaries to:

WEIL:\95701648\1\44444.0005

SECTION 6.01. **_Indebtedness_**.    Incur, create, assume or permit to exist any Indebtedness, except:

(a) Indebtedness existing on the Petition Date;

(b) (i) Indebtedness created hereunder and under the other Loan Documents and (ii) Indebtedness incurred under the Prepetition Credit Agreement;

(c) Intercompany Indebtedness of the Borrower and the Subsidiaries to the extent permitted by Section 6.04(c) so long as any such Indebtedness owed by a Loan Party to a Subsidiary that is not a Subsidiary Guarantor is subordinated to the Obligations pursuant to an Affiliate Subordination Agreement and shall not require any payment with respect thereto until the Obligations are paid in full (other than any contingent indemnification Obligations for which no claim has been asserted);

(d) Capital Lease Obligations in an aggregate principal amount, when combined, not in excess of $500,000 at any time outstanding;

(e) Indebtedness represented by any loans, advances, capital contributions or acquisitions, forming any joint ventures or partnerships, or the making of any other investments in any Subsidiaries or any other Person, in each case agreed to in writing by the Required Lenders; and

(f) Indebtedness under performance bonds or with respect to workers' compensation claims, in each case incurred in the ordinary course of business.

SECTION 6.02. **_Liens_**.    Create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests or other securities of any Person, including the Borrower or any Subsidiary) now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except:

(a) Liens on property or assets of the Borrower and the Subsidiaries existing on the date hereof and set forth in Schedule 6.02 or reflected in the title insurance policies delivered to the Administrative Agent; provided that such Liens shall secure only those obligations which they secure on the date hereof;

(b) any Lien created under the Loan Documents or the Orders;

(c) Liens for taxes, assessments, water charges, sewer rents or governmental charges which are not yet delinquent or which are being contested in compliance with Section 5.03;

(d) carriers', warehousemen's, mechanics', materialmen's, repairmen's, suppliers', construction or other like Liens arising in the ordinary course of business and securing obligations which are (i) incident to the construction, operation, maintenance, repair, restoration or improvement of any property or

74

asset and (ii) (A) not yet delinquent or (B) being contested in compliance with Section 5.03;

(e) Liens, pledges and deposits made in the ordinary course of business in compliance with workmen's compensation, unemployment insurance and other social security laws or regulations;

(f) deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations but including new store leases), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(g) zoning restrictions, easements, rights-of-way, restrictions on use of real property and other Liens incurred in the ordinary course of business which, in the aggregate, are not substantial in amount and do not materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of the Subsidiaries;

(h) purchase money security interests in real property, improvements thereto or equipment hereafter acquired (or, in the case of improvements, constructed) by the Borrower or any Subsidiary; provided that (i) such security interests secure Indebtedness existing on the Closing Date and permitted by Section 6.01, (ii) the Indebtedness secured thereby does not exceed the lesser of the cost or the fair market value of such real property, improvements or equipment at the time of such acquisition (or construction) and (iv) such security interests do not apply to any other property or assets of the Borrower or any Subsidiary;

(i) judgment Liens securing judgments not constituting an Event of Default under Section 7.01;

(j) Liens in favor of collecting banks arising under Section 4-210 of the New York UCC and Liens (including the right of set-off) in favor of a bank or other depository institution arising as a matter of law encumbering deposits;

(k) any interest or title of a lessor or licensor under any operating lease or license entered into by any Loan Party in the ordinary course of business and covering only the assets leased or licensed; and

(l) other Liens arising by operation of law in the ordinary course of business.

SECTION 6.03. *Sale and Lease-Back Transactions*.   Enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

WEIL:\95701648\1\44444.0005

SECTION 6.04. ***Investments, Loans and Advances***. Purchase, hold or acquire any Equity Interests, evidences of indebtedness or other securities of, make or permit to exist any loans or advances to, or make or permit to exist any investment or any other interest in, any other Person, except:

(a) (i) investments by Holdings, the Borrower and the Subsidiaries existing on the date hereof in the Equity Interests of the Borrower and the Subsidiaries and (ii) additional investments by Holdings, the Borrower and the Subsidiaries in the Equity Interests of the Borrower and the Subsidiary Guarantors; underline provided that any such Equity Interests held by a Loan Party shall be pledged pursuant to the Guarantee and Collateral Agreement or the Orders;

(b) Permitted Investments;

(c) loans or advances made by the Borrower to any Subsidiary and made by any Subsidiary to Holdings, the Borrower or any other Subsidiary; underline provided that (i) any such loans and advances made by a Loan Party to a Subsidiary that is not a Subsidiary Guarantor shall be evidenced by a promissory note pledged to the Collateral Agent for the ratable benefit of the Secured Parties pursuant to the Guarantee and Collateral Agreement, and (ii) any such loans and advances made by a Subsidiary that is not a Subsidiary Guarantor to a Loan Party shall be unsecured and subordinated to the Obligations pursuant to an Affiliate Subordination Agreement and shall not require any payment with respect thereto until the Obligations are paid in full (other than any contingent indemnification Obligations for which no claim has been asserted);

(d) investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(e) [reserved];

(f) [reserved];

(g) [reserved];

(h) trade credit extended in the ordinary course of business;

(i) [reserved]; and

(j) [reserved].

SECTION 6.05. ***Mergers, Consolidations, Sales of Assets and Acquisitions; Accounting***. (a) Merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all the assets (whether now owned or hereafter acquired) of the Borrower or less than all the Equity Interests of any Subsidiary, or purchase, lease or otherwise acquire (in one transaction or a series of

76

transactions) all or any substantial part of the assets of any other Person, except that the Borrower and any Subsidiary may (i) purchase and sell inventory in the ordinary course of business, (ii) dispose of Permitted Investments in the ordinary course of business and (iii) purchase and dispose of assets in accordance with the Budget subject to Permitted Variances.

(b)   Permit any change in accounting or treatment or reporting practices, except as required by GAAP or as permitted or contemplated by the RSA, the Prepackaged Plan or this Agreement.

SECTION 6.06.  *Restricted Payments; Restrictive Agreements*.  (a) Declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or make any principal payment, interest payment or other payment on any loan or advance; provided, however, that (i) any Subsidiary may declare and pay dividends or make other distributions ratably to its equity holders and Holdings may declare and pay dividends in the form of common stock of Holdings on a pro rata basis to all holders, (ii) [reserved], (iii) [reserved], (iv) the Borrower may make distributions to Holdings in an amount necessary to enable Holdings to pay the Tax liabilities of Holdings, the Borrower and the Subsidiaries directly attributable to (or arising as a result of) the operations of Holdings, the Borrower and the Subsidiaries; provided, however, that the amount of distributions made pursuant to this clause (iv) shall not exceed the amount that Holdings, the Borrower and the Subsidiaries would be required to pay in respect of Federal, State and local taxes were the Borrower and the Subsidiaries to pay such taxes as stand-alone taxpayers (with appropriate adjustments, such as timing of the recognition of income and deductions, single surcharge exemptions, etc., for the fact that such companies actually file as part of a consolidated federal income tax return (and may similarly so file for certain state and local tax purposes) or are disregarded for income tax purposes), (v) [reserved], (vi) [reserved], (vii) [reserved], (ix) [reserved], (x) [reserved], (xi) [reserved] and (xii) any Restricted Payments required in connection with the Prepackaged Plan or the Orders; provided, however, that all distributions made to Holdings pursuant to clauses (ii), (iii), (iv), (v) and (vi) are used by Holdings for the purposes specified therein within 20 days of the receipt thereof.

(b)   Enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (i) the ability of Holdings, the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets, or (ii) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided that (A) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document or the Prepetition Credit Agreement, (B) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (C) the foregoing shall not apply to restrictions and conditions imposed on any Foreign Subsidiary by the terms of any Indebtedness of such

Foreign Subsidiary permitted to be incurred hereunder, (D) clause (i) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (E) clause (i) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof and (F) the foregoing shall not apply to any restrictions and conditions in existence on the Closing Date.

SECTION 6.07. *Transactions with Affiliates*.  Except for transactions between or among Loan Parties, sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except that (i) the Borrower or any Subsidiary may engage in any of the foregoing transactions, including such transactions permitted by Section 6.06, in the ordinary course of business at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (ii) the Borrower or any Subsidiary may perform all obligations under leases with Affiliates existing on the Closing Date to the extent permitted hereunder and made in accordance with the Budget; underlined provided that such leases are not amended after the Closing Date on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (iii) Subject to Section 6.06, Holdings, the Borrower or any Subsidiary may enter into, and perform under, employment agreements with their respective officers entered into in the ordinary course of business and approved by the board of directors of Holdings and the Required Lenders, (iv) Holdings may perform its obligations under the Registration Rights Agreement, dated as of January 18, 2007, to which it is a party and (v) the Borrower and its Subsidiaries may perform all obligations under the loans and investments permitted by Section 6.01(c) and Section 6.04(c).

SECTION 6.08. *Business of Holdings, Borrower and Subsidiaries*.  (a) With respect to Holdings, (i) engage in any business activities or have any assets or liabilities other than its ownership of the Equity Interests of the Borrower and activities incidental thereto, including its liabilities pursuant to the Guarantee and Collateral Agreement and guarantees of leases of Subsidiaries, or (ii) permit any Liens on the Equity Interests of the Borrower other than Liens in favor of the Lenders and Liens existing on the Closing Date.

(b)  With respect to the Borrower and the Subsidiaries, engage at any time in any business or business activity other than the business currently conducted by it and business activities reasonably incidental thereto.

SECTION 6.09. *Subordinated Indebtedness and Other Agreements*.  (a) Permit (i) any waiver, supplement, modification, amendment, termination or release of any indenture, instrument or agreement pursuant to which any subordinated Indebtedness of Holdings, the Borrower or any of the Subsidiaries is outstanding if the effect of such waiver, supplement, modification, amendment, termination or release would materially increase the obligations of the obligor or confer additional material rights on the holder of such subordinated Indebtedness in a manner adverse to Holdings, the Borrower, any of

78

the Subsidiaries or the Lenders or (ii) any waiver or amendment of its certificate of incorporation or by-laws or other organizational documents if such waiver or amendment is adverse to the Lenders (in their capacity as such) in any material respect.

(b) (i) Make any distribution, whether in cash, property, securities or a combination thereof, other than regular scheduled payments of principal and interest as and when due (to the extent not prohibited by applicable subordination provisions), in respect of, or pay or prepay, or commit to pay or prepay, or directly or indirectly redeem, repurchase, retire or otherwise acquire for consideration, or set apart any sum for the aforesaid purposes, any subordinated Indebtedness, except as contemplated by the Orders, the Prepackaged Plan or the Budget.

SECTION 6.10. ***Chapter 11 Claims***.  Except for the Carve-Out and Permitted Priority Liens and as provided in the Orders, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien that is pari passu with or senior to the claims or Liens granted under the Loan Documents, as the case may be, of the Administrative Agent and the Lenders against the Loan Parties hereunder or under the Orders, or apply to the Bankruptcy Court for authority to do so.

SECTION 6.11. ***Revision of Orders; Applications to Bankruptcy Court; Superpriority Claims***.  Directly or indirectly, (a) seek, support, consent to or suffer to exist any modification, stay, vacation or amendment of any Order or any other order of the Bankruptcy Court except for (i) any such modification, stay, vacation or amendment that is stayed or reversed with five Business Days, (ii) modifications and amendments that do not affect the interests of the Lenders and (iii) any modifications and amendments agreed to in writing by the Required Lenders, in their sole discretion, (b) apply to the Bankruptcy Court for authority to take any action prohibited by this Article VI (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of the Administrative Agent and the Required Lenders, in their sole discretion) or (c) seek authorization for, or permit the existence of, any claims other than that of the Secured Parties entitled to superpriority status under section 364(c)(1) of the Bankruptcy Code that is senior or pari passu with the Secured Parties' claim under section 364(c)(1) of the Bankruptcy Code, except for the Carve-Out.

SECTION 6.12. ***Compliance with Budget***.

(a) Except as otherwise provided herein or approved by the Administrative Agent (at the direction of the Required Lenders, in their sole discretion), directly or indirectly, (a) use any cash, including the proceeds of any Loans, in a manner or for a purpose other than those permitted under this Agreement, the Orders or the Budget, (b) make any Prepetition Payment or application for authority to make any Prepetition Payment, other than those permitted by this Agreement, the Orders, the Prepackaged Plan or the Budget, (c) permit the actual aggregate disbursements in any Testing Period to exceed the aggregate amount of disbursements in the Budget for such Testing Period by more than the Permitted Variance, and (d) permit the actual aggregate cash receipts (excluding proceeds of the Loans that may be deemed a receipt) during any Testing

WEIL:\95701648\1\44444.0005

Period to be less than the aggregate amount of such cash receipts in the Budget for such Testing Period by more than the Permitted Variance; and

(b)   So long as an unwaived Event of Default has not occurred, and to the extent permitted under the Orders, the Loan Parties are authorized and directed to pay fees and expenses allowed and payable, as applicable, by any interim, procedural, or final order of the Bankruptcy Court (that has not been vacated or stayed, unless the stay has been vacated) under Sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable.

SECTION 6.13.  *Fiscal Year*.   With respect to Holdings and the Borrower, change their fiscal year-end to a date other than the Sunday closest to March 31, except as permitted under GAAP.

SECTION 6.14.  *Reserved*.

SECTION 6.15.  *Investigation Rights*.   The Committee (to the extent one is appointed) shall have a maximum of thirty (30) calendar days from the date of the Committee's appointment, but in no event later than forty-five (45) calendar days from entry of the Interim Order (the "Investigation Period") to investigate and commence an adversary proceeding or contested matter, as required by the applicable Federal Rules of Bankruptcy Procedure, and challenge (each, a "Challenge") the findings, the Loan Parties' stipulations, or any other stipulations contained in the Orders, including, without limitation, any challenge to the validity, priority or enforceability of the liens securing the obligations under the Prepetition Loan Documents, or to assert any claim or cause of action against the Prepetition Agent or the Prepetition Lenders arising under or in connection with the Prepetition Loan Documents or the Prepetition Obligations, as the case may be, whether in the nature of a setoff, counterclaim or defense of Prepetition Obligations, or otherwise.  The Investigation Period may only be extended with the prior written consent of counsel to the Administrative Agent (acting at the direction of the Required Lenders), as memorialized in an order of the Bankruptcy Court.  Except to the extent asserted in an adversary proceeding or contested matter filed during the Investigation Period, upon the expiration of such applicable Investigation Period (to the extent not otherwise waived or barred), (i) any and all Challenges or potential challenges shall be deemed to be forever waived and barred; (ii) all of the agreements, waivers, releases, affirmations, acknowledgements and stipulations contained in the Orders shall be irrevocably and forever binding on the Loan Parties, the Committee and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, including any Chapter 7 Trustee, without further action by any party or the Bankruptcy Court; (iii) the Prepetition Obligations shall be deemed to be finally allowed and the Prepetition Credit Agreement Liens shall be deemed to constitute valid, binding and enforceable encumbrances, and not subject to avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iv) the Loan Parties shall be deemed to have released, waived and discharged the Released Parties from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Obligations.  Notwithstanding anything to the contrary herein: (x) if any Challenge is timely commenced, the stipulations contained in the Final Order shall nonetheless remain

binding on all other parties-in-interest and preclusive except to the extent that such stipulations are expressly and successfully challenged in such Challenge; and (y) the Released Parties reserve all of their rights to contest on any grounds any Challenge.

SECTION 6.16. ***Access to Controlled Account***  No Loan Party shall withdraw funds from any Controlled Account after the occurrence and during the continuance of a Default or Event of Default.

## ARTICLE VII

### *Events of Default*

SECTION 7.01. ***Events of Default.***  In case of the happening of any of the following events ("Events of Default"):

(a) any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings or issuances of Letters of Credit hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(b) default shall be made in the payment of any principal of any Loan or the reimbursement with respect to any L/C Disbursement and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c) default shall be made in the payment of any interest on any Loan or any Fee or L/C Disbursement or any other amount (other than an amount referred to in (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of five Business Days;

(d) default shall be made in the due observance or performance by Holdings, the Borrower or any Subsidiary of any covenant, condition or agreement contained in Section 2.01(h), 5.01(a), 5.02, 5.04, 5.05, 5.08, 5.15 or 5.18 or in Article VI;

(e) default shall be made in the due observance or performance by Holdings, the Borrower or any Subsidiary of any covenant, condition or agreement contained in any Loan Document (other than those specified in (b), (c) or (d) above) and such default shall continue unremedied for a period of 30 days after the earlier of (i) notice thereof from the Administrative Agent to the Borrower (which notice shall also be given at the request of any Lender) or (ii) knowledge thereof of Holdings or the Borrower;

81

(f) (i) Holdings, the Borrower or any Subsidiary shall fail to pay any principal or interest, regardless of amount, due in respect of any post-petition Material Indebtedness, when and as the same shall become due and payable (subject to any applicable grace periods) or (ii) any other event or condition occurs that results in any post-petition Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any post-petition Material Indebtedness or any trustee or agent on its or their behalf to cause any post-petition Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (ii) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(g) an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other such ERISA Events, could reasonably be expected to result in liability of the Borrower and its ERISA Affiliates in an aggregate amount exceeding $10,000,000;

(h) any Guarantee under the Guarantee and Collateral Agreement for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any Guarantor shall deny in writing that it has any further liability under the Guarantee and Collateral Agreement (other than as a result of the discharge of such Guarantor in accordance with the terms of the Loan Documents);

(i) any security interest in Collateral purported to be created by any Security Document or Order shall cease to be, or shall be asserted by the Borrower or any other Loan Party not to be, a valid, perfected, first-priority (except with respect to Mortgaged Property of Lake Grove and as otherwise expressly provided in this Agreement or such Security Document or Order) security interest in the securities, assets or properties covered thereby;

(j) any subordinated Indebtedness of Holdings, the Borrower and the Subsidiaries constituting Material Indebtedness shall cease (or any Loan Party or an Affiliate of any Loan Party shall so assert), for any reason, to be validly subordinated to the Obligations as provided in the agreements evidencing such subordinated Indebtedness;

(k) there shall have occurred a Change in Control, except as contemplated by the Prepackaged Plan; or

(l) The occurrence of any of the following in any Chapter 11 Case:

(i) filing of a plan of reorganization under Chapter 11 of the Bankruptcy Code by the Loan Parties (other than the Prepackaged Plan) that has not been consented to by the Required Lenders;

82

(ii) filing of a plan of reorganization by the Loan Parties (other than the Prepackaged Plan) that does not propose to indefeasibly repay the Obligations in full in cash, unless otherwise consented to by the Administrative Agent and the Required Lenders;

(iii) any of the Loan Parties shall file a pleading seeking to vacate or modify any of the Orders over the objection of the Administrative Agent at the direction of the Required Lenders;

(iv) entry of an order without the prior written consent of the Required Lenders amending, supplementing or otherwise modifying any Order, other than (i) any such amendment, supplement or modification that is stayed or reversed with five Business Days and (ii) amendments, supplements or modifications that do not affect the interests of the Lenders;

(v) reversal, vacation or stay of the effectiveness of any Order;

(vi) any violation of the terms of any Order;

(vii) dismissal of the Chapter 11 Case of a Loan Party with material assets or conversion of the Chapter 11 Case of a Loan Party with material assets to a case under Chapter 7 of the Bankruptcy Code;

(viii) appointment of a Chapter 11 trustee or examiner with enlarged powers relating to the operation of the business of the Borrower or any Guarantor;

(ix) any sale of all or substantially all assets of the Loan Parties pursuant to section 363 of the Bankruptcy Code, unless (i) the proceeds of such sale indefeasibly satisfy the Obligations in full in cash, or (ii) such sale is supported by the Administrative Agent at the direction of the Required Lenders;

(x) failure to meet a Milestone, unless extended or waived by the prior written consent of the Administrative Agent at the direction of the Required Lenders;

(xi) granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on assets of the Borrower or any Guarantor, in each case, with an aggregate fair market value in excess of $10,000,000;

(xii) the Loan Parties' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the Lenders' claims under the DIP Facility;

83

(xiii) the Loan Parties' filing of a motion seeking entry of an order approving any key employee incentive plan, employee retention plan, or comparable plan, except as provided in the Prepackaged Plan, without the prior written consent of the Required Lenders;

(xiv) the Loan Parties' challenge (or supporting any other person's challenge) to the validity or enforceability of any of the obligations of the parties under the Prepetition Loan Documents;

(xv) payment of or granting adequate protection with respect to prepetition debt, other than as expressly provided herein or in the Orders or consented to by the Administrative Agent at the direction of the Required Lenders;

(xvi) expiration or termination of exclusivity of a Loan Party with material assets;

(xvii) cessation of the Superpriority DIP Claims to be valid and enforceable in all respects;

(xviii) Permitted Variances under the Budget are exceeded for any period of time without consent of or waiver by the Administrative Agent at the direction of the Required Lenders;

(xix) the Loan Parties' CRO ceases to serve in such capacity or is replaced, unless such replacement is reasonably acceptable to the Required Lenders in their reasonable discretion;

(xx) any uninsured judgments are entered with respect to any post-petition liabilities against any of the Loan Parties or any of their respective properties in a combined aggregate amount in excess of $10,000,000, unless stayed;

(xxi) the termination of the RSA and revocation of the votes to accept the Prepackaged Plan by Prepetition Lenders that has the effect of causing the percentage of funded debt owned by the Requisite Consenting Lenders to fall below $66^2/_3\%$ of the total amount outstanding under the Prepetition Loan Documents, it being understood and agreed that Requisite Consenting Lenders shall have the right to revoke their votes to accept the Prepackaged Plan as provided in the RSA; or

(xxii) any Loan Party asserting any right of subrogation or contribution against any other Loan Party until all borrowings under the DIP Facility are paid in full and the commitments are terminated.

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by written notice to the Borrower, its counsel, the U.S. Trustee and counsel for any statutory

84

committee, terminate the DIP Facility, declare the obligations in respect thereof to be immediately due and payable and, subject to Section 7.02, exercise all rights and remedies under the Loan Documents and the Orders.

SECTION 7.02. ***Remedies upon an Event of Default.***  (a)  If any Event of Default occurs and is continuing, then, and in any such event, without further order from the Bankruptcy Court, and subject to the terms of the Orders, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Administrative Agent and the Lenders to exercise all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable): (i) immediately terminate the Loan Parties' limited use of any cash collateral; (ii) cease making any Loans under the DIP Facility to the Loan Parties; (iii) declare all Obligations to be immediately due and payable; (iv) freeze monies or balances in the Loan Parties' accounts (and, with respect to this Agreement and the DIP Facility, sweep all funds contained in any Controlled Account); (v) immediately set-off any and all amounts in accounts maintained by the Loan Parties with the Administrative Agent or the Lenders against the Obligations, or otherwise enforce any and all rights against the Collateral in the possession of any of the applicable Secured Parties, including, without limitation, disposition of the Collateral solely for application towards the Obligations; and (vi) take any other actions or exercise any other rights or remedies permitted under the Orders, the Loan Documents or applicable law to effect the repayment of the Obligations; provided, however, that prior to the exercise of any right in clauses (i) or (vi) of this paragraph, the Administrative Agent shall be required to provide five (5) business days written notice to the Loan Parties and the Committee of the Administrative Agent's intent to exercise its rights and remedies; provided, further, that neither the Loan Parties, the Committee nor any other party-in-interest shall have the right to contest the enforcement of the remedies set forth in the Orders and the Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable Loan Documents.  The Loan Parties shall cooperate fully with the Administrative Agent and the DIP Lenders in their exercise of rights and remedies, whether against the Collateral or otherwise.

(b)  Except as expressly provided above in this Section 7.02, to the maximum extent permitted by applicable law, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

(c)  Each of the Loan Parties hereby waives any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the Administrative Agent and the Lenders set forth in the Orders and in the Loan Documents.

ARTICLE VIII

*The Administrative Agent and the Collateral Agent; Etc.*

Each Lender and the Issuing Bank hereby irrevocably appoints the Administrative Agent and the Collateral Agent (for purposes of this Article VIII, the Administrative Agent and the Collateral Agent are referred to collectively as the "Agents") its agent and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to (i) execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

The institution serving as the Administrative Agent or the Collateral Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with Holdings, the Borrower or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

Neither Agent shall have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) neither Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) neither Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that such Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.08), and (c) except as expressly set forth in the Loan Documents, neither Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to Holdings, the Borrower or any of the Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent or Collateral Agent or any of its Affiliates in any capacity.  Neither Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.08) or in the absence of its own gross negligence or willful misconduct.  Neither Agent shall be deemed to have knowledge of any Default unless and until written notice thereof is given to such Agent by Holdings, the Required Lenders, the Borrower or a Lender, and neither Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or

86

conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent.

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. Each Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the DIP Facility as well as activities as Agent.

Subject to the appointment and acceptance of a successor Agent as provided below, either Agent may resign at any time by notifying the Lenders, the Issuing Bank and the Borrower. Upon any such resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders and the Issuing Bank, appoint a successor Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. If no successor Agent has been appointed pursuant to the immediately preceding sentence by the 30th day after the date such notice of resignation was given by such Agent, such Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent and/or Collateral Agent, as the case may be. Any such resignation by such Agent hereunder shall also constitute, to the extent applicable, its resignation as an Issuing Bank, in which case such resigning Agent (a) shall not be required to issue any further Letters of Credit hereunder and (b) shall maintain all of its rights as Issuing Bank with respect to any Letters of Credit issued by it prior to the date of such resignation. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such

WEIL:\95701648\1\44444.0005

successor. After an Agent's resignation hereunder, the provisions of this Article and Section 9.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

No Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Agents on behalf of the Secured Parties in accordance with the terms thereof.  In the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and the Administrative Agent or Collateral Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by such Agent on behalf of the Secured Parties at such sale or other disposition.  Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Obligations provided under the Loan Documents, to have agreed to the foregoing provisions.

Nothing contained herein shall be deemed to (x) require any Agent to file or prove any claim in the Chapter 11 Cases, or (y) authorize any Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

In connection with any sale of any of the Loan Parties' assets under section 363 of the Bankruptcy Code or under a plan of reorganization the Administrative Agent shall have the right to credit bid all amounts outstanding under the DIP Facility at the direction of the Required Lenders, in each case, in accordance with section 363(k) of the Bankruptcy Code.

ARTICLE IX

*Miscellaneous*

SECTION 9.01. ***Notices; Electronic Communications***.    Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

(a) if to the Borrower or Holdings, to it at 2284 12th Avenue, New York, New York 10027, Attention: Chief Financial Officer (Fax No. 646-224-1346), with a copy to General Counsel (Fax No. 646-616-8072);

(b) if to the Administrative Agent, to Credit Suisse AG, Agency Manager, One Madison Avenue, New York, NY 10010, Fax: 212-322-2291, email: agency.loanops@credit-suisse.com;

(c) if to the Collateral Agent, to Credit Suisse AG, One Madison Avenue, 2nd Floor, New York, NY 10010, Attn: Loan Operations - Boutique Management, Tel: 212-538-3525, e-mail: nirmala.durgana@credit-suisse.com and list.ops-collateral@credit-suisse.com; and

(d) if to a Lender, to it at its address (or fax number) set forth on Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01. As agreed to among Holdings, the Borrower, the Administrative Agent and the applicable Lenders from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable Person provided from time to time by such Person.

The Borrower hereby agrees, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to the Borrower, that it will, or will cause the Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under Article V, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (a) is or relates to a Borrowing Request, a notice pursuant to Section 2.10 or a notice requesting the issuance, amendment, extension or renewal of a Letter of Credit pursuant to Section 2.22, (b) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (c) provides

89

notice of any Default or Event of Default under this Agreement or any other Loan Document or (d) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "Communications"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative Agent.  In addition, the Borrower agrees, and agrees to cause the Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders and the L/C Issuer materials and/or information provided by or on behalf of the Borrower hereunder (collectively, the "Borrower Materials") by posting the Borrower Materials on Intralinks or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities) (each, a "Public Lender"). The Borrower hereby agrees that (i) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (ii) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of United States federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 9.16); (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor;" and (iv) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor." Notwithstanding the foregoing, the following Borrower Materials shall be marked "PUBLIC", unless the Borrower notifies the Administrative Agent promptly that any such document contains material non-public information: (A) the Loan Documents and (B) notification of changes in the terms of the DIP Facility.

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.02. *Survival of Agreement*. All covenants, agreements, representations and warranties made by the Borrower or Holdings herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and the Issuing Bank and shall survive the making by the Lenders of the Loans and the issuance of Letters of Credit by the Issuing Bank, regardless of any investigation made by the Lenders or the Issuing Bank or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any Fee or any other amount payable under this Agreement or any other Loan

91

Document is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not been terminated.  The provisions of Sections 2.14, 2.16, 2.20 and 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the expiration of any Letter of Credit, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent, any Lender or the Issuing Bank.

SECTION 9.03.  ***Binding Effect***.  This Agreement shall become effective when it shall have been executed by the Borrower, Holdings and the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

SECTION 9.04.  ***Successors and Assigns***.  (a)  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Borrower, Holdings, the Administrative Agent, the Collateral Agent, the Issuing Bank or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

(b)  Each Lender may assign to one or more Eligible Assignees all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it), with notice to the Borrower (failure to provide or delay in providing such notice shall not invalidate such assignment) and the prior written consent of the Administrative Agent (not to be unreasonably withheld or delayed); provided, however, that (i) in the case of an assignment of a L/C Credit Commitment, each of the Borrower and the Issuing Bank must also give its prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed) (provided that (A) the consent of the Borrower shall not be required for any such assignment made (1) to another L/C Credit Lender or (2) after the occurrence and during the continuance of any Default or Event of Default and (B) the consent of the Borrower will be deemed to have been given if the Borrower has not responded within five business days of a request for such consent), (ii) the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall be in an integral multiple of, and not less than, $1,000,000 (or, if less, the entire remaining amount of such Lender's Commitment or Loans of the relevant Class); provided that simultaneous assignments by or to two or more Related Funds shall be combined for purposes of determining whether the minimum assignment requirement is met, (iii) the parties to each assignment shall (A) execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent or (B) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Acceptance, and, in each case, shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent), (iv) the assignee, if it is not a Lender, shall

92

deliver to the Administrative Agent an Administrative Questionnaire (in which the assignee shall designate one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws) and, to the Administrative Agent and the Borrower, all applicable tax forms (including the tax forms required pursuant to Section 2.20(e) hereof), (v) [reserved] and (vi) a Lender may not make any assignment to Sponsor or its Affiliates. Upon acceptance and recording pursuant to paragraph (e) of this Section 9.04, from and after the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement and (B) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.14, 2.16, 2.20 and 9.05, as well as to any Fees accrued for its account and not yet paid).

(c)  By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows: (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and that its Term Loan Commitment and L/C Credit Commitment, and the outstanding balances of its Term Loans and L/C Loans, in each case without giving effect to assignments thereof which have not been effective, are as set forth in such Assignment and Acceptance, (ii) except as set forth in (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Borrower or any Subsidiary or the performance or observance by the Borrower or any Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants that it is an Eligible Assignee legally authorized to enter into such Assignment and Acceptance; (iv) [reserved]; (v) such assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements referred to in Section 3.05 or delivered pursuant to Section 5.04 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (vi) such assignee will independently and without reliance upon the Administrative Agent, the Collateral Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vii) such assignee appoints and authorizes the Administrative Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers

WEIL:\95701648\1\44444.0005

under this Agreement as are delegated to the Administrative Agent and the Collateral Agent, respectively, by the terms hereof, together with such powers as are reasonably incidental thereto; and (viii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)   The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in The City of New York a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of and interest on the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive and the Borrower, the Administrative Agent, the Issuing Bank, the Collateral Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, the Issuing Bank, the Collateral Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)   Upon its receipt of, and consent to, a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) above, if applicable, and the written consent of the Administrative Agent and, if required, the Borrower and the Issuing Bank to such assignment and any applicable tax forms, the Administrative Agent shall (i) accept such Assignment and Acceptance and (ii) record the information contained therein in the Register. No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (e).

(f)   Each Lender may without the consent of the Borrower, the Issuing Bank or the Administrative Agent sell participations to one or more banks or other Persons in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided, however, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other Persons shall be entitled to the benefit of the cost protection provisions contained in Sections 2.14, 2.16 and 2.20 to the same extent as if they were Lenders (but, with respect to any particular participant, to no greater extent than the Lender that sold the participation to such participant, and only if such participant provides any necessary documentation to the Administrative Agent and the Borrower under Section 2.20 as if it were a Lender hereunder), and (iv) the Borrower, the Administrative Agent, the Issuing Bank and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Borrower relating to the Loans or L/C Disbursements and to approve any amendment, modification or waiver of any provision of this Agreement (other than, if agreed to between such participating bank or Person and the applicable Lender, amendments,

modifications or waivers decreasing any fees payable to such participating bank or Person hereunder or the amount of principal of or the rate at which interest is payable on the Loans in which such participating bank or Person has an interest, extending any scheduled principal payment date or date fixed for the payment of interest on the Loans in which such participating bank or Person has an interest, increasing or extending the Commitments in which such participating bank or Person has an interest or releasing any Guarantor (other than in connection with the sale of such Guarantor in a transaction permitted by Section 6.05) or all or substantially all of the Collateral).   To the extent permitted by law, each participating bank or other Person also shall be entitled to the benefits of Section 9.06 as though it were a Lender, provided that such participating bank or other Person agrees to be subject to Section 2.18 as though it were a Lender.   Any Lender that sells participations as permitted hereunder shall collect from such participants the forms, certificates or other documents described in Section 2.20(e) as if such participant were a Lender, and shall provide them to the Borrower.   Each Lender having sold a participation under this Agreement, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain a register (the "Participant Register") for the recordation of the names and addresses of such participants and the rights, interests or obligations of such participants in any Loan and in any right to receive any payments hereunder (including, in particular, the principal amounts and stated interest of each Participant's interest in any Loan or other obligations under this Agreement).   The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.   The Participant Register shall be available for inspection by the Borrower and the Administrative Agent at any time and from time to time upon reasonable prior notice.

(g)   Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.04, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; provided that, prior to any such disclosure of information designated by the Borrower as confidential, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree (subject to customary exceptions) to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Lenders pursuant to Section 9.16.

(h)   Any Lender may at any time assign all or any portion of its rights under this Agreement to secure extensions of credit to such Lender or in support of obligations owed by such Lender; provided that no such assignment shall release a Lender from any of its obligations hereunder or substitute any such assignee for such Lender as a party hereto.

(i)   Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (an "SPV"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to

this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it will not institute against, or join any other Person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this Section 9.04, any SPV may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.

(j)    Neither Holdings nor the Borrower shall assign or delegate any of its rights or duties hereunder without the prior written consent of the Administrative Agent, the Issuing Bank and each Lender, and any attempted assignment without such consent shall be null and void.

(k)    In the event that any L/C Credit Lender shall become a Defaulting Lender or S&P, Moody's and Thompson's BankWatch (or InsuranceWatch Ratings Service, in the case of Lenders that are insurance companies (or Best's Insurance Reports, if such insurance company is not rated by Insurance Watch Ratings Service)) shall, after the date that any Lender becomes a L/C Credit Lender, downgrade the long-term certificate deposit ratings of such Lender, and the resulting ratings shall be below BBB-, Baa3 and C (or BB, in the case of a Lender that is an insurance company (or B, in the case of an insurance company not rated by InsuranceWatch Ratings Service)) (or, with respect to any L/C Credit Lender that is not rated by any such ratings service or provider, the Issuing Bank shall have reasonably determined that there has occurred a material adverse change in the financial condition of any such Lender, or a material impairment of the ability of any such Lender to perform its obligations hereunder, as compared to such condition or ability as of the date that any such Lender became a L/C Credit Lender) then the Issuing Bank shall have the right, but not the obligation, at its own expense, upon notice to such Lender and the Administrative Agent, to replace such Lender with an assignee (in accordance with and subject to the restrictions contained in paragraph (b) above), and such Lender hereby agrees to transfer and assign without recourse (in accordance with and subject to the restrictions contained in paragraph (b) above) all its

interests, rights and obligations in respect of its L/C Credit Commitment to such assignee; provided, however, that (i) no such assignment shall conflict with any law, rule and regulation or order of any Governmental Authority and (ii) the Issuing Bank or such assignee, as the case may be, shall pay to such Lender in immediately available funds on the date of such assignment the principal of and interest accrued to the date of payment on the Loans made by such Lender hereunder and all other amounts accrued for such Lender's account or owed to it hereunder.

(l)   Notwithstanding anything set forth in this Section 9.04, any assignment of Commitments and/or Loans of any Class on or prior to May 12, 2016 shall be a ratable assignment of the Commitments and/or Loans of the applicable Lenders and shall be made at par (net of "original issue discount") plus accrued interest with respect thereto.

(m)   This Agreement, the other Loan Documents, and all Liens and DIP Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Debtor, the estate of each Debtor, and any trustee, other estate representative or any successor in interest of any Debtor in any Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Administrative Agent and the Lenders and their respective assigns, transferees and endorsees.  The Liens and DIP Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Debtor to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Administrative Agent file financing statements or otherwise perfect its Liens or DIP Liens under applicable law. No Loan Party may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of the Administrative Agent and the Lenders.  Any such purported assignment, transfer, hypothecation or other conveyance by any Loan Party without the prior express written consent of the Administrative Agent and the Lenders shall be void.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Loan Party, the Administrative Agent and the Lenders with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

Notwithstanding the foregoing provisions of this Section 9.04, nothing in this Section 9.04 is intended to or should be construed to limit the Borrower's right to prepay the Obligations as provided hereunder, including under Sections 2.11 and 2.13(a).

SECTION 9.05.  *Expenses; Indemnity*.   (a) The Borrower and each Guarantor Holdings agree, jointly and severally, to pay all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses (i) incurred by the Administrative Agent (including (and limited, in the case of counsel, to) all reasonable

fees, costs, disbursements and expenses of the Administrative Agent's outside counsel, K&S, and, to the extent necessary, one firm of local counsel engaged by the Administrative Agent in connection with the Loan Parties' Chapter 11 Cases), the Collateral Agent, Moelis and the Issuing Bank in connection with the negotiations, preparation, execution and delivery of the Loan Documents, including, without limitation, all due diligence, transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the Administrative Agent and its counsel and professional advisors in connection with the DIP Facility, the Loan Documents or the transaction contemplated thereby, the administration of the DIP Facility and any amendment or waiver of any provision of the Loan Documents, (whether or not the transactions hereby or thereby contemplated shall be consummated) or (ii) incurred by the Administrative Agent, the Collateral Agent or any Lender in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents or in connection with the Loans made or Letters of Credit issued hereunder, in each case, including the fees, charges and disbursements of K&S, counsel for the Administrative Agent and the Collateral Agent, and, in connection with any such enforcement or protection, the fees, charges and disbursements of one firm of local counsel for the Administrative Agent, the Collateral Agent or any Lender and other professional advisors.

(b) The Loan Parties agree, jointly and severally, to indemnify the Administrative Agent, the Collateral Agent, each Lender, the Issuing Bank and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel fees, charges and disbursements, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated thereby (including fundings under the DIP Facility), (ii) the use of the proceeds of the Loans or issuance of Letters of Credit, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (and regardless of whether such matter is initiated by a third party or by the Borrower, any other Loan Party or any of their respective Affiliates), or (iv) any Release or actual or alleged presence of Hazardous Materials on, at or under any property currently or formerly owned, leased or operated by the Borrower or any of the Subsidiaries, or any Environmental Liability related in any way to the Borrower or the Subsidiaries; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Indemnitee.  No Indemnitee shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Loan Party or any of its Related Persons for or in connection with the transactions contemplated hereby, except, with respect to any Indemnitee, to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have

resulted solely from such Indemnitee's gross negligence or willful misconduct or any of such Indemnitee's affiliates or their respective principals, directors, officers or employees.

(c)  To the extent that the Loan Parties fail to pay any amount required to be paid by them to the Administrative Agent, the Collateral Agent or the Issuing Bank under paragraph (a) or (b) of this Section 9.05, each Lender severally agrees to pay to the Administrative Agent, the Collateral Agent or the Issuing Bank, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent, the Collateral Agent or the Issuing Bank in its capacity as such.  For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the Aggregate L/C Credit Exposure, outstanding Term Loans and unused Commitments at the time (in each case, determined as if no Lender were a Defaulting Lender).

(d)  To the extent permitted by applicable law, no party hereto shall assert, and each hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof.

(e)  The provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the expiration of any Letter of Credit, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent any Lender or the Issuing Bank.  All amounts due under this Section 9.05 shall be payable on written demand therefor.

SECTION 9.06.  ***Right of Setoff***.  If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, except to the extent prohibited by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of the Borrower or Holdings against any of and all the obligations of the Borrower or Holdings now or hereafter existing under this Agreement and other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although such obligations may be unmatured.  The rights of each Lender under this Section 9.06 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 9.07.  ***Applicable Law***.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN LETTERS OF CREDIT AND AS EXPRESSLY

99

SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE. EACH LETTER OF CREDIT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OR RULES DESIGNATED IN SUCH LETTER OF CREDIT, OR IF NO SUCH LAWS OR RULES ARE DESIGNATED, THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS MOST RECENTLY PUBLISHED AND IN EFFECT, ON THE DATE SUCH LETTER OF CREDIT WAS ISSUED, BY THE INTERNATIONAL CHAMBER OF COMMERCE (THE "UNIFORM CUSTOMS") AND, AS TO MATTERS NOT GOVERNED BY THE UNIFORM CUSTOMS, THE LAWS OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE.

SECTION 9.08. *Waivers; Amendment*. (a) No failure or delay of the Administrative Agent, the Collateral Agent, any Lender or the Issuing Bank in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, the Collateral Agent, the Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on the Borrower or Holdings in any case shall entitle the Borrower or Holdings to any other or further notice or demand in similar or other circumstances.

(b) Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower, Holdings and the Required Lenders; provided, however, that no such agreement shall (i) decrease the principal amount of, or extend the maturity of or any scheduled principal payment date or date for the payment of any interest on any Loan or any date for reimbursement of an L/C Disbursement, or waive or excuse any such payment or any part thereof, or decrease the rate of interest on any Loan or L/C Disbursement, without the prior written consent of each Lender directly adversely affected thereby, (ii) increase or extend the Commitment or decrease or extend the date for payment of any Fees of any Lender without the prior written consent of such Lender, (iii) amend or modify the pro rata requirements of Section 2.17, the provisions of Section 9.04(j) or the provisions of this Section 9.08 or release any Guarantor (other than in connection with the sale of such Guarantor in a transaction permitted by Section 6.05) or all or substantially all of the Collateral, without the prior written consent of each Lender, (iv) change the provisions of any Loan Document in a manner that by its terms adversely affects the rights in respect of payments due to Lenders holding Loans of one Class differently from the rights of Lenders holding Loans of any other Class without the

prior written consent of Lenders holding a majority in interest of the outstanding Loans and unused Commitments of each adversely affected Class, (v) modify the protections afforded to an SPV pursuant to the provisions of Section 9.04(i) without the written consent of such SPV or (vi) reduce the percentage contained in the definition of the term "Required Lenders" without the prior written consent of each Lender (it being understood that with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the Term Loan Commitments and L/C Credit Commitments on the date hereof); provided further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent, the Collateral Agent or the Issuing Bank hereunder or under any other Loan Document without the prior written consent of the Administrative Agent, the Collateral Agent or the Issuing Bank. Notwithstanding the foregoing, with the consent of Holdings, the Borrower and the Required Lenders, this Agreement (including Section 2.17) may be amended (i) to allow the Borrower to prepay Loans of a Class on a non-pro rata basis in connection with offers made to all the Lenders of such Class pursuant to procedures approved by the Administrative Agent and (ii) to allow the Borrower to make loan modification offers to all the Lenders of one or more Classes that, if accepted, would (A) allow the maturity and scheduled amortization of the Loans of the accepting Lenders to be extended, (B) increase the Applicable Margins or Fees payable with respect to the Loans and Commitments of the accepting Lenders and (C) treat the modified Loans and Commitments of the accepting Lenders as a new tranche of Loans and Commitments for all purposes under this Agreement.

(c)    [Reserved].

SECTION 9.09. *Interest Rate Limitation*. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan or participation in any L/C Disbursement, together with all fees, charges and other amounts which are treated as interest on such Loan or participation in such L/C Disbursement under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan or participation but were not payable as a result of the operation of this Section 9.09 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or participations or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.10. *Entire Agreement*. This Agreement, the Fee Letter and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof. Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents. Nothing in this Agreement or in the other Loan Documents, expressed or implied, is

WEIL:\95701648\1\44444.0005

intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder (including any Affiliate of the Issuing Bank that issues any Letter of Credit) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent, the Issuing Bank and the Lenders) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

SECTION 9.11. ***WAIVER OF JURY TRIAL***.   EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.    EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.

SECTION 9.12. ***Severability***.   In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).   The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 9.13. ***Counterparts***.   This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 9.03.   Delivery of an executed signature page to this Agreement by facsimile or other customary means of electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 9.14. ***Headings***.   Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 9.15. ***Jurisdiction; Consent to Service of Process***.   (a) Each of Holdings and the Borrower hereby irrevocably and unconditionally submits, for itself and

its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof except to the extent that the provisions of the Bankruptcy Code are applicable and specifically conflict with the foregoing, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Administrative Agent, the Collateral Agent, the Issuing Bank or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against the Borrower, Holdings or their respective properties in the courts of any jurisdiction.

(b)   Each of Holdings and the Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)   Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Notwithstanding any other provision of this Section 9.15, the Bankruptcy Court shall have exclusive jurisdiction over any action or dispute involving, relating to or arising out of this agreement or the other DIP Loan Documents.

SECTION 9.16.  *Confidentiality*.   Each of the Administrative Agent, the Collateral Agent, the Issuing Bank and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section 9.16, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this

WEIL:\95701648\1\44444.0005

Agreement and the other Loan Documents or any current or prospective investors of any Lender or any Related Fund of such Lender or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower or any Subsidiary or any of their respective obligations, (f) with the consent of the Borrower or (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 9.16. For the purposes of this Section 9.16, "Information" shall mean all information received from the Borrower or Holdings and related to the Borrower or Holdings or their business, other than any such information that was available to the Administrative Agent, the Collateral Agent, the Issuing Bank or any Lender on a nonconfidential basis prior to its disclosure by the Borrower or Holdings; provided that, in the case of Information received from the Borrower or Holdings after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 9.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information.

SECTION 9.17. **_Lender Action_**. Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, unless expressly provided for herein or in any other Loan Document, without the prior written consent of the Administrative Agent. The provisions of this Section 9.17 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

SECTION 9.18. **_USA PATRIOT Act Notice_**. Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Holdings and the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies Holdings, the Borrower and any Guarantor, which information includes the name and address of Holdings, the Borrower and any Guarantor and other information that will allow such Lender or the Administrative Agent, as applicable, to identify Holdings, the Borrower and any Guarantor in accordance with the USA PATRIOT Act.

SECTION 9.19. **_Acknowledgement and Consent to Bail-In of EEA Financial Institutions_**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

WEIL:\95701648\1\44444.0005

(a)  the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)  the effects of any Bail-in Action on any such liability, including, if applicable:

(i) a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

SECTION 9.20.  *Exit Financing*.   The Administrative Agent and the Lenders agree that, on the date of consummation of a joint prepackaged plan in the form filed with the Bankruptcy Court on the Petition Date, together with such modifications as may be agreed by the Administrative Agent and Required Lenders in their sole discretion (the "Prepackaged Plan"), which Prepackaged Plan shall be solicited and approved by Prepetition Lenders holding at least 66 $^2/_3$% in funded amount outstanding under the Prepetition Loan Documents (collectively, the "Requisite Consenting Lenders"), (x) the Term Facility shall be converted into a first-out exit term loan with a maturity date of 42 months from the Effective Date, and (y) the LC Facility shall be converted into a first-out letter of credit facility with a maturity date of 2 years from the Effective Date, in each case, on substantially similar terms as those provided in the Prepetition Credit Agreement pursuant to the terms of the Prepackaged Plan.

*[Signature pages follow.]*

WEIL:\95701648\1\44444.0005

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

FAIRWAY GROUP ACQUISITION COMPANY,

by

_____
Name:
Title:

FAIRWAY GROUP HOLDINGS CORP.,

by

_____
Name:
Title:

[*Signature Page to Credit Agreement*]

CREDIT SUISSE AG, CAYMAN
ISLANDS BRANCH, individually and as
Administrative Agent, Collateral Agent and
Issuing Bank,

by

_____
Name:
Title:


by

_____
Name:
Title:

*[Signature Page to Credit Agreement]*

BANK OF AMERICA, N.A., as a L/C
Credit Lender,

by

_____
Name:
Title:

JEFFERIES FINANCE, LLC, as a L/C
Credit Lender,

by

_____
Name:
Title:

WEIL:\95701648\1\44444.0005

**Exhibit 2**

**Commitment Letter**

**CONFIDENTIAL**

May 2, 2016

Fairway Group Acquisition Company
Fairway Group Holdings Corp.
2284 12th Avenue
New York, New York 10027
Attention: Chief Financial Officer

Fairway Group Acquisition Company
<u>$85,611,941</u> DIP Facility
<u>DIP Commitment Letter</u>

Ladies and Gentlemen:

Each of the undersigned (collectively, the "<u>DIP Commitment Parties</u>" and each individually, a "<u>DIP Commitment Party</u>") hereby, severally but not jointly, commit to provide (directly and/or through one or more of its affiliates and direct or indirect subsidiaries) its share of commitments set forth on Schedule I hereto of a **$85,611,941** superpriority senior secured debtor-in-possession credit facility (the "<u>DIP Facility</u>") to Fairway Group Acquisition Company (the "<u>Borrower</u>"), and Credit Suisse AG, Cayman Islands Branch, hereby agrees to act as administrative agent for the DIP Facility (the "<u>DIP Agent</u>"), in connection with the Borrower's, Fairway Group Holdings Corp.'s ("<u>Holdings</u>") and certain of their respective subsidiaries' filing of petitions for relief (collectively, the "<u>Bankruptcy Case</u>") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq (the "<u>Bankruptcy Code</u>") and implementing a restructuring by means of a "prepackaged" plan of reorganization (the "<u>Plan</u>" and the transactions contemplated thereby, the "<u>Transaction</u>") as set forth in that Plan Support Agreement, dated as of the date hereof, by and among the Borrower, Holdings, their respective subsidiaries and certain of its lenders (the "<u>Plan Support Agreement</u>").

In addition, each of the DIP Commitment Parties (for themselves and on behalf of any of their successors and assigns) hereby commits that, on the date on which the Transactions contemplated by the Plan are consummated in accordance with terms of the Plan Support Agreement, such DIP Commitment Parties shall roll their outstanding loans and commitments under the DIP Facility into the exit financing facility described in that certain Commitment Letter and Term Sheet, dated as of the date hereof, by and among the Borrower and its Subsidiaries, Credit Suisse AG, Cayman Islands Branch, as agent, and the financial institutions and other lenders party thereto.

The DIP Commitment Parties' commitments are subject to the terms and conditions set forth herein and in the Summary of Proposed Terms and Conditions attached as Exhibit A (the "<u>DIP Term Sheet</u>" and, together with this letter, the "<u>DIP Commitment Letter</u>"). Capitalized terms used in the text of this DIP Commitment Letter without definition have the meanings assigned in the DIP Term Sheet.

Any assignment by a DIP Commitment Party of all or any portion of its Term Commitment (and outstanding DIP Loans) and/or LC Commitment (and reimbursement obligations and outstanding participation interests in outstanding DIP LCs), as applicable, and any joinder hereto by the assignee party to such assignment, in each case, on or before May 12, 2016, shall reduce the Term Commitment (and outstanding DIP Loans) and/or LC Commitment (and reimbursement obligations and outstanding participation interests in outstanding DIP LCs), as applicable, of the DIP Commitment Parties

party hereto on the date hereof on a pro rata basis. The joinder agreement to be executed by any such assignee in respect of any such assignment shall be in the form of Exhibit B attached hereto (each, a "Joinder Agreement"). Schedule I hereto shall be deemed updated by Annex A attached to any Joinder Agreement. Any such assignment shall be at par (net of "original issue discount") plus accrued interest.

*Evaluation Material*.

You hereby represent to the best of your knowledge and covenant that (a) all written information other than projections ("Projections") and general economic or specific industry information (the "Information") that has been or will be made available to the DIP Commitment Parties and/or the DIP Lenders by you, or any of your affiliates or representatives, taken as a whole, is or will be, when furnished, correct in all material respects and does not or will not, taken as a whole when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (b) the Projections that have been or will be made available to the DIP Commitment Parties by you or any of your affiliates or representatives have been or will be prepared in good faith based upon assumptions believed to be reasonable at the time made (it being understood and agreed that financial projections are not a guarantee of financial performance and actual results may differ from financial projections and such differences may be material). You agree that if at any time prior to the closing of the DIP Facility, you become aware that any of the representations in the preceding sentence would be incorrect in any material respect if the Information or Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement the Information or the Projections, as the case may be, so that such representations will be correct in all material respects under those circumstances. You understand that in making its commitment hereunder, each DIP Commitment Party may use and rely on the Information and Projections without independent verification thereof.

You hereby authorize and agree, on behalf of yourself and your affiliates, that the Information, the Projections and all other information (including third party reports) provided by or on behalf of you and your affiliates to the DIP Commitment Parties regarding you and your affiliates, in connection with the DIP Facility, the Transaction and the transactions contemplated hereby may be disseminated by or on behalf of the DIP Commitment Parties, and made available, to prospective DIP Lenders and their advisors, who have each agreed to be bound by customary confidentiality undertakings (including "click-through" agreements) (whether transmitted electronically by means of a website, e-mail or otherwise, or made available orally or in writing, including at prospective DIP Lender or other meetings). You hereby further authorize the DIP Commitment Parties to download copies of your logos and agree to use commercially reasonable efforts to obtain authorization to permit the DIP Commitment Parties to download copies of your logos, from your websites and post copies thereof on an IntraLinks® or similar workspace and use such logos on any materials prepared in connection with the DIP Facility.

*Expenses*.

Regardless of whether the DIP Facility closes, you hereby agree to reimburse the DIP Commitment Parties and the DIP Agent, as applicable, for all reasonable fees and expenses incurred by the DIP Commitment Parties and DIP Agent in connection with the DIP Facility (including, but not limited to, (a) all reasonable costs and out-of-pocket expenses of one primary legal counsel (which shall be King & Spalding LLP) and one local counsel in all relevant jurisdictions for all DIP Commitment Parties and the DIP Agent and (b) all reasonable costs and out-of-pocket expenses of one financial advisor for all DIP Commitment Parties and the DIP Agent.

*Confidentiality*.

You agree that you will not disclose the contents of this DIP Commitment Letter, the DIP Fee Letter dated as of the date hereof (the "DIP Fee Letter") among the DIP Commitment Parties, Holdings and the Borrower or the DIP Commitment Parties' involvement with the DIP Facility to any third party (including, without limitation, any financial institution or intermediary) without each DIP Commitment Party's prior written consent other than to (a) those individuals who are your directors, officers, employees, attorneys or advisors in connection with the DIP Facility; provided that this DIP Commitment Letter and the DIP Fee Letter may also be disclosed to your equity holders, directors, officers, employees, attorneys and advisors on a confidential basis, (b) as may be compelled in a judicial or administrative proceeding or as otherwise required by law (in which case you agree to inform the DIP Commitment Parties promptly thereof), (c) to the extent necessary in connection with the exercise of any remedies or enforcement of any rights hereunder and (d) other recipients as required by the Bankruptcy Court or the Plan Support Agreement, or as part of the Borrower and its subsidiaries' disclosure statement soliciting votes in support of the Plan, whether before or after the commencement of the Bankruptcy Case.  Except in connection with the disclosure statement soliciting votes in support of the Plan, you agree to inform all such persons who receive information concerning the DIP Commitment Parties, this DIP Commitment Letter or the DIP Fee Letter that such information is confidential and may not be used for any purpose other than in connection with the Transaction and may not be disclosed to any other person.  The DIP Commitment Parties reserve the right to review and approve, in advance, all materials, press releases, advertisements and disclosures that contain their name or any affiliate's name or describe their respective financing commitment.

Each of Holdings and the Borrower hereby agrees that if the DIP Fee Letter is required to be filed with any bankruptcy court or disclosed to any U.S. Trustee for purposes of obtaining approval to pay any fees provided for therein or otherwise, then it shall promptly notify the DIP Commitment Parties and take all reasonable actions necessary to prevent the DIP Fee Letter from becoming publicly available, including, without limitation, filing a motion pursuant to sections 105(a) and 107(b) of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure seeking a bankruptcy court order authorizing the Borrower to file the DIP Fee Letter under seal to the maximum extent permitted by applicable law; provided, however, that if the applicable bankruptcy court or applicable law does not permit such filing under seal, then any such filing shall be redacted to the maximum extent permitted by such bankruptcy court and such law and approved by the DIP Commitment Parties in writing (such approval not to be unreasonably withheld).  The provisions of this section shall survive any termination or completion of the arrangement provided by this DIP Commitment Letter.

*Indemnity.*

Regardless of whether the DIP Facility is closed, you agree to (a) indemnify, defend and hold each of the DIP Commitment Parties, the DIP Agent, each DIP Lender, and their respective affiliates and the principals, directors, officers, employees, representatives, agents, attorneys and third party advisors of each of them (each, an "Indemnified Person") harmless from and against all losses, disputes, claims, investigations, litigation, proceedings, expenses (including, but not limited to, attorneys' fees), damages, and liabilities of any kind to which any Indemnified Person may become subject in connection with this DIP Commitment Letter, the DIP Fee Letter, the DIP Facility, the use or the proposed use of the proceeds thereof, the Transaction or any other transaction contemplated by this DIP Commitment Letter (each, a "Claim", and collectively, the "Claims"), regardless of whether such Indemnified Person is a party thereto (and regardless of whether such matter is initiated by a third party, you, or any of your or its respective affiliates), and (b) reimburse each Indemnified Person upon demand for all legal and other expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (each, an "Expense"); provided that no Indemnified Person

DMSLIBRARY01\28799471.v12

shall be entitled to indemnity hereunder in respect of any Claim or Expense to the extent that the same (i) is found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence, willful misconduct or bad faith of such Indemnified Person or any of its affiliates and their principals, directors, officers, employees, representatives, agents, attorneys or third party advisors, (ii) is found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from a material breach of the obligations of such Indemnified Person or any of its affiliates and their principals, directors, officers, employees, representatives, agents, attorneys or third party advisors under this Commitment Letter or (iii) arises from any dispute among Indemnified Persons (other than any claims against any DIP Commitment Party or the DIP Agent in its capacity or in fulfilling its role as an agent under the DIP Facility).  No party hereto or any of their respective affiliates shall be liable for any punitive, exemplary, consequential or indirect damages alleged in connection with, arising out of, or relating to, any Claims, this DIP Commitment Letter, the DIP Fee Letter, the DIP Facility, the use or the proposed use of the proceeds thereof, the Transaction, and any other transaction contemplated by this DIP Commitment Letter; provided that this sentence shall not limit your indemnification obligations set forth in this paragraph.

Furthermore, you hereby acknowledge and agree that the use of electronic transmission is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse.  You agree to assume and accept such risks and hereby authorize the use of transmission of electronic transmissions, and that none of the DIP Commitment Parties nor any of their respective affiliates will have any liability for any damages arising from the use of such electronic transmission systems, except to the extent such damages have been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence, willful misconduct or bad faith of such DIP Commitment Party or any of its affiliates and their principals, directors, officers, employees, representatives, agents, attorneys or third party advisors.

_Sharing Information; Absence of Fiduciary Relationship._

You acknowledge that the DIP Commitment Parties, the DIP Agent and their respective affiliates may be providing debt financing, equity capital or other services to other companies with which you may have conflicting interests.  You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and any of the DIP Commitment Parties or the DIP Agent has been or will be created in respect of any of the transactions contemplated by this DIP Commitment Letter, irrespective of whether the DIP Commitment Parties, the DIP Agent and/or their respective affiliates have advised or are advising you on other matters and (b) you will not assert any claim against any of the DIP Commitment Parties or the DIP Agent for breach or alleged breach of fiduciary duty and agree that none of the DIP Commitment Parties or the DIP Agent shall have any direct or indirect liability to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of you, including your stockholders, employees or creditors.

_Assignments and Amendments._

This DIP Commitment Letter shall not be assignable by you without the prior written consent of the DIP Commitment Parties (and any purported assignment without such consent shall be null and void), and is solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the Indemnified Persons.  The DIP Commitment Parties may assign their respective commitments hereunder, in whole or in part, to any of their affiliates, any funds or accounts managed, advised, sub-managed or sub-advised by them or their affiliates or, subject to the prior written consent of the Borrower (such consent not to be unreasonably withheld or delayed) to any prospective DIP Lender; _provided_ that, in each case, any such assignment

- 4 -

shall not release them of the obligations hereunder. This DIP Commitment Letter may not be amended or waived except in a written instrument signed by you, the DIP Commitment Parties and the DIP Agent.

*Counterparts and Governing Law*.

This DIP Commitment Letter may be executed in counterparts, each of which shall be deemed an original and all of which counterparts shall constitute one and the same document.  Delivery of an executed signature page of this DIP Commitment Letter by facsimile or electronic (including "PDF") transmission shall be effective as delivery of a manually executed counterpart hereof.

The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this DIP Commitment Letter, including, without limitation, its validity, interpretation, construction, performance and enforcement and any claims sounding in contract law or tort law arising out of the subject matter hereof.

*Venue and Submission to Jurisdiction*.

The parties hereto consent and agree that the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Bankruptcy Case, shall have exclusive jurisdiction to hear and determine any claims or disputes between or among any of the parties hereto pertaining to this DIP Commitment Letter, the DIP Fee Letter, the DIP Facility, the Transaction, any other transaction relating hereto or thereto, and any investigation, litigation, or proceeding in connection with, related to or arising out of any such matters; provided that if the Bankruptcy Court abstains from or does not accept jurisdiction over such dispute or the Bankruptcy Case is not commenced, exclusive jurisdiction shall be in state or federal courts located in New York County, State of New York, except that the parties hereto acknowledge that any appeal from those courts may have to be heard by a court located outside of such jurisdiction.  The parties hereto expressly submit and consent in advance to such jurisdiction in any action or suit commenced in any such court, and hereby waive any objection, which each of the parties may have based upon lack of personal jurisdiction, improper venue or inconvenient forum.

*Waiver of Jury Trial*.

THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS DIP COMMITMENT LETTER, THE DIP FEE LETTER, THE DIP FACILITY, THE TRANSACTION AND ANY OTHER TRANSACTION RELATED HERETO OR THERETO.  THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

*Survival*.

The provisions of this letter set forth under this heading and the headings "Evaluation Material", "Expenses", "Confidentiality", "Indemnity", "Sharing Information; Absence of Fiduciary Relationship", "Assignments and Amendments", "Counterparts and Governing Law", "Venue and Submission to Jurisdiction" and "Waiver of Jury Trial" shall survive the termination or expiration of this DIP Commitment Letter and shall remain in full force and effect regardless of whether the DIP Facility is closed or the credit documentation with respect to the DIP Facility shall be executed and delivered; provided that if the DIP Facility is closed and the credit documentation with respect to the DIP Facility shall be executed and delivered, the provisions under the heading "Expenses", "Confidentiality", "Indemnity", and "Sharing Information; and Absence of Fiduciary Relationship" shall be superseded and

DMSLIBRARY01\28799471.v12

deemed replaced by the terms of the credit documentation with respect to the DIP Facility governing such matters.

*Integration*.

This DIP Commitment Letter and the DIP Fee Letter supersede any and all discussions, negotiations, understandings or agreements, written or oral, express or implied, between or among the parties hereto and their affiliates as to the subject matter hereof.

*Patriot Act*.

The DIP Commitment Parties hereby notify you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "PATRIOT Act"), each DIP Lender may be required to obtain, verify and record information that identifies the Borrower and each Guarantor, which information includes the name, address, tax identification number and other information regarding the Borrower and each Guarantor that will allow such DIP Lender to identify the Borrower and each Guarantor in accordance with the PATRIOT Act.  This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to each DIP Lender.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

DMSLIBRARY01\28799471.v12

Please indicate your acceptance of the terms hereof and of the DIP Fee Letter by signing in the appropriate space below and in the DIP Fee Letter and returning to the DIP Commitment Parties such signature pages by 5:00 p.m., New York time on May 2, 2016. Unless extended in writing by the DIP Commitment Parties, the commitments and agreements of the DIP Commitment Parties contained herein (subject to the provisions under the heading "Survival") shall automatically expire on the first to occur of (a) the date and time referred to in the previous sentence unless you shall have executed and delivered a copy of this DIP Commitment Letter and the DIP Fee Letter, as provided above, (b) 5:00 p.m. New York time on May 9, 2016, and (c) execution and delivery of the credit documentation with respect to the DIP Facility and funding of the DIP Facility.

Sincerely,

Name:     CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH

By:
Name:     Didier Siffer
Title:     Authorized Signatory


By:
Name:     Julia Bykhovskaia
Title:     Authorized Signatory

[Signature Page to DIP Commitment Letter]

Name:       SPECIAL SITUATIONS INVESTING GROUP, INC.

By:         _____

Name:       DANIEL S. ONEGLIA

Title:      AUTHORIZED SIGNATORY

[Signature Page to DIP Commitment Letter]

Name:      BJC HEALTH SYSTEM – 1
BJC PENSION PLAN TRUST
PPG INDUSTRIES, INC. PENSION PLAN TRUST

BY: GSO CAPITAL ADVISORS LLC, AS ITS INVESTMENT MANAGER

BLACKSTONE / GSO SENIOR FLOATING RATE TERM FUND
BLACKSTONE / GSO STRATEGIC CREDIT FUND

BY: GSO / BLACKSTONE DEBT FUNDS MANAGEMENT LLC, AS
INVESTMENT ADVISER

COOPER RIVER FUNDING LLC
BY: FS INVESTMENT CORPORATION II, AS SOLE MEMBER
BY: GSO / BLACKSTONE DEBT FUNDS MANAGEMENT LLC, AS SUB-
ADVISER

GERMANTOWN FUNDING LLC
BY: FS INVESTMENT CORPORATION III, AS SOLE MEMBER
BY: GSO  BLACKSTONE DEBT FUNDS MANAGEMENT LLC, AS SUB-
ADVISER

FS INVESTMENT CORPORATION III
BY: GSO / BLACKSTONE DEBT FUNDS MANAGEMENT LLC, AS SUB-
ADVISER

FS GLOBAL CREDIT OPPORTUNITIES FUND
BY: GSO CAPITAL PARTNERS LP, AS SUB-ADVISER

By:
Name:          Marisa Beeney
Title:          Authorized Signatory

BLACKSTONE/GSO GLOBAL DYNAMIC CREDIT FUNDING LIMITED

By:
Name:          Thomas Iannarone
Title:          Authorized Signatory

[Signature Page to DIP Commitment Letter]

**JEFFERIES FINANCE LLC**

By: _____

Name: J. Paul McDonnell

Title:   Managing Director

[Signature Page to DIP Commitment Letter]

Name:        BATTALION CLO 2007-I, LTD.
             By: Brigade Capital Management, LP as Collateral Manager

By:          _____

Name:        James D. Keogh

Title:       Operations Manager

[Signature Page to DIP Commitment Letter]

Name:      BATTALION CLO III LTD.
           By: Brigade Capital Management, LP as Collateral Manager

By:        _____
Name:      James D. Keogh
Title:     Operations Manager

[Signature Page to DIP Commitment Letter]

Name:          BATTALION CLO IV LTD.
               By: Brigade Capital Management, LP as Collateral Manager

By:            _____
Name:          James D. Keogh
Title:         Operations Manager

[Signature Page to DIP Commitment Letter]

Name:        BATTALION CLO IX LTD.
             By: Brigade Capital Management, LP as Collateral Manager

By:          _____
Name:        James D. Keogh
Title:       Operations Manager

[Signature Page to DIP Commitment Letter]

Name:       BATTALION CLO V Ltd.
            By: Brigade Capital Management, LP as Collateral Manager

By:         _____
Name:       James D. Keogh
Title:      Operations Manager

[Signature Page to DIP Commitment Letter]

Name: BATTALION CLO VI LTD.
   By: Brigade Capital Management, LP as Collateral Manager

By:
Name: James D. Keogh
Title: Operations Manager

[Signature Page to DIP Commitment Letter]

Name:        BATTALION CLO VII LTD.
             By: Brigade Capital Management, LP as Collateral Manager

By:          _____

Name:        James D. Keogh

Title:       Operations Manager

[Signature Page to DIP Commitment Letter]

Name:      BATTALION CLO VIII LTD.
             By: Brigade Capital Management, LP as Collateral Manager

By:         _____
Name:      James D. Keogh
Title:       Operations Manager

[Signature Page to DIP Commitment Letter]

Name:        BLUE FALCON LIMITED
             By: Brigade Capital Management, LP as Investment Manager

By:          _____
Name:        James D. Keogh
Title:       Operations Manager

Name:     BLUE PEARL B 2015 LIMITED
          By: Brigade Capital Management, LP as Investment Manager

By:       _____
Name:     James D. Keogh
Title:    Operations Manager

[Signature Page to DIP Commitment Letter]

Name:        BRIGADE DISTRESSED VALUE MASTER FUND LTD.
             By: Brigade Capital Management, LP as Investment Manager

By:          _____
Name:        James D. Keogh
Title:       Operations Manager

[Signature Page to DIP Commitment Letter]

Name:        BRIGADE LEVERAGED CAPITAL STRUCTURES FUND LTD.
             By: Brigade Capital Management, LP as Investment Manager

By:          _____
Name:        James D. Keogh
Title:       Operations Manager

[Signature Page to DIP Commitment Letter]

Name:          JPMORGAN CHASE RETIREMENT PLAN
               By: Brigade Capital Management, LP as Investment Manager

By:            _____
Name:          James D. Keogh
Title:         Operations Manager

[Signature Page to DIP Commitment Letter]

Name:     BANK OF AMERICA, N.A.

By:       _____ V.P.
Name:     MAtthew Wright  V.P.
Title:    Vice President

[Signature Page to DIP Commitment Letter]

AGREED AND ACCEPTED

THIS ___2nd___ DAY OF ___May___, 2016

**FAIRWAY GROUP HOLDINGS CORP.**

By: _____
Name: Edward C. Arditte
Title: Co-President and Chief Financial Officer

**FAIRWAY GROUP ACQUISITION COMPANY**

By: _____
Name: Edward C. Arditte
Title: Co-President and Chief Financial Officer

[Signature Page to DIP Commitment Letter]

Schedule 1

Lenders and Commitments

Term Lenders

| Lender | Commitment | Address |
|---|---|---|
| Blackstone / GSO Strategic Credit Fund | $903,431.39 | Robert Zable<br>345 Park Avenue<br>31st Floor<br>New York, NY 10154<br>Robert.Zable@gso.com;<br>GSOCLOOPS@blackstone.com |
| Blackstone / GSO Senior Floating Rate Term Fund | $256,589.75 | Robert Zable<br>345 Park Avenue<br>31st Floor<br>New York, NY 10154<br>Robert.Zable@gso.com;<br>GSOCLOOPS@blackstone.com |
| BJC Health System - 1 | $1,075,727.47 | Robert Zable<br>345 Park Avenue<br>31st Floor<br>New York, NY 10154<br>Robert.Zable@gso.com;<br>GSOCLOOPS@blackstone.com |
| BJC Pension Plan Trust | $172,513.80 | Robert Zable<br>345 Park Avenue<br>31st Floor<br>New York, NY 10154<br>Robert.Zable@gso.com;<br>GSOCLOOPS@blackstone.com |
| PPG Industries, Inc. Pension Plan Trust | $517,460.34 | Robert Zable<br>345 Park Avenue<br>31st Floor<br>New York, NY 10154<br>Robert.Zable@gso.com;<br>GSOCLOOPS@blackstone.com |
| CCP Loan Funding LLC | $4,212,068.87 | Robert Zable<br>345 Park Avenue<br>31st Floor<br>New York, NY 10154<br>Robert.Zable@gso.com;<br>GSOCLOOPS@blackstone.com |
| Germantown Funding LLC | $1,441,930.88 | Robert Zable<br>345 Park Avenue<br>31st Floor<br>New York, NY 10154 |

| | | Robert.Zable@gso.com; GSOCLOOPS@blackstone.com |
|---|---|---|
| Cooper River LLC | $2,502,103.59 | Robert Zable<br>345 Park Avenue<br>31st Floor<br>New York, NY 10154<br>Robert.Zable@gso.com;<br>GSOCLOOPS@blackstone.com |
| FS Global Credit Opportunities Fund | $6,053,677.86 | Robert Zable<br>345 Park Avenue<br>31st Floor<br>New York, NY 10154<br>Robert.Zable@gso.com;<br>GSOCLOOPS@blackstone.com |
| Blackstone / GSO Global Dynamic Credit Funding Limited | $1,302,595.13 | Robert Zable<br>345 Park Avenue<br>31st Floor<br>New York, NY 10154<br>Robert.Zable@gso.com;<br>GSOCLOOPS@blackstone.com |
| Credit Suisse AG, Cayman Islands Branch | $27,674,957.50 | Julia Bykhovskaia and Didier S. Siffer<br>Eleven Madison Avenue<br>23rd Floor<br>New York, NY 10010 |
| Goldman Sachs Special Situations | $8,886,943.41 | Cleaver Sower<br>Daniel Oneglia<br>200 West Street<br>New York, NY 10282<br>cleaver.sower@gs.com<br>daniel.oneglia@gs.com |
| **TOTAL:** | $55,000,000.00 | |

L/C Credit Lenders

| Lender | Commitment | Address |
|---|---|---|
| Apex Credit Partners LLC | $3,826,493.00 | Paul Mcdonnell and Eric Warden<br>520 Madison Avenue,<br>19th Floor<br>New York, NY 10022<br>pmcdonnell@jefferies.com<br>ewarden@jefferies.com |
| Bank of America, N.A. | $7,652,985.00 | Matthew Wright<br>214 North Tryon Street,<br>NC1-027-15-01<br>Charlotte, NC 28255 |

| | | matthew.wi.wright@bankofamerica.com |
|---|---|---|
| Credit Suisse AG, Cayman Islands Branch | $19,132,463.00 | Julia Bykhovskaia and Didier S. Siffer<br>Eleven Madison Avenue<br>23rd Floor<br>New York, NY 10010<br>julia.bykhovskaia@credit-suisse.com<br>didier.siffer@credit-suisse.com |
| **TOTAL:** | $30,611,941.00 | |

**Exhibit 3**

**Budget**

Highly Confidential
Prepared at the Request of Counsel
Preliminary Draft; Subject to Material Change
Contains Sensitive Business Information

**Fairway Market**
13-Week Cash Flow

| Fiscal Period | | Apr 2016 | May 2016 | | | | Jun 2016 | | | | Jul 2016 | | | | 13 Week |
| ($ in 000) | | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Total |
| Week Ended | | 8-May | 15-May | 22-May | 29-May | 5-Jun | 12-Jun | 19-Jun | 26-Jun | 3-Jul | 10-Jul | 17-Jul | 24-Jul | 31-Jul | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales | [1] | 14,348 | 13,883 | 13,814 | 14,248 | 14,916 | 13,721 | 13,619 | 13,511 | 13,987 | 13,705 | 12,980 | 12,761 | 12,714 | 178,206 |
| **Receipts** | | | | | | | | | | | | | | | |
| Net Sales Receipts | [2] | 13,284 | 14,123 | 13,952 | 14,036 | 14,545 | 14,372 | 13,603 | 13,675 | 13,744 | 13,715 | 13,397 | 12,998 | 12,830 | 178,274 |
| Other Receipts | [3] | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 193 | 2,509 |
| Total | | 13,477 | 14,316 | 14,145 | 14,229 | 14,738 | 14,565 | 13,796 | 13,868 | 13,937 | 13,908 | 13,590 | 13,191 | 13,023 | 180,783 |
| **Disbursements** | | | | | | | | | | | | | | | |
| Merchandise | [4] | (9,718) | (9,128) | (9,134) | (8,828) | (9,121) | (8,928) | (8,835) | (8,628) | (8,228) | (7,884) | (7,884) | (7,884) | (8,184) | (112,385) |
| Store-related & Other | [5] | (1,148) | (1,148) | (1,148) | (1,148) | (1,148) | (1,148) | (1,148) | (1,148) | (1,148) | (1,193) | (1,148) | (1,148) | (1,148) | (14,963) |
| Payroll | [6] | (2,524) | (3,024) | (3,624) | (2,524) | (2,524) | (2,524) | (3,024) | (3,624) | (2,524) | (2,225) | (2,725) | (3,325) | (2,225) | (36,418) |
| Rent | [7] | (1,020) | - | - | - | (3,400) | - | - | - | - | (2,000) | (1,400) | - | (2,000) | (9,820) |
| Other Occupancy | [8] | (270) | (270) | (270) | (270) | (270) | (270) | (270) | (270) | (270) | (270) | (270) | (280) | (270) | (3,508) |
| Taxes | [9] | - | - | (219) | (563) | - | (45) | (419) | (562) | - | - | - | - | (619) | (2,707) |
| Total | | (14,680) | (13,570) | (14,395) | (13,333) | (16,462) | (12,915) | (13,696) | (14,232) | (14,170) | (12,972) | (12,026) | (12,906) | (14,446) | (179,801) |
| **Net Cash Flow from Operations** | | (1,203) | 746 | (249) | 897 | (1,724) | 1,650 | 100 | (364) | (232) | 936 | 1,563 | 285 | (1,423) | 982 |
| **Other Disbursements** | | | | | | | | | | | | | | | |
| Insurance | [10] | - | - | (4,500) | - | - | - | - | - | - | - | - | - | - | (4,500) |
| CapEx | [11] | (100) | (100) | (100) | (100) | (100) | (100) | (100) | (100) | (100) | (100) | (100) | (100) | (69) | (1,269) |
| Debt Service | [12] | (963) | - | - | - | (147) | - | - | - | (370) | - | - | - | - | (1,479) |
| Other | [13] | - | - | - | - | - | - | - | - | - | - | - | (125) | - | (125) |
| Total | | (1,063) | (100) | (4,600) | (100) | (247) | (100) | (100) | (100) | (470) | (100) | (100) | (225) | (69) | (7,373) |
| **Restructuring Disbursements** | | | | | | | | | | | | | | | |
| Utility Deposits/UST Fees | [14] | (300) | (400) | (400) | - | (855) | - | - | - | - | - | - | (250) | - | (1,350) |
| Professional Fees | [15] | (3,407) | - | - | - | - | - | - | - | - | (1,155) | - | - | - | (5,417) |
| Total | | (3,707) | (400) | (400) | - | (855) | - | - | - | - | (1,155) | - | (250) | - | (6,767) |
| **Net Cash Flow** | | (5,972) | 246 | (5,249) | 797 | (2,826) | 1,550 | (0) | (464) | (702) | (319) | 1,463 | (190) | (1,492) | (13,157) |

| Cash Flow Reconciliation | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | | 6,135 | 12,963 | 13,209 | 7,960 | 8,756 | 5,930 | 47,480 | 47,480 | 47,016 | 46,314 | 45,996 | 47,459 | 47,269 | 6,135 |
| Net Proceeds from DIP Loan | | 12,800 | - | - | - | - | 40,000 | - | - | - | - | - | - | - | 52,800 |
| Net Cash Flow | | (5,972) | 246 | (5,249) | 797 | (2,826) | 1,550 | (0) | (464) | (702) | (319) | 1,463 | (190) | (1,492) | (13,157) |
| **Ending Cash Balance** | | 12,963 | 13,209 | 7,960 | 8,756 | 5,930 | 47,480 | 47,480 | 47,016 | 46,314 | 45,996 | 47,459 | 47,269 | 45,777 | 45,777 |